**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In re:

American Health Associates Holdings, Inc., *et al.*,[1]          Case No. 26-14825-SMG

      Debtor.          Chapter 11

_____ /

**DECLARATION OF CHRISTOPHER MARTIN IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Christopher Martin, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am the President of the Debtors, (1) American Health Associates Holdings, Inc., (2) American Health Associates Parent, LLC, (3) American Health Holdings, LLC, (4) American Health Holdings II, LLC, (5) American Health Holdings III, LLC, (6) American Health Holdings IV, LLC, (7) American Health MW, LLC, (8) American Health Imaging MW, LLC, (9) American Health S, LLC, (10) American Health Imaging S, LLC, (11) American Health W, LLC, (12) American Health NE, LLC, and (13) Mobile XRay Diagnostics, LLC (together, the "Debtors"). The various Debtors are Florida and Delaware entities, respectively, with their principal place of business being 15712 SW 41st St., Suite 16, Davie, FL 33331. I am authorized by the Debtors to submit this declaration (this "First Day Declaration") and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1] The Debtors in these jointly administered cases are: (1) American Health Associates Holdings, Inc.; (2) American Health Associates Parent, LLC; (3) American Health Holdings, LLC; (4) American Health Holdings II, LLC; (5) American Health Holdings III, LLC; (6) American Health Holdings IV, LLC; (7) American Health MW, LLC; (8) American Health Imaging MW, LLC; (9) American Health S, LLC; (10) American Health Imaging S, LLC; (11) American Health W, LLC; (12) American Health NE, LLC; and (13) Mobile Xray Diagnostic, LLC.

2.      I have served as the President of all thirteen Debtors since 2013. Shortly after stepping into my role, I led the acquisition of MEDLAB in 2014, an opportunity that allowed the Debtors to expand their nursing home laboratory offerings. I am familiar with the Debtors' day-to-day operations, organizational structure, and books and records from review of financial documents and discussions with other members of the Debtors' management and advisors. Except as noted in this First Day Declaration, the statements set forth herein are based on (a) my personal knowledge or opinion derived from my experience, (b) information that I have received from the Debtors' advisors or employees, and (c) my review of relevant documents. Any references to the Bankruptcy Code, the chapter 11 process, and related legal matters reflect my understanding of the explanations and advice of counsel to the Debtors.

3.      On April 17, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors will continue to operate their businesses and manage their affairs as debtors in possession.

4.      I submit this First Day Declaration on behalf of the Debtors in support of their voluntary petitions for relief and the first-day pleadings (the "First Day Motions") filed contemporaneously herewith. I am familiar with the Debtors' petitions and First Day Motions, and I believe that the relief sought in the First Day Motions is necessary to ensure the Debtors' business continues to operate during the chapter 11 process and to preserve the Debtors' enterprise value for the benefit of all parties in interest.

### The Debtors' Business

5.      The Debtors operate in the healthcare diagnostic space. Debbie Martin, the Debtors' Chief Executive Officer, founded the Debtors in October 1990 (with the exception of the mobile imaging business which was acquired in 2021). Over time, Debbie Martin positioned the Debtors

to provide clinical laboratory and mobile imaging services, aiming to provide high-quality care in patients' homes, nursing home facilities, and hospitals. The Debtors employ 1,047people.

6.　　A large number of the individuals the Debtors' serve are dual-enrolled in Medicaid and Medicare and are often located in rural, out-of-reach areas. Today, the Debtors serve over 2,700 healthcare facilities across 23 states, including more than 2,260 skilled nursing or other long term care facilities. Operations span four regions—Midwest, South, Northeast, and West—with particularly dense coverage in the Midwest and South.

7.　　A significant portion of the Debtors' client facilities are located in rural and underserved areas where alternative laboratory services are either unavailable or would require significant travel. Many of these skilled nursing facilities depend entirely on the Debtors for diagnostic testing. There is no current laboratory infrastructure that the Debtors are aware of in numerous rural areas that could rapidly absorb the Debtors' specimen volume in the event of a service disruption.

8.　　The Debtors deliver a health-at-bedside model, leveraging their 89 leased vehicles and employee-owned cars to deliver mobile phlebotomy and laboratory services and portable X-ray exams directly to patients. Test results are generally delivered to patients within hours of completing an exam, which is critical to the care of the Debtors' patients. The Debtors' patients' physicians rely on these results to make life-and-death clinical decisions. Without the Debtors' services, these patients would need to be transported to regional hospitals, disrupting continuity of care and straining already overburdened emergency systems.

9.　　In many of the rural communities the Debtors serve, the Debtors' operations also augment and in cases effectively supplant rural hospital diagnostics operations that lack the capacity, test menu, or turnaround time to serve the volume and acuity of testing required by skilled

3

nursing facility patients. The Debtors process tens of thousands of specimens daily across their laboratory network.

10. The Debtors do not own any real property. Rather, the Debtors lease property, specifically fourteen (14) laboratories that are in core geographic areas across the United States. The laboratories work in unison with traveling practitioners, with the laboratory clinicians providing reliable and quick diagnostic results upon completion of a patient exam. The Debtors lease a further thirty spin sites where blood is spun as part of the testing process. The Debtors also have eight draw locations and six office locations. The Debtors' principal place of business is 15712 SW 41st St., Suite #16, Davie, FL.

11. The thirteen Debtors share common management and ownership. Debtor American Health Associates Holdings, Inc. serves as the holding company of the remaining twelve entities, with American Health Associated Parent, LLC serving as the parent company. American Health Associates Parent, LLC owns 100% of the equity interests in American Health Holdings, LLC, American Health Holdings II, LLC, American Health Holdings IV, LLC, and 75% of American Health Holdings III, LLC (altogether, the "Holdings Debtors"), with non-debtor MXD/AHA, JV, LLC owning the remaining 25% of the entity. The Holdings Debtors own 100% of the equity interests in the remaining Debtors, which are the operating entities. An organizational chart is attached hereto as **Exhibit A**.

**Prepetition Capital Structure and Indebtedness**

12. The Debtors have three secured creditors: City National Bank ("CNB"), National Biz Capital, and Forward Financing, LLC (the "Lenders"). The Lenders have UCC liens on certain assets of the Debtors. Moreover, the Debtors maintain deposit accounts at CNB, and therefore, CNB has an interest in the Debtors' cash collateral.

4

13.	The Debtors' assets primarily consist of accounts receivable which have a book value of approximately $39 million.  This A/R falls almost entirely into one of three buckets: (1) nursing home clients; (2) Medicare; and (3) health insurers.

14.	The Debtors' other assets consist of inventory with a book value of $1.1 million which consists of testing reagents, test tubes, phlebotomy supplies, and other materials used to conduct laboratory testing. The Debtors' vehicles are all leased from Enterprise and do not have any significant liquidation value. Similarly, the laboratory equipment is generally leased.

15.	In 2024, the Debtors had revenue of $101.2 million, and in 2025, the Debtors had revenue of $97.6 million. The Debtors' total cash collections for January and February of 2026 were $12.6 million.

16.	CNB serves as the primary secured lender for American Health S, LLC and American Health MW, LLC, with the former being a Florida limited liability company and the latter being a Delaware limited liability company. Under the security agreement entered into between these three parties, CNB provides American Health S, LLC and American Health MW, LLC with a revolving loan in the maximum principal amount of $9,632,274.00 (the "CNB Security Agreement"). As of the Petition Date, CNB holds a secured claim in the asserted principal amount of at least $9,632,274.00.

17.	The remaining two lenders, National Biz Capital and Forward Financing, LLC, are merchant cash advance lenders (jointly, the "MCA Lenders"). National Biz Capital holds a claim for $1,840,642.75, and Forward Financing, LLC holds a claim for $229,905.00. The Debtors dispute National Biz Capital and Forward Financing, LLC's claims.

## Events Leading to Bankruptcy

### *The Covenant Default*

18.      CNB, the Debtors' senior secured lender, instituted foreclosure proceedings on July 1, 2025 due to the Debtors' default on a Fixed Charge Coverage Ratio requirement under the secured loan between CNB and the Debtors (the "Loan"). The Loan required a maintenance ratio of not less than 1.25 to 1.00. Those proceedings prompted the Debtors to seek bankruptcy protection.

## Facts in Support of First Day Motions

### *Cash Collateral*

19.      The Debtors filed the *Emergency Motion to Use Cash Collateral* (the "Cash Collateral Motion") contemporaneously with this First Day Declaration.

20.      The Debtors require the use of cash collateral to pay ongoing business expenses. Failure to meet operating expenses, including payroll, will result in immediate and irreparable harm to the Debtors' estates. The proposed use of cash collateral will preserve the Debtors' value as a going concern and operate to the benefit of creditors and other interested parties. Accordingly, the continued use of cash collateral is a sound exercise of the Debtors' business judgment and in the best interests of creditors.

21.      The Debtors prepared the budget attached to the Cash Collateral Motion as **Exhibit A** (the "Budget"). The Debtors project positive cash flow. Accordingly, given that the Debtors will provide the Debtors' secured lenders, CNB and the MCA Lenders, with replacement liens against the Debtors' property for any use of cash collateral and experience positive cash flow, CNB and the MCA Lenders will be adequately protected pursuant to section 363 of the Bankruptcy Code.

22.    In addition, the Debtors contend that both CNB and the MCA Lenders are over-secured.

**Maintain Pre-petition Bank Accounts**

23.    The Debtors filed the *Emergency Motion to Maintain Pre-Petition Bank Accounts and Cash Management System* (the "Bank Accounts Motion"). In the Bank Accounts Motion, the Debtors seek a Court order waiving, at least temporarily, the United States Trustee Guidelines' requirement to close pre-petition bank accounts and open new debtor-in-possession accounts.

24.    The Debtors wish to maintain twelve pre-petition bank accounts: nine (9) at City National Bank, two (2) at Bank of America, and one (1) at US Bank (jointly, the "Bank Accounts"). The " (together, the "CNB Accounts") include: a master Zero Balance Account (ZBA) account ending in x9194 (the "Master ZBA Account"); a deposit account ending in x3481 (the "Deposit Account"); and seven operating accounts ending in x9000, x9152, x6512, x6277, x3032, x0810, x9042. All CNB Accounts function through a ZBA structure, with the account ending in x9194 being the "master" account and account ending in x3481 being the "Priority 1" deposit account. The remaining seven CNB Accounts decrease in ZBA priority, with account number x9000 being of "Priority 2" status and account number x9042 being of "Priority 8" status. The Deposit Account collects all incoming deposits and thereafter sweeps the collected funds into the Master ZBA Account nightly.

25.    All CNB Accounts are linked to the Master ZBA Account. At midnight each business day, funds are automatically swept back to the Master ZBA Account or to each subsidiary account. Further, if a subsidiary account has excess funds, those funds are swept back into the Master ZBA Account; however, if a subsidiary account has a negative balance, funds are taken out

7

of the Master ZBA Account and transferred to that respective account to rectify the imbalance of funds.

26.    The Bank of America accounts (together, the "Bank of America Accounts") include: (i) an account relating to Mobile XRay Diagnostics, LLC's subsidiary operations ending in x2544 and (ii) an "Olea Health" subsidiary operations account ending in x2723 (this corresponds to an entity, AHA-Olea, LLC, which was a subsidiary of the Debtors that was dissolved in 2025 as it had no material assets or operations). The Bank of America Accounts are not part of the CNB ZBA structure.

27.    In the Bank Accounts Motion, the Debtors request authorization for the post-petition use of a pre-petition charge card (the "Amex Card"). The Debtors historically have used the Amex Card for general business expenses. The use of the Amex Card allows the Debtors to smooth expenses over a monthly time period and provides benefits to the business's cashflow.

28.    The Bank Accounts are essential to the Debtors' business operations. To switch to a new account would take enormous effort, and it is not practicable on an immediate timeframe. Further, failure to continue using the Amex Card will interrupt the Debtors' ability to contribute towards business operations and make payments.

29.    Accordingly, the Debtors require use of the Bank Accounts and Amex Card for at least a temporary period while they switch internal systems over to DIP accounts.

**Utilities**

30.    The Debtors filed the *Motion to Determine Adequate Assurance of Payment for Utility Services and Preclude Utilities from Altering, Refusing, or Discontinuing Service* (the "Utilities Motion").

8

31.    The Debtors receive utility services from the parties listed on **Exhibit A** attached to the Utilities Motion. Many of the Utility Providers provide services to multiple of the Debtors' locations.

32.    The Debtors anticipate sufficient cash post-petition and assure to provide the Utility Providers with prompt and continued payments for all invoices on an ongoing basis. Thus, the Debtors maintain that the Adequate Assurance Procedures pursuant to 366 of the Bankruptcy Code, in addition to the Debtors' anticipated post-petition cash flow, constitute adequate assurance of payment.

***Pre-petition Wages***

33.    The Debtors filed the *Emergency Motion for Entry of Order Authorizing Payment of Prepetition Payroll Obligations and Employee Benefits* (the "Wages Motion") seeking to pay pre-petition wages of approximately $WAGES owed as of the Petition Date. The relief sought in the Wages Motion is essential to the Debtors' continued business operations.

34.    As of the Petition Date, the Debtors have 1,047 employees (the "Employees"). The Employees fall into the following categories by approximate percentage: Phlebotomy – 48%; Laboratory Operations – 15%; Courier and Logistics – 3.5%; Billing and Revenue Cycle – 5%; Customer Service – 3%; Imaging/Radiology – 1.5%; Sales and Marketing – 1.5%; IT and Technology – 1.5%; Corporate and Administrative – approximately 2%; Unclassified – approximately 19%. The Unclassified category primarily consists of field (Phlebotomy) and laboratory staff not yet assigned formal titles in the payroll system.

35.    The Employees are necessary to the Debtors' healthcare business and play an essential role in providing care for patients. Certain of the employees will refuse to continue working, or will seek other employment, unless their pre-petition wages are paid.

36.     Failure to pay these employees will have a negative impact on employee morale and likely result in turnover, causing immediate and pervasive damage to the Debtors' business. The Debtors seeks to pay pre-petition wages up to the priority limit in 11 U.S.C. § 507(4). The wages would receive full payment under a plan of reorganization. Accordingly, immediate payment only affects the timing and not the amount of payments. No employee has a prepetition wage claim for greater than the priority amount.

37.     The relief sought in the Wages Motion is necessary for an effective reorganization, a sound exercise of business judgment, and disfavored creditors will be at least as well off.

38.     This concludes my declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Christopher Martin (Apr 19, 2026 22:06:16 EDT)
Christopher Martin, President

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via

Notice of Electronic Filing by CM/ECF to all parties registered to receive such service in this

case on April 19, 2026.

Respectfully submitted,

**SHRAIBERG PAGE P.A.**
Proposed Attorneys for the Debtors
2385 NW Executive Center Dr., #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email: bss@slp.law

By: */s/ Bradley S. Shraiberg*
      Bradley S. Shraiberg
      Florida Bar No. 121622

# EXHIBIT A

