**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In re:

American Health Associates Holdings, Inc., *et al.*,[1] Case No. 26-14825-SMG

Debtors. Chapter 11

_____________________________________/

***EXPEDITED* MOTION FOR ORDER APPROVING THE PRIVATE SALE OF THE DEBTORS' IMAGING BUSINESS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

**Basis for Expedited Hearing:**

**On August 21, 2026, the Debtors entered into an agreement for the sale of the Debtors' imaging business structured as the sale of the equity interests of certain Debtors. The Buyer requires a closing date of September 1, 2026. If the Court does not approve the sale prior to the September 1, 2026, closing date, the Debtors will not be able to close on the sale, to the detriment of their estates. Accordingly, the Debtors request the Court hold a hearing on this Motion on or before August 31, 2026.**

The Debtors, pursuant to 11 U.S.C. §§ 363(b) & 363(f), request the entry of an order approving the sale of the membership interests in American Health Imaging MW, LLC, American Health Imaging S, LLC, Mobile Xray Diagnostics, LLC, and American Health W, LLC (such Debtors, the "**Imaging Debtors**" and such membership interests, the "**Membership Interests**") to All-Stat Portable LLC ("**Buyer**") pursuant to the Membership Interest Purchase Agreement attached hereto as **Exhibit 1** ("**MIPA**" or "**Purchase Agreement**"). In support, the Debtors state as follows:

[1] The Debtors in these jointly administered cases are: (1) American Health Associates Holdings, Inc.; (2) American Health Associates Parent, LLC; (3) American Health Holdings, LLC; (4) American Health Holdings II, LLC; (5) American Health Holdings III, LLC; (6) American Health Holdings IV, LLC; (7) American Health MW, LLC; (8) American Health Imaging MW, LLC; (9) American Health S, LLC; (10) American Health Imaging S, LLC; (11) American Health W, LLC; (12) American Health NE, LLC; and (13) Mobile Xray Diagnostic, LLC.

## CONCISE STATEMENT PURSUANT TO LOCAL RULE 6004-1(a)

| | |
|---|---|
| **Identity of Buyer**: | All-Stat Portable LLC |
| **Assets:** | The membership interests in American Health Imaging MW, LLC, American Health Imaging S, LLC, Mobile Xray Diagnostics, LLC, and American Health W, LLC |
| **Purchase Price:** | $3,000,000.00 (subject to the Closing Adjustment as provided in the MIPA) |
| **Warranties:** | As provided in Artivle IV of the MIPA, including as to the accuracy of information provided to Buyer, subject to the limitations of Article VIII of the MIPA. |
| **Closing Date:** | September 1, 2026 |
| **Closing Conditions:** | • Court Approval |
| **Lienholders:** | • National Biz Capital, LLC (disputed) |

## FACTUAL BACKGROUND

1. On April 17, 2026 (the "**Petition Date**"), the Debtors each filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

2. The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. On May 6, 2026, the United States Trustee appointed an official committee of unsecured creditors (the "**Committee**").

4. No request for a trustee or examiner has been made in this chapter 11 case.

5. Information regarding the Debtors' business and background is available in the

*Declaration of Christopher Martin in Support of Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 10].

6. The Debtors' business falls into two categories. First, the Debtors perform mobile phlebotomy services to collect specimens which the Debtors then test. Second, the Debtors deliver mobile imaging services directly to patients. This second business line is contained within the Imaging Debtors which hold the licenses necessary to perform x-ray and other imaging services. The imaging business is expensive to run and does not generate meaningful profits for the Debtors. The Debtors also recently lost an executive from the imaging business and two x-ray technicians who would be expensive and difficult to replace in a challenging labor market—the Imaging Debtors operate in a niche industry with limited participants. The Debtors must now either sell the imaging business or shutter it.

7. From before the Petition Date, the Debtors and their advisors have looked to sell their imaging business. Those efforts included direct engagement with the largest national provider of mobile imaging services, a Massachusetts-based mobile imaging operator, two multi-state mobile imaging providers seeking entry into the New England market, and a large owner of skilled nursing facilities and affiliated companies. Each of those companies received access to diligence materials and to the Imaging Debtors' financial and operational information. Of the parties engaged, only All-State Portable, LLC proceeded to a definitive agreement. The Debtors and Buyer reached agreement on the terms of the MIPA on August 24, 2026, for a closing on September 1, 2026. The Buyer insists on a closing on either the first or last day of a calendar month. If the sale does not close on September 1, 2026, the Debtors risk (i) the uncertainty of whether the Buyer will close; and (ii) the expense of operating the Imaging Debtors' business for another month.

8. The Debtors and Buyer structured the transaction as a sale of the Membership Interests because the licenses necessary to running the imaging business are non-transferable and the process to procure licenses can take over one year. Obtaining provider enrollment approvals from the Medicare program (the primary licenses at issue) can take years. State health departments perform onsite inspections for Medicare programs. These state health departments often classify initial certification surveys for portable x-ray suppliers as a lower-tier priority as compared to emergency or acute-care facilities.

9. The MIPA provides for a purchase price of $3,000,000.00 (the "**Purchase Price**") subject to the Closing Adjustment (as defined in the MIPA). The Closing Adjustment is equal to the Imaging Debtors' Cash (as defined in the MIPA) less the Imaging Debtors' Accounts Payable (as defined in the MIPA). Among the Imaging Debtors' liabilities are (i) guaranties of the Debtors' obligation to City National Bank of Florida ("**CNB**") in the amount of approximately $10,517,921.71 and (ii) the disputed claim of National Biz Capital, LLC ("**NBC**") in the amount of $1,840,642.75. Contemporaneously with the filing of this Motion, the Debtors will file a motion to approve a structured dismissal of the Imaging Debtors' cases including a release of CNB's claim against the Imaging Debtors for a payment of $1,000,000.00 from the sale proceeds and a release of NBC's claim against the Imaging Debtors for a payment of $400,000.00 from the sale proceeds. Excluding the claims of CNB and NBC, the Debtors estimate the Closing Adjustment will be approximately -$135,000, such that the Debtors will receive roughly $1,865,000 at closing.

10. The MIPA provides that $2,000,000.00 of the Purchase Price will be paid in cash at closing, with $1,000,000.00 held back. The remaining Purchase Price shall be paid in $200,000.00 increments on each of the effective dates of the Buyer's regulatory approval to own

and operate in the states of Florida, Colorado, Washington, Michigan, and Ohio. The regulatory approval process is a pro forma process necessary due to the change of ownership of the Imaging Debtors.

11. The MIPA contains numerous representations and warranties regarding the accuracy of the information provided by the Debtors to the Buyer. Following the closing, those representations and warranties will survive only to the extent of fraud or willful misconduct except for the representations concerning the following which will not be subject to the limitation of fraud or willful misconduct: litigation, employee matters, and healthcare regulatory matters.

12. NBC is the only creditor who the Debtors are aware of that may assert a security interest in the Membership Interests. The Debtors dispute NBC's claim as a usurious loan and have filed an adversary proceeding against NBC, Adv. Pro. No. 26-01270-SMG. Additionally, assuming NBC has a valid claim and security interest, the underlying agreement only purports to grant a security interest in "Accounts, Payment Intangibles, Letter of Credit Rights, in each case, as defined in Article 9 of the Uniform Commercial Code, and rights to payment of any kind, including chose in kind" and their proceeds. The Membership Interests do not fall into any of those categories.

## RELIEF REQUESTED

### A. The Court Should Approve the Sale Under 11 U.S.C. § 363(b).

13. Section 363(b) of the Bankruptcy Code permits the use, sale or lease, "other than in the ordinary course of business," of property of the estate. 11 U.S.C. § 363(b). In evaluating proposed uses of property under § 363(b), courts employ the business judgment rule, which "is a policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges." *In re Friedman's, Inc.*, 336 B.R. 891, 895

(Bankr. S.D. Ga. 2005) (quotation omitted). "Courts should approve an exercise of a debtor's business judgment unless it is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim or caprice." *Friedman's*, 336 B.R. at 895 (quotation omitted); *see In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Lionel Corp.*, 722 F.2d 1063 (2nd. Cir. 1983).

14. The Debtors submit that all of the factors demonstrating their sound business judgment are met and that the sale terms set forth in the MIPA and summarized in this Motion should be approved. The Debtors engaged in an extensive prepetition marketing process that included direct engagement with multiple parties receiving access to diligence materials and operational information. The negotiations between the Debtors and Buyer have been extensive, in good faith and at arms-length. There is substantial business justification to support the private sale to Buyer. Based on the diligent and extensive marketing efforts for the Membership Interests, the Debtors do not believe that further marketing or an auction are practicable and, in any event, would not result in a higher sale price.

15. Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (a) the sale price is fair and reasonable; (b) the debtor in possession has provided interested parties with adequate and reasonable notice; and (c) the Buyer is proceeding in good faith. *See In re Abbotts Dairies of Pennsylvania*, 788 F.2d 143, 147 (3d Cir. 1986) (noting that the phrase "good faith" encompasses one who purchases in good faith and for value); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). All of the factors are or will be satisfied in this matter.

16. First, as set forth above, the Purchase Price is fair and reasonable. While the transaction represented by the Purchase Agreement is not subject to higher and better offers, the

proposed transaction provides a price that was achieved after months of arms-length negotiations and an extensive prepetition marketing effort. The Debtors also stand at an inflection point where they must either offload the imaging business or close it down. Accordingly, an auction would only produce increased expenses without any benefit to interested parties. The sale to Buyer results in a substantial and material benefit to the estates and creditors as, after the Closing Adjustment and settlements with CNB and NBC, the estates will net over $1 million and the creditors of the Imaging Debtors will have their claims survive to be paid in full.

17. Second, the Debtors will provide notice to all interested parties of this Motion. The Debtor will serve this Motion, including exhibits, and the Court's notice of hearing on its creditor matrix, the Buyer, and the Office of the United States Trustee. The Debtor submits that such notice constitutes good and sufficient notice and that no further notice need be given.

18. Finally, the Buyer is a good faith purchaser. The Buyer is not an insider of, or otherwise affiliated with, the Debtors, and the offer was negotiated at arm's length. As such, the Debtors request that the Court find that the Buyer constitutes a good faith purchaser of the Assets pursuant to 11 U.S.C. § 363(m), such that the reversal or modification on appeal of the sale shall not affect its validity. *See, e.g.*, 11 U.S.C. § 363(m) (reversal or modification on appeal of a transaction authorized under § 363(b) of the Bankruptcy Code does not affect the validity of the sale to an entity that acquired the property in good faith); *In re Adamson Co., Inc.*, 159 F.3d 896 (4th Cir. 1998.).

### B. The Court Should Approve the Sale Free and Clear of All Liens, Claims and Encumbrances Under 11 U.S.C. § 363(f).

19. Section 363(f) of the Bankruptcy Code permits the trustee (or debtor in possession) to sell property of the estate free and clear of any third-party interests in such property if certain conditions are satisfied, including the consent of the affected parties. *See* 11 U.S.C. § 363(f)(1)–

(5).

20. The only asserted secured claim is that of NBC. The Debtors have filed an adversary proceeding contesting NBC's claim. Accordingly, NBC's claim is the subject of a bona fide dispute, and the Court can approve the sale of the Membership Interests free and clear under § 363(f)(4).

**C. The Court Should Waive the Rule 6004(h) and 6006(d) Stays.**

21. Finally, in order to expedite the sale of the Assets, the Debtors request that the Court waive the requirement for a 14-day stay of the order approving the sale of the Membership Interests and assignment of the Leases pursuant to Rules 6004(h) and 6006(d) so that the order approving the requested sale is effective immediately.

**WHEREFORE**, the Debtors request that the Court enter an order, substantially in the form of the order attached hereto as **Exhibit 2**: (1) granting this Motion; (2) approving the MIPA; (3) approving the sale of the Membership Interests to the Buyer; (4) approving the assumption and assignment of the Assumed Contracts; (5) waiving the 14-day stay of Rules 6004 and 6006; and (6) granting such other and further relief as the Court deems just and appropriate.

**SHRAIBERG PAGE P.A.**

Attorneys for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
bss@slp.law
shess@slp.law

By: *__/s/ Bradley S. Shraiberg__*
Bradley S. Shraiberg
Florida Bar No. 121622
Samuel W. Hess
Florida Bar No. 1044184

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing to those parties registered to receive electronic noticing in this case on August 25, 2026.

*/s/ Bradley S. Shraiberg*

Served via CM/ECF:

- **Brett M Amron** bamron@bastamron.com, mdesvergunat@bastamron.com,jmiranda@bastamron.com,sroque@bastamron.com
- **Douglas A Bates** doug.bates@phelps.com, jodi.moore@phelps.com;debi.dulaney@phelps.com
- **Paul J. Battista** pjbattista@venable.com, cascavone@venable.com;jnunez@venable.com;imalcolm@venable.com;heburke@venable.com;imalcolm@ecf.courtdrive.com;cascavone@ecf.courtdrive.com
- **Robert S Bernstein** rbernstein@bernsteinlaw.com, rbernstein@ecf.courtdrive.com;pghecf@bernsteinlaw.com
- **Jake Blanchard** jake@jakeblanchardlaw.com, rebecca@jakeblanchardlaw.com;jeff@jakeblanchardlaw.com;4803807420@filings.docketbird.com
- **Alexandra D Blye** ablye@carltonfields.com, kcasazza@carltonfields.com;kathompson@carltonfields.com;wpbecf@cfdom.net
- **Kirk B. Burkley** kburkley@bernsteinlaw.com, cwirick@bernsteinlaw.com;kburkley@ecf.courtdrive.com
- **Kevin C Calhoun** kevin@lawyermich.com
- **Michael R Dal Lago** mike@dallagolaw.com, kim@dallagolaw.com,fbravo@dallagolaw.com,fvazquez@dallagolaw.com
- **Jonathan S. Feldman** feldman@katiephang.com, service@katiephang.com
- **Jeffrey K Garfinkle** jgarfinkle@buchalter.com, lverstegen@buchalter.com;docket@buchalter.com
- **Matthew Alan Goldberger** matthew@goldbergerfirm.com
- **Robert Charles Harris** rharris@bcrhllp.com
- **Ross R Hartog** rhartog@mrthlaw.com, ecfnotices@mrthlaw.com,ycandia@mrthlaw.com,gruiz@mrthlaw.com,lshortino@mrthlaw.com,msalazar@mrthlaw.com,mrthbkc@gmail.com,rhartog@ecf.courtdrive.com
- **Samuel W Hess** shess@slp.law, dwoodall@slp.law;pmouton@slp.law;shess@ecf.courtdrive.com;mortman@slp.law
- **Donald R Kirk** dkirk@carltonfields.com, kathompson@carltonfields.com
- **Hannah J. Lief** hlief@slp.law, dwoodall@slp.law;pmouton@slp.law;mortman@slp.law
- **Sergio Eduardo Molina** smolina@vedder.com, ecfmidocket@vedder.com;sergio-molina-5360@ecf.pacerpro.com
- **Martin P Ochs** martin.p.ochs@usdoj.gov
- **Office of the US Trustee** USTPRegion21.MM.ECF@usdoj.gov
- **John E Page** jpage@slp.law, dwoodall@slp.law;pmouton@slp.law;pmouton@ecf.courtdrive.com;jpage@ecf.courtdrive.com;mortman@slp.law
- **Kristopher Pearson** kpearson@dvcattorneys.com, lfd@dvllp.com,ana@culmolaw.com
- **Richard C. Pedone** rpedone@nixonpeabody.com

- **Eric S Pendergraft** ependergraft@slp.law, dwoodall@slp.law;mortman@slp.law;bshraibergecfmail@gmail.com;pmouton@slp.law
- **Dustin Ryan Piercy** drp@lss.law, drp@ecf.courtdrive.com;info@shelomith.law;zshelomith@ecf.inforuptcy.com;alt@shelomith.law
- **Robert F. Reynolds** rreynolds@loriumlaw.com, ecf.rreynolds@loriumlaw.com
- **Alan R Rosenberg** arosenberg@mrthlaw.com, gruiz@mrthlaw.com,ycandia@mrthlaw.com,mrthbkc@gmail.com
- **Mark Alan Salzberg** mark.salzberg@squirepb.com, shannon.munsell@squirepb.com;FLA_DCKT@squirepb.com;mark-a-salzberg-2003@ecf.pacerpro.com;Gregory.davis@squirepb.com
- **Mallory Lynn Bouchee Satre** msatre@swlaw.com, pdxecf@swlaw.com;ncromwell@swlaw.com;tnguyen@swlaw.com;dshaffer@swlaw.com
- **Callan C Searcy** bk-csearcy@texasattorneygeneral.gov, sherri.simpson@oag.texas.gov
- **Zach B Shelomith** zbs@shelomith.law, info@shelomith.law;alt@shelomith.law;agp@shelomith.law;drp@shelomith.law;mpc@shelomith.law ;Shelomith.ZachB.B105131@notify.bestcase.com;zshelomith@ecf.inforuptcy.com
- **Bradley S Shraiberg** bss@slp.law, dwoodall@slp.law;dwoodall@ecf.courtdrive.com;pmouton@slp.law;mortman@slp.law
- **Christian Somodevilla** Christian.Somodevilla@usdoj.gov, shannon.patterson@usdoj.gov;bridgett.moore@usdoj.gov
- **Eric R. Von Helms** evonhelms@kmksc.com
- **Beverly Weiss Manne** bmanne@tuckerlaw.com
- **Stuart F Wilson-Patton** stuart.wilson-patton@ag.tn.gov
- **Benjamin C Woodruff** bwoodruff@swlaw.com, pdxecf@swlaw.com;bpartridge@swlaw.com;ncromwell@swlaw.com;tnguyen@swlaw.com
- **George L. Zinkler** gzinkler@loriumlaw.com, ecf.zinkler@loriumlaw.com

# EXHIBIT 1

**Execution Version**

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is entered into effective as of the 24th day of August, 2026, by and among American Health Imaging MW, LLC, a Delaware limited liability company ("AHI MW"), American Health Imaging S, LLC, a Delaware limited liability company ("AHI S"), Mobile Xray Diagnostics, LLC, a Delaware limited liability company ("MXD"), American Health W, LLC, a Delaware limited liability company ("AH W"), American Health Holdings, LLC, a Delaware limited liability company (the "AHI MW Seller"), American Health Holdings II, LLC, a Delaware limited liability company (the "AHI S Seller"), American Health Holdings III, LLC, a Delaware limited liability company (the "MXD Seller"), American Health Holdings IV, LLC, a Delaware limited liability company (the "AH W Seller" and together with each of the AHI MW Seller, the AHI S Seller and the MXD Seller, each a "Seller" and collectively the "Sellers"), and All-Stat Portable LLC, an Illinois limited liability company ("Buyer"). AHI MW, AHI S, MXD, AH W, the Sellers and the Buyer may be referred to herein individually, as a "Party", or collectively as the "Parties".

## RECITALS

WHEREAS, the AHI MW Seller owns one hundred percent (100%) of the membership interests (the "AHI MW Membership Interests") of AHI MW;

WHEREAS, the AHI S Seller owns one hundred percent (100%) of the membership interests (the "AHI S Membership Interests") of AHI S;

WHEREAS, the MXD Seller owns one hundred percent (100%) of the membership interests (the "MXD Membership Interests") of MXD;

WHEREAS, the AH W Seller owns one hundred percent (100%) of the membership interests (the "AH W Membership Interests" and together with the AHI MW Membership Interests, the AHI S Membership Interests and the MXD Membership Interests, collectively the "Membership Interests") of AH W;

WHEREAS, Buyer desires to purchase from the Sellers one hundred percent (100%) of the Membership Interests in each of the Companies, and the Sellers desire to sell such Membership Interests to Buyer on the terms and conditions set forth.

NOW, THEREFORE, in consideration of the recitals and the mutual covenants, representations, warranties, conditions, and agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1 Capitalized Terms. The following words or phrases shall have the meaning given them in this Article I (other capitalized terms have the meaning ascribed to them in the text of this Agreement):

(a) "Affiliate" means, when used with respect to any Person, any other Person that directly or indirectly Controls, is controlled by or is under common control with such person.

(b) "Business" means the business of the Companies, including but not limited to mobile diagnostic imaging.

(c) "Cash" means each Company's aggregate amount of cash on hand and on deposit in U.S. domiciled accounts with any bank or other depository institution; *provided*, *that* the amount of Cash as of any date will (i) be reduced by bank overdrafts and other negative balances of cash and cash equivalents in any bank account of any of the Companies, (ii) exclude the amount of any deposits from any of the Companies that are in transit but not yet reflected in the balance of an account of a Person that is not such Company with a bank or other depository institution, (iii) be reduced by the amount of any outstanding checks that have been duly executed by an individual on behalf of any of the Companies but not yet deposited into an account of a Person that is not such Company with a bank or other depository institution, and (iv) exclude any security deposits made by any of the Companies.

(d) "Closing" means and refers to the consummation of the transactions contemplated by this Agreement, as provided for in Article III.

(e) "Closing Adjustment" means (i) Cash at Closing less (ii) the Companies' Accounts Payable, and attached hereto as Schedule 1.1(e).

(f) "Code" means the Internal Revenue Code of 1986, as amended.

(g) "Companies" means, collectively, MXD, AHI MW, AHI S and AH W, and each, individually, a "Company".

(h) "Companies' Accounts Payable" means each Company's accrued but unpaid liabilities as of the Closing (which shall include, without limitation, the Payroll Obligations, Company Transaction Expenses and each Company's Indebtedness).

(i) "Companies' Accounts Receivable" means the Accounts Receivable for each of the Companies which remains unpaid and outstanding as of the Closing.

(j) "Company Benefit Plan" means any benefit arrangement, obligation, custom or practice, whether or not legally enforceable, to provide benefits, other than salary, including without limitation retirement, 401K, medical or disability insurance, life insurance, tuition reimbursement or scholarship programs, employee discount programs, meals, travel, or vehicle allowances, and any plans providing benefits or payments in the event of a change of control.

(k) "Company Transaction Expenses" means all fees and expenses of the Sellers or any of the Companies incurred or payable by the Companies as of the Closing, and not paid prior to the Closing, payable to professionals (including attorneys, accountants and other consultants and advisors) retained by the Sellers or any of the Companies in connection with the negotiation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, including Sellers' portion of the cost of the Tail Policy, as set forth on Schedule 6.5.

(l) "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "controlled by", "controlling" and "under common control with" shall have correlative meanings.

(m) "Final Determination" means, with respect to any claim for Losses made by Buyer or any Buyer Indemnitee pursuant to this Agreement, all Losses payable to Buyer as determined pursuant

to (i) a final non-appealable order from a Governmental Authority determining the amount of Losses or (ii) the written consent of the Sellers.

(n) "Governing Documents" means the articles of organization and operating agreement of each of the Companies, and any other agreement by and/or among the Sellers, any managers and/or of each of the Companies, relating to the ownership, management or capitalization of, or transfer of ownership in, the Company.

(o) "Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court, or tribunal of competent jurisdiction.

(p) "Indebtedness" means, without duplication, the aggregate amount of (i) any obligations of any of the Companies for borrowed money (including any prepayment premiums, penalties and any other fees and expenses paid to satisfy such indebtedness), (ii) any obligations of any of the Companies evidenced by bonds, debentures, notes or similar instruments (other than payment and/or performance bonds for which no amounts have been called under such bond), (iii) any obligations of any of the Companies under conditional sale or other title retention agreements (excluding trade accounts payable), (iv) any obligations of persons other than the Companies that is secured by any lien on property or assets owned or acquired by any of the Companies, whether or not the obligations secured thereby have been assumed, (v) any obligations of any of the Companies issued or assumed as the deferred purchase price of property or services (excluding obligations of the Companies to creditors for goods and services incurred in the ordinary course of the Companies' business), (vi) any capitalized lease obligations of any of the Companies, (vii) obligations of any of the Companies under interest rate or currency swap transactions (valued at the termination value thereof), (viii) any amounts owed with respect to drawn letters of credit issued for the account of any of the Companies, and (ix) any accrued interest or penalties on any of the foregoing.

(q) "Knowledge" or similar language, when applied to the Sellers herein, means the actual knowledge of Christopher Martin, Mindy de Medieros, Jennifer Holt, Daniel Schwartz, and the officers and directors of the Sellers, after due inquiry.

(r) "Law" means any statute, law, ordinance, decree, order, injunction, rule, directive, or regulation of any Governmental Authority.

(s) "Membership Interests" means and refer to the membership interests in each of the Companies, representing an undivided one hundred percent (100%) interest in each of the Companies being sold by the Sellers to Buyer as set forth herein.

(t) "Payroll Obligations" means the accrued payroll (which shall include Taxes and benefits payable by the applicable Company with respect to such payroll) in the ordinary course of business as of the Closing Date (which for the avoidance of doubt includes amounts earned but not paid as of the Closing Date but does not include amounts earned from and after the Closing Date).

(u) "Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

(v) "Post-Closing Tax Period" means any taxable period beginning after the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period beginning after the Closing Date.

(w) "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

(x) "Pre-Closing Taxes" means Taxes of any of the Companies for any Pre-Closing Tax Period.

(y) "Purchase Price" means Three Million Dollars ($3,000,000.00) plus or minus the Closing Adjustment, and subject to further adjustment as provided in this Agreement.

(z) "Representative" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

(aa) "Restricted Business" means any services (both current and currently contemplated) provided by any of the Companies, including, but not limited to portable diagnostic services operating with any of the following licenses, modalities or services: (1) Portable X-Ray ("PXR") license or (2) Independent Diagnostic Testing Facility ("IDTF") license.

(bb) "Taxes" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

(cc) "Tax Return" means any return, declaration, report, claim for refund, or information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(dd) "Territory" means the States of Colorado, Florida, Massachusetts, Michigan, Ohio, Rhode Island, and Washington.

1.2 Headings; Interpretation. The Article and Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of the Agreement. Each reference in this Agreement to an Article or Section unless otherwise indicated, shall mean an Article or a Section of this Agreement, respectively. References herein to "days," unless otherwise indicated, are to consecutive calendar days. Each Party hereto has participated substantially in the negotiation and drafting of this Agreement and each Party agrees that any ambiguity herein should not be construed against the draftsman. The recitals to this Agreement are incorporated into and are deemed a part of this Agreement. The neuter shall include the feminine and masculine, and vice versa, the singular shall include the plural, and the plural shall include the singular, except where expressly provided to the contrary.

## ARTICLE II.
## PURCHASE AND SALE

2.1 Assignment. The Sellers shall sell, assign, transfer, grant, bargain, deliver, and convey to Buyer, as of the Closing Date, all of the Sellers' right, title and interest in and to the Membership Interests, free and clear of all liens, claims and encumbrances, and Buyer shall purchase from the Sellers all of such right, title and interest in and to the Membership Interests.

2.2 Payment of Purchase Price. At the Closing, Buyer shall pay the Sellers the Purchase Price *less* an amount equal to One Million Dollars ($1,000,000.00) (the "Deferred Payment Amount"), by wire transfer of immediately available funds to the bank account(s) set forth on Exhibit A attached hereto (the "Sellers' Bank Account"), in the amounts set forth on Exhibit A. Following the Closing and on each of the effective dates of Buyer's Change of Ownership regulatory approvals (the "CHOWs") to own and operate in the states of (i) Florida, (ii) Colorado, (iii) Washington, (iv) Michigan and (v) Ohio, Buyer shall pay to the Sellers by wire transfer of immediately available funds to the Sellers' Bank Account, from the Deferred Payment Amount, an amount equal to Two Hundred Thousand Dollars ($200,000.00) for each CHOW from the foregoing states.

## ARTICLE III.
## CLOSING

3.1 Closing. The Closing shall take place upon the satisfaction or waiver of the conditions set forth the in Sections 3.2, 3.3 and 3.4 (the "Closing Date") remotely by exchange of documents and signatures (or their electronic counterparts), which is expected to be on September 1, 2026. Notwithstanding anything to the contrary herein, the consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. Central Time on August 1, 2026.

3.2 Conditions to Obligations of All Parties. The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a) The U.S. Bankruptcy Court for the Southern District of Florida shall have approved this Agreement and the transactions contemplated by this Agreement and shall have entered the draft order, substantially in the form of Exhibit H (the "Bankruptcy Court Approval").

(b) No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Action which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

3.3 Conditions to Obligations of the Sellers to Close. The obligations of the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or the Sellers' waiver, at or prior to the Closing, of each of the following conditions:

(a) The representations and warranties of Buyer contained in this Agreement and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality) or in all material respects (in the case of any representation or warranty not qualified by materiality) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b) Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and any certificate or other writing delivered pursuant hereto to be performed or complied with by it prior to or on the Closing Date; provided, that, with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c) On or before the Closing Date, Buyer shall pay the amounts set forth in Section 2.2 and shall deliver or cause to be delivered to the Sellers such documents, instruments, or certificates as the Sellers or their counsel reasonably determines are required to consummate the transaction contemplated hereunder.

3.4 Conditions to Obligations of Buyer to Close. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a) The representations and warranties of the Sellers contained in this Agreement, and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality) or in all material respects (in the case of any representation or warranty not qualified by materiality) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b) The Sellers shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and any certificate or other writing delivered pursuant hereto to be performed or complied with by it prior to or on the Closing Date; provided, that, with respect to agreements, covenants and conditions that are qualified by materiality, the Sellers shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c) On or before the Closing Date, the Sellers shall deliver, or cause to be delivered to Buyer, the documents and items and instruments described below:

(i) an assignment of Membership Interests duly executed by each Seller evidencing the transfer of the Membership Interests from such Seller to Buyer in the form attached hereto as Exhibit B;

(ii) a copy of the Certificate of Formation of each of the Companies and the Sellers, certified by the applicable Secretary of State, of the state of formation together with a certificate of good standing with respect to each of the Companies and the Sellers;

(iii) written resignations, effective as of the Closing Date, of any and all officers, managers or directors of each of the Companies in the form attached hereto as Exhibit C;

(iv) a release agreement in the form attached hereto as Exhibit D, duly executed by each of the Sellers, Christopher Martin, Debbie Martin, and Minda De Medieros;

(v) a certificate in the form attached hereto as Exhibit E (provided that Sellers shall use reasonable efforts to deliver a compiled copy of such certificate at least three

(3) days prior to the Closing Date for review by Buyer) duly executed on behalf of each of the Companies by an authorized officer of each such Company, dated as of the Closing Date (the "Officer's Certificate");

(vi) a Form W-9 for each of the Sellers, copies of which are attached hereto as Exhibit F; and

(vii) such other documents, instruments or certificates as Buyer or its counsel reasonably determines are required to consummate the transaction contemplated hereunder.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE COMPANIES AND THE SELLERS

Except as otherwise set forth in any of the schedules attached to this Agreement (hereinafter collectively referred to as the "Disclosure Schedule"), the Companies and the Sellers, jointly and severally, represent and warrant to Buyer as set forth below, as of the date hereof and as of the Closing Date:

4.1 Organization and Qualification. Each of the Sellers and each of the Companies is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Each of the Sellers and each of the Companies is qualified to transact business in each jurisdiction where it is required to qualify in order to conduct its business as presently conducted. None of the Companies owns the equity of any Person.

4.2 Authority. Each of the Sellers and the Companies has full limited liability company power and authority to enter into this Agreement and has received all necessary consents and authorizations from its respective equityholders and managers (if any) to approve of and consummate the transactions contemplated hereby. None of (i) the execution and delivery of this Agreement, (ii) the performance by the Companies or the Sellers of their respective obligations hereunder, or (iii) the consummation of the transactions expressly set forth herein, will:

(a) violate any provision of the Governing Documents of any of the Companies or the Sellers;

(b) violate, or be in conflict with, or constitute a default under or breach of, or permit the termination of, or cause the acceleration of the maturity of, any indenture, mortgage, contract, commitment, debt or obligation of any of the Companies or the Sellers;

(c) require the consent of any other party to or result in the creation or imposition of any lien upon any property or assets of any of the Companies or the Sellers under any indenture, mortgage contract, commitment, debt or obligation of or to which any such Person is bound;

(d) violate any Law; or

(e) result in the loss of any material license, privilege, or certificate benefiting any of the Companies.

4.3 Validity. This Agreement and the other agreements and instruments set forth herein to which any of the Companies or the Sellers is a party (i) have been duly and validly executed and delivered by such Company or the Sellers, (ii) constitute the valid and binding obligations of the Companies and the Sellers, and (iii) assuming due authorization, execution and delivery by Buyer, are enforceable against the

Companies and the Sellers in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.4 Capitalization; No Liens. There are no other membership interests or other equity securities of the Companies or other ownership interests in any of the Companies outstanding other than the Membership Interests. Each Seller has good and valid title to its respective Membership Interests, free and clear of all liens or other encumbrances (other than transfer restrictions arising under applicable securities Laws). Each Seller has full right, power and authority to transfer and deliver to Buyer good and valid title to the Membership Interests, free and clear of all liens or other encumbrances (other than transfer restrictions arising under applicable securities Laws), including options, warrants, rights of first refusal, rights of first offer or any other rights to purchase the Membership Interests. Immediately following the Closing, Buyer will be the record and beneficial owner of the Membership Interests, and will have good and valid title to the Membership Interests, free and clear of all liens or other encumbrances (other than transfer restrictions arising under applicable securities Laws). All of the Membership Interests are duly authorized and validly issued and are fully paid and non-assessable. Except for Buyer's rights pursuant to this Agreement, (i) there are no authorized or outstanding (A) securities of the Companies or other ownership interests in any of the Companies other than the Membership Interests, or (B) warrants, preemptive rights, other rights, or options with respect to any securities of the Companies, and (ii) the Companies, the Sellers and/or Buyer are not subject to any obligation to issue, sell, deliver, redeem, or otherwise transfer, acquire or retire the Membership Interests or any other securities of the Companies. Additionally, the sale of the Membership Interests does not and will not violate any agreement, contract, commitment or obligation, whether written, verbal or otherwise of or to which any of the Companies or the Sellers is a party or by which any of the Companies or the Sellers is bound. A true, correct and complete copy of each Company's articles of organization and operating agreement are attached to the Officer's Certificate.

4.5 Leases. None of the Companies owns any real property. Schedule 4.5, attached hereto, contains a complete list of each lease pursuant to which any of the Companies leases, as lessor or lessee, any real or personal property interest. Each such lease is valid and binding and is in full force and effect, subject only to exceptions based on bankruptcy, insolvency, or similar laws of general application, and to the Knowledge of the Sellers there are no existing defaults by any party to any such lease, or any condition, event, or act to the Sellers' Knowledge which, with notice or lapse of time or both, would constitute such a default. Without limiting the foregoing, none of the Companies is in default under any of such leases, and none of the Companies has received any written notice from any person asserting a default by any of the Companies under any such lease.

4.6 Consents and Approvals of Governmental Authorities. No consent, approval, or authorization of, or declaration, filing, or registration with, any governmental or regulatory authority or any other party is required to be made or obtained by any of the Companies or the Sellers in connection with the execution, delivery, and performance of this Agreement or any of the other documents referenced herein by the Companies or the Sellers.

4.7 Financial Statements. Schedule 4.7 sets forth the following (collectively, the "Financial Statements"): true and complete copies of (A) MXD's unaudited cash-based statement of profit and loss as of and for fiscal year ended December 31, 2025, and (B) MXD's unaudited cash-based statement of profit and loss as of and for the seven (7) month period ended July 31, 2026 (such date, the "P&L Statement Date"). The Financial Statements (i) have been prepared in accordance with the books and records of the Companies and (ii) are true and correct and fairly present, in all material respects, the financial condition of the Companies as of the respective dates thereof and the results of operations of the Companies for the periods then ended. None of the Companies has any material liabilities, obligations or commitments of any

nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise except (a) those which are adequately reflected on the Financial Statements, (b) those Accounts Payable set forth on Schedule 4.9, (c) those which have been incurred in the ordinary course of business of the Companies consistent with past practice, or (d) those set forth on Schedule 4.7.

4.8 Accounts Receivable. Each Company's outstanding accounts receivable as of the P&L Statement Date are set forth on Schedule 4.8 ("Accounts Receivable").

4.9 Accounts Payable. Schedule 4.9 sets forth a true and correct list of each Companies' Accounts Payable as of the P&L Statement Date.

4.10 Absence of Certain Changes. Except as set forth on Schedule 4.10, from January 1, 2026 until the Closing Date, the business of the Companies has been conducted in the ordinary course consistent with past practices, and none of the Companies has:

(a) suffered any damage, destruction, or loss, whether covered by insurance or not, materially adversely affecting the Business;

(b) sold, assigned, leased or otherwise transferred or disposed of any of its assets other than in the ordinary course of business;

(c) entered into, amended or terminated any contract or lease other than in the ordinary course of business, or committed any material breach of any contract or lease;

(d) assumed, guaranteed, endorsed, or otherwise become responsible for the obligations of any person with respect to the Business or any of the Companies' assets;

(e) permitted or allowed any of its property or assets (personal, or mixed, tangible or intangible) to be subjected to any mortgage, pledge, security interest, conditional sale, or other title retention agreement, encumbrance, lien, easement, claim, right of way, warrant, or charge of any kind (individually and collectively hereinafter referred to as a "Lien"); or

(f) agreed, whether in writing or otherwise, to take any action described in this Section 4.10.

4.11 Litigation; Legal Proceedings.

(a) Except as disclosed in Schedule 4.11, there are no suits, actions, claims, orders, writs, injunctions, decrees, investigations, stipulations, proceedings or arbitration proceedings, whether legal or administrative ("Actions") pending, or to the Sellers' Knowledge, threatened against or affecting any of the Companies, the Sellers or the Business, or otherwise affecting the Sellers' or any Company's ability to perform their obligations under this Agreement.

(b) There are no unsatisfied judgments, penalties, or awards against or affecting any of the Companies, the Sellers or the Business.

4.12 Tax Matters.

(a) There are no pending or, to the Knowledge of the Sellers, threatened, actions or proceedings, assessments or collections of Tax with respect to any of the Companies or the Sellers that could subject Buyer to any liability for such Taxes for any period prior to the Closing Date nor

is there a basis for any such actions or proceedings, and Buyer shall not be subject to any liability for such Taxes or for any other Tax of any of the Companies or the Sellers with respect to any period prior to the Closing Date or attributable to any transaction prior to the Closing Date. No tax returns of any of the Companies have been audited or to the Knowledge of the Sellers are currently the subject of audit. Each of the Companies and the Sellers have duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it or him or her and has paid in full all Taxes owed (whether or not shown as due and payable thereupon) which were due and payable on or prior to the Closing Date, and there are in effect no waivers of applicable statutes of limitations with respect to Taxes for any year.

(b) Each of the Companies and the Sellers have withheld or collected all Taxes required by Law to have been withheld or collected and, to the extent required, paid over such Taxes to the appropriate Governmental Authorities. Each of the Companies has complied with all information reporting and backup withholding provisions of applicable Law. No claim has been received from any Governmental Authority in a jurisdiction where a Company does not file tax returns that such Company is or may be subject to taxation by that jurisdiction. None of the Companies is a party to any tax allocation or sharing arrangement. None of the Companies has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a tax assessment or deficiency. No Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2. None of the Companies is or has been a United States real property holding corporation (as defined in Section 897(c)(2) of the Code). None of the Companies is, or has been, a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b). None of the Companies is a party to any Tax sharing agreement.

(c) Except as set forth on Schedule 4.12(c), each of the Companies is, and has at all times prior to the Closing Date been, a "disregarded entity" within the meaning of Treasury Regulation § 301.7701-3 that is disregarded as separate from a United States person within the meaning of Section 7701(a)(30) of the Code and each such Company is not and has never been required to withhold or otherwise be subject to liability under Sections 1441, 1445 and 1461 of the Code.

(d) None of the Companies has any permanent establishment in any jurisdiction outside of the United States.

4.13 Contracts and Commitments.

(a) Schedule 4.13, attached hereto, contains a complete list of each contract and commitment of the Companies (but excluding patient relationships), including but not limited to the following:

(i) all contracts or commitments, written or oral, with distributors, brokers, manufacturer's representatives, sales representatives, service or warranty representatives, and other persons, firms, or corporations engaged in the sale or distribution of any Company's products or services; and

(ii) all contracts and arrangements between any of the Companies and any Affiliate of any of the Companies.

(b) Each of the contracts listed on Schedule 4.13 is valid and binding, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and to general principles of equity, and have been entered into in the ordinary course of the Companies' business. To the Sellers' Knowledge, no other party thereto, is

in breach or violation of, or default under, any such contract or commitment, and no event has occurred that with notice or lapse of time or both would constitute a violation, breach or default under any such contract or commitment. The Sellers have delivered or caused to be delivered or made available to Buyer true and complete copies of all contracts, leases, and commitments of the Companies.

4.14 Compliance with Laws. Except as set forth on Schedule 4.14:

(a) The Companies and the Sellers have not received any written notice or other written communication from any Governmental Authority or private party, customer, supplier or vendor alleging noncompliance with any applicable Law by any of the Companies.

(b) Each of the Companies is and in the past five (5) years has been operating the Business in compliance in all material respects with all applicable Laws, and no Actions have been filed or commenced against any of the Companies alleging any failure so to comply.

4.15 Permits, License and Authorizations. Each of the Companies has all approvals, authorizations, consents, licenses, franchises, orders, and other permits (collectively, "Licenses") of (i) any governmental or regulatory agency, whether federal, state, local or foreign, and (ii) all trade or industry associations, required in the ownership or operation of the Business as presently conducted, all of which are in full force and effect. All Licenses required by the Companies to operate the Business are listed on Schedule 4.15 attached hereto. Each of the Licenses shown in Schedule 4.15 is in good standing. The Sellers and Companies do not have Knowledge of any facts that could cause a cancellation or revocation of said Licenses (including as a result of the transactions contemplated by this Agreement).

4.16 Equipment and Inventory; Intellectual Property. Schedule 4.16 contains a true and complete list of all of the fixtures, furniture, equipment and Intellectual Property of the Companies as of the Closing Date, as well as the agreed upon Purchase Price allocation between the Sellers and Buyer. The fixtures, furniture, equipment and supplies of the Companies are in good operating condition and repair (subject to normal wear and tear) and are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted. Each of the Companies owns all patents, inventions, trademarks, service marks, trade dress, trade names, logos, together with all of the goodwill associated therewith, copyrights mask works, computer software (in both source code and object code form), data, trade secrets and other confidential information, internet domain names and websites, and copies and tangible embodiments thereof (in whatever form or medium), and other intellectual property (the "Intellectual Property"), in each case necessary for the Companies to conduct the Business as currently conducted. No claim is pending or, to the Knowledge of the Sellers, threatened by any third party challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, and, to the Knowledge of the Sellers, the use of such Intellectual Property by any of the Companies does not infringe on the rights of any third party.

4.17 Employee Matters. Schedule 4.17 contains a true and complete list of all of the employees of the Companies as of the Closing Date, setting forth each employee's name, annual base salary or wages, date of hire, job title or position, accrued, but unused vacation and/or paid time off, bonus and/or commission potential, employer and office location. Schedule 4.17 also sets forth the names of all employees who are currently on disability, maternity or other authorized leave and their anticipated date of return to full service. There are no employees on any leave of absence. None of such employees have given any Company written notice terminating his or her employment with such Company, or terminating his or her employment upon a sale of, or business combination relating to, any Company or in connection with the transactions contemplated by this Agreement. None of the Companies has any independent contractors except as set

forth in Schedule 4.17. None of the Companies is or has been for the last five (5) years the subject of any unfair labor practice complaint pending or, to the Knowledge of the Sellers, threatened, before the National Labor Relations Board or any other comparable foreign or domestic authority or any workers' council. To the Sellers' Knowledge, no former or current employee of any of the Companies is in violation of any term of any non-competition agreement or any restrictive covenant. None of the Companies is or has been for the last five (5) years a party to or bound by any collective bargaining agreement, trade union agreement, works council, employee representative agreement or information or consultation agreement. No strike, slowdown, picketing, work stoppage, concerted refusal to work overtime or other similar labor activity with respect to any current employees of any of the Companies is occurring or, to the Knowledge of the Sellers, is being planned to occur.

4.18 Employment Policies. The Companies have delivered or made available to Buyer a true and complete copy of the Companies' existing employee handbook(s) and all material policies on employment with the Companies that apply to their employees, including without limitation any Company Benefit Plans (collectively with the handbooks, the "Employment Policies"). The Employment Policies comply in all material respects with all applicable Laws.

4.19 Insurance. Each of the Companies has maintained insurance covering it and its properties in such amounts against such hazards and liabilities and for such purposes as is customary in the industry for companies engaged in the same or similar businesses and owning or operating similar properties. Complete and correct copies of all such current insurance policies of the Companies have been made available to Buyer for inspection. None of the Companies is in default under any of such policies. There are no facts known to the Sellers which would likely result in an insurer reducing coverage or increasing premiums on existing policies and all such insurance policies can be maintained in full force and effect without substantial increase in premium or reducing the coverage thereof following the Closing Date. There is no claim pending or, to the Knowledge of the Sellers, threatened under any of such policies as to which coverage has been questioned, denied or disputed by the underwriters of such policy.

4.20 Broker's Fees. Neither the Companies nor the Sellers has employed any broker, finder, or other person or incurred any liability on behalf of the Companies or the Sellers or Buyer for any advisory, brokerage, finder, success, deal completion or similar fees or commissions in connection with the transactions contemplated by this Agreement.

4.21 Healthcare Matters.

(a) Each of the Companies is authorized to provide PXR and IDTF services in each Territory. Each of the Companies has written agreements and/or other agreements or affiliations with nursing and other long-term care facilities, other health care facilities, medical or other practices, other health care providers or suppliers, correctional facilities, industrial and other self-insured businesses.

(b) The Sellers have delivered to Buyer true, correct, and complete copies of the most recent state survey reports, including any statements of deficiencies and plans of correction. None of the Companies has any outstanding deficiencies with respect to any such reports.

(c) Each of the Companies is eligible to receive payment without restriction under all federal and state programs, including, without limitation, Medicare, and Medicaid (collectively, "Government Programs"), and is a supplier with valid and current Medicare supplier and Medicaid provider agreements, Medicare CMS Certification Numbers, National Provider Identifier numbers, and other Government Programs contract numbers which are listed on Schedule 4.21(c). Each of the Companies is currently in compliance with the conditions of participation for the Government

Programs, and there is no pending or threatened, proceeding or investigation under the Government Programs involving any of the Companies.

(d) Each of the Companies has at all times held and currently holds all federal and state licenses, permits, and registrations, required for PXR and IDTF services provided by any of the Companies. Each Health Care Professional (as defined below) that has provided any diagnostic testing or related services to or on behalf of any of the Companies has been and is duly licensed or certified, as applicable, to practice his or her profession in each Territory. With respect to services performed on behalf of any of the Companies, each Health Care Professional has provided services solely within the scope of his or her training and, as applicable, licensure or certification. The Companies have provided to Buyer, or otherwise made available to Buyer, complete copies of all such professional licenses and specialist certifications of the Health Care Professionals. As used herein, (A) the term "Health Care Professional" means any individual required to be licensed, certified or otherwise registered to provide or supervise PXR and IDTF services, who is employed by or under contract with any of the Companies, and who has provided such PXR and IDTF services to any of the Companies. A list of all Health Care Professionals is attached as Schedule 4.21(d).

(e) No Health Care Professional (i) has been sanctioned, excluded, debarred, had a billing privilege revocation or loss of third party payor credentialing, or was disciplined by any licensing board or any other governmental authority or professional association, (ii) has had a final judgment or settlement without judgment entered against him or her in connection with a malpractice action, (iii) has been the subject of any criminal complaint, indictment or criminal proceeding, (iv) has been the subject of any proceeding relating to an allegation of filing false health care claims, violating anti-kickback, "Stark" or other self-referral or fee-splitting laws, or engaging in billing practices in violation of applicable law or (v) has been subject to any investigation or proceeding based on any allegation of violating professional ethics or standards, or engaging in illegal conduct, relating to his or her practice.

(f) None of the Companies, the Sellers, nor any officer, agent, employee, contractor or managing employee (as such term is defined in 42 U.S.C. § 1320a-5(b)) of any of the Companies has been: (i) excluded or debarred or had a billing privilege revocation or has been suspended from participation in any federal (as defined in 42 U.S.C. § 1320a-7b(f)) and/or state health care programs, (ii) subject to sanction pursuant to 42 U.S.C. § 1320a-7a or 1320a-8, or (iii) convicted of a crime described at 42 U.S.C. § 1320a-7b, nor is any such exclusion, debarment, revocation, termination, sanction or conviction pending or threatened.

(g) Neither any of the Companies nor the Sellers (i) is a party to any corporate integrity agreement with any governmental authority, (ii) has reporting obligations pursuant to any settlement agreement entered into with any governmental authority, (iii) has been a target or defendant in any federal, state or local *qui tam* / False Claims Act or similar litigation, or has had certified error rate testing (CERT) audits, Recovery Audit Contractor (RAC) audits, or target probe (TPE) audits, or (iv) has been served with or received any search warrant, subpoena, civil investigative demand, contact letter or telephone or personal contact by or from any federal or state enforcement agency; nor (v) has received any written complaints or complaints via telephone, fax, email, or other methods of communication from employees, contractors, vendors, or any other person that would indicate that such Company has in the past violated, or is currently in violation of, any applicable law, rule or regulation.

(h) Each of the Companies currently and has always had billing practices, including claims submission and receipt of payments, that are in compliance with all applicable Laws and third-party payor policies and rules. Each of the Companies has paid in the ordinary course of business

and as applicable, all discovered undisputed refunds, overpayments, discounts and adjustments which it is obligated to pay under any contract, and there is no pending or threatened appeal, adjustment, challenge, audit (including notice of an intent to audit), inquiry or other proceeding by any third-party payor with respect to any such report or billing. None of the Companies has been audited by any third-party payor. Each of the Companies has timely filed any required applications or other forms to provide updates to enrollment or credentialing data to Medicare, Medicaid, and other federal payors. None of the Companies has any outstanding liability under any Government Program for any refund, overpayment, discount, or adjustment.

(i) Each of the Companies and its Health Care Professionals are and always have been in compliance with the False Claims Act (31 U.S.C. § 3729 et seq.) and any equivalent state laws, the fraud and abuse provisions of Section 1128B of the Social Security Act and 42 U.S.C. § 1320a-7b, 42 U.S.C. § 1395nn and any equivalent state laws, Title VII of the Civil Rights Act of 1964, or the Age Discrimination in Employment Act of 1967 and any rules or regulations thereunder promulgated by the U.S. Department of Health and Human Services, or any other governmental authority or any applicable and comparable fraud and abuse or anti-discrimination statutes and regulations promulgated by any other federal, state or local agency.

(j) Each of the Companies and the Sellers are in compliance with (i) the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), including the Privacy Rule and the Security Standards and including the amendments contained in the amendments to HIPAA set forth in Division A, Title XIII of the American Recovery and Reinvestment Act of 2009, known as The Health Information Technology for Economic and Clinical Health Act or "HITECH Act" and (ii) all laws in each Territory applicable to the privacy and security of medical records. True, correct and complete copies of each Company's HIPAA policies and procedures have been delivered to Buyer.

(k) With respect to the generation, transportation, treatment, storage, disposal and other handling of Medical Waste (as defined below), to the extent applicable to it, each of the Companies is in compliance with the Medical Waste Tracking Act of 1988, 42 U.S.C. § 6992 et seq., the United States Public Vessel Medical Waste Anti-Dumping Act of 1988, 33 U.S.C. § 2501 et seq., the Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. § 1401 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the United States Department of Health and Human Services, National Institute for Occupational Self-Safety and Health Infectious Waste Disposal Guidelines, Publication No. 88-119 et seq., and all other applicable Laws regulating Medical Waste or imposing requirements relating to Medical Waste. As used herein, the term "Medical Waste" means (i) pathological waste, (ii) blood, (iii) contaminated disposable equipment and supplies, (iv) cultures and associated biological agents, (v) isolation wastes, (vi) contaminated equipment, and (vii) other biological waste and discarded materials contaminated with or exposed to blood, excretion, or secretions from human beings, including any substance, pollutant, material or contaminant listed or regulated under the Medical Waste Tracking Act of 1988, 42 U.S.C. § 6992, et seq.

(l) Schedule 4.21(l) contains a list of the governmental funding or relief programs established pursuant to the Coronavirus Aid, Relief and Economic Security Act (Pub. L. 116-136) (the "CARES Act") or otherwise with respect to or relating to Covid in which any of the Companies participated or is participating. All applications and certifications of compliance with eligibility requirements made by the Companies with respect to funds or relief programs set forth on Schedule 4.21(l) were and are true and correct in all material respects and have been timely and properly filed, and each of the Companies has complied in all material respects with all applicable laws relating to, and terms and conditions of, all funding and/or relief received in connection with Covid,

and all CARES Act and related funds received or deferred by any of the Companies have been held, used, applied, deposited, paid, and/or returned in compliance with all applicable Law.

4.22 No Other Representations and Warranties. Except for the representations and warranties contained in this Article IV (including the related portions of the Disclosure Schedules), none of the Sellers, the Companies or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Sellers or the Companies, including any representation or warranty as to the accuracy or completeness of any information regarding the Companies furnished or made available to Buyer and its Representatives any information, documents or material made available to Buyer, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Companies, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE V.
## REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGEMENT OF BUYER

Buyer represents and warrants to the Sellers as set forth below as of the date hereof and as of the Closing Date:

5.1 Authority. Buyer has full power and authority to enter into this Agreement and has received all necessary consents and authorizations from its members, and managers (if any) to approve of and consummate the transactions contemplated hereby.

5.2 Validity. This Agreement and the other agreements and instruments contemplated hereby to which Buyer is a party have been duly and validly executed and delivered by Buyer, and constitute the valid and binding obligations of Buyer, and is enforceable against Buyer in accordance with their respective terms.

5.3 Not for Investment Purposes. Buyer is acquiring the Membership Interests for its own account for investment purposes only and not for distribution, assignment or resale, except with respect to assignment to an entity solely owned by Buyer.

5.4 Sufficient Knowledge. Buyer has sufficient knowledge and experience to evaluate the merits and bear the economic risks of investment in the Membership Interests, has been given the opportunity to ask any questions about the Companies and the Business and has, to its satisfaction, had any such questions answered.

5.5 Broker's Fees. Buyer has not employed any broker, finder, or other person or incurred any liability on behalf of Buyer for any advisory, brokerage, finder, success, deal completion or similar fees or commissions in connection with the transactions contemplated by this Agreement.

5.6 No Other Representations and Warranties. Except for the representations and warranties contained in this Article V, none of Buyer or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Buyer, including any representation or warranty arising from statute or otherwise in law.

## ARTICLE VI.
## CERTAIN COVENANTS

6.1 Confidentiality. The Sellers shall, and shall cause their Affiliates to, hold in confidence any and all Confidential Information concerning the Companies, whether written or oral, except to the extent that the Sellers can show that such Confidential Information (a) is generally available to and known by the public

through no fault of the Sellers; (b) is independently developed by the Sellers without violation of this Section 6.1; or (c) is lawfully acquired by the Sellers, from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. As used herein, "Confidential Information" shall mean any information with respect to the Companies, their business, assets, liabilities, personnel or relationships, including methods of operation, pending or completed acquisitions of any company, division, product line or other business unit, prices, fees, costs, plans, designs, technology, inventions, trade secrets, know-how, software, marketing methods, policies, plans, personnel, customers, suppliers, competitors, markets or other specialized information or proprietary matters. If the Sellers are compelled to disclose any information by judicial or administrative process or by other requirements of Law, such Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which such Seller is advised by its counsel in writing is legally required to be disclosed; *provided that* such Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information. Notwithstanding the foregoing, nothing in this Section 6.1 shall be construed to prohibit the disclosure of Confidential Information, including without limitation this Agreement, in connection with any legal requirements in connection with the bankruptcy proceedings of the Sellers and their Affiliates.

6.2 Non-Competition; Non-Solicitation.

(a) For a period of five (5) years commencing on the Closing Date (the "Restricted Period"), the Sellers shall not, and shall not permit any of their Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Restricted Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, independent contractor, agent, trustee, or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Companies and customers or suppliers of the Company with respect to the Restricted Business. Notwithstanding the foregoing, (A) the passive ownership of less than three percent (3.0%) of the ownership interests of an entity having a class of securities that is traded on a national securities exchange or over-the-counter market and (B) holding a passive investment of not more than three percent (3%) of the equity interests in a private investment fund (over which the Sellers or their Affiliates has no investment or management control) shall not be a violation of this Section 6.2(a).

(b) During the Restricted Period, the Sellers shall not, and shall not permit any of their Affiliates to, directly or indirectly, hire or solicit any employee of the Companies or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; *provided, that* nothing in this Section 6.2(b) shall prevent the Sellers or their Affiliates from hiring (i) any employee whose employment has been terminated by the Companies after the Closing Date or (ii) after three hundred sixty (360) days from the date of termination of employment, any employee whose employment has been terminated by the employee.

(c) The Sellers acknowledge that a breach or threatened breach of Section 6.1 or this Section 6.2 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by the Sellers of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d) The Sellers acknowledge and agree that the restrictions contained in this Section 6.1 and Section 6.2 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in Section 6.1 or this Section 6.2 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable Law. The covenants contained in Section 6.1 and this Section 6.2 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

6.3 Public Announcements. Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no Seller shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

6.4 Further Assurances. Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as any Party may reasonably request to carry out the provisions hereof and give effect to the transactions expressly set forth in this Agreement. In connection with the forgoing, Buyer covenants and agrees to, as soon as reasonably practicable, submit all required documentation and take such required acts in connection with the CHOWs following the Closing, and each Party covenants and agrees to, as soon as reasonably practicable, provide such necessary documentation and assistance to the other Party in connection with Buyer obtaining the CHOWs; *provided that*, for the avoidance of doubt, each Party shall bear their own expenses (including any attorneys or professional fees) in connection with the forgoing.

6.5 Director and Officer Indemnification and Insurance.

(a) On or prior to the Closing Date, the Companies shall, or Sellers shall cause the Companies to, obtain a prepaid tail policy (the "Tail Policy") that provides each current (as of immediately prior to the Closing) and each former director, manager or officer of each Company (the "Indemnified Employees") with directors' and officers' liability insurance, on terms no less favorable than those set forth in the Companies' current directors' and officers' liability insurance policy immediately prior to the execution and delivery of this Agreement, for a period ending no earlier than the third (3rd) anniversary of the Closing. The Sellers and Buyer shall split the costs and expenses related to obtaining and entering into the Tail Policy, including the total premium, on a 50/50 basis, with the Buyer's portion to be paid to the Sellers at Closing. Attached as Schedule 6.5 is a copy of the Tail Policy endorsement and proof of payment.

(b) For the duration of the Tail Policy coverage period, Buyer agrees that all rights to indemnification, advancement of expenses and exculpation by the Companies now existing in favor of each Person who is now, or has been at any time prior to the date hereof or who becomes prior to the Closing Date, an officer or manager of the Companies, as provided in the Organizational Documents of the Companies, in each case as in effect on the date of this Agreement, shall survive the Closing Date and shall continue in full force and effect in accordance with their respective terms.

(c) The obligations of Buyer and the Companies under this Section 6.5 shall not be terminated or modified in such a manner as to adversely affect any manager or officer to whom this Section 6.5 applies without the consent of such affected manager or officer (it being expressly agreed that the managers and officers to whom this Section 6.5 applies shall be third-party beneficiaries of this Section 6.5, each of whom may enforce the provisions of this Section 6.5).

(d) In the event Buyer, the Companies or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in either such case, proper provision shall be made so that the successors and assigns of Buyer or the Companies, as the case may be, shall assume all of the obligations set forth in this Section 6.5.

6.6 Companies' Accounts Receivable. Following the Closing Date, upon receipt by Buyer or any of the Companies, Buyer shall promptly pay over to an account designated by Sellers any Companies' Accounts Receivable, in each case pursuant to the Billing Services Agreement attached hereto as Exhibit G. Notwithstanding anything to the contrary in this Agreement, Buyer shall be entitled to withhold, setoff and deduct from the Companies' Accounts Receivable any recoupments incurred by any Company, as well as a monthly management fee in the amount of (a) six percent (6.0%) of the collections per calendar month for the first three (3) calendar months following the Closing Date and (b) ten percent (10.0%) of the collections per calendar month thereafter. For the avoidance of doubt, in the event the aggregate amount of recoupment costs and liabilities and the management fee exceed the aggregate amount of Companies' Accounts Receivable collected, Buyer may pursue any and all remedies available to it under this Agreement, at law or in equity, including indemnification pursuant to Article VIII.

6.7 Name Change. Promptly following the Closing, Buyer shall execute and file name change amendments and any associated filings to change the name of AHI S, AHI MW and AH W to remove the term "American Health" from such Companies' names. Buyer shall have no right to use the name "American Health" or any similar name following the Closing.

6.8 Books and Records. In order to facilitate the resolution of any claims made against or incurred by the Sellers, or for any other reasonable purpose, for a period of six (6) years after the Closing, Buyer shall:

(a) retain the books and records (including personnel files) of the Companies relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of the Companies; and

(b) upon reasonable advance written notice, afford the Representatives of the Sellers reasonable access (including the right to make, at Sellers' expense, photocopies), during normal business hours, to such books and records.

6.9 Conduct of Business Prior to the Closing. From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), Sellers shall, and shall cause the Companies to, (x) conduct the business of the Companies in the ordinary course of business consistent with past practice (subject to any requirements in connection with the bankruptcy proceedings of the Sellers and their Affiliates); and (y) use reasonable best efforts to maintain and preserve intact the current organization, business and franchise of the Companies and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having business relationships with the Companies.

## ARTICLE VII.

## TAX COVENANTS

7.1 Tax Covenants.

(a) Notwithstanding the foregoing or anything to the contrary contained in this Agreement: (a) Buyer will prepare and deliver to the Sellers a completed Internal Revenue Service Form 8883, and the Parties, to the extent required by applicable Law, will attach such form to their respective income tax returns as required by applicable Law, and such Form 8883 shall be based on the allocation provided in Section 7.5.

(b) Without the prior written consent of Buyer, to the extent it may affect or relate to any of the Companies after Closing, the Sellers shall not make, change or rescind any Tax election or amend any Tax Return, and the Sellers shall not take any position on any Tax Return or take any action, omit to take any action or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Buyer or any of the Companies in respect of any Post-Closing Tax Period. The Sellers agree that Buyer is to have no liability for any Tax resulting from any such action of the Sellers or any of their Affiliates or any of their respective Representatives, and the Sellers agree to indemnify and hold harmless Buyer (and, after the Closing Date, the Companies) against any such Tax or reduction of any Tax asset.

(c) All transfer, documentary, sales, use, stamp, registration, value-added, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (including any real property transfer Tax and any other similar Tax) shall be borne and paid by the Sellers when due. The Sellers shall, at the expense of the Sellers, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

(d) The Sellers shall prepare, or cause to be prepared, with the consent and approval of Buyer, all Tax Returns required to be filed by any of the Companies after the Closing Date with respect to a Pre-Closing Tax Period, including without limitation all Federal and state income Tax Returns. Any such Tax Returns shall be prepared in a manner consistent with past practice (unless otherwise required by Law) and without a change of any election or any accounting method and shall be submitted by the Sellers to Buyer (together with schedules, statements and, to the extent requested by Buyer, supporting documentation) at least fifteen (15) days prior to the due date (including extensions) of such Tax Return. If Buyer objects to any item on any such Tax Return, it shall, within ten (10) days after delivery of such Tax Return, notify the Sellers in writing that it so objects, specifying with particularity any such item and stating the specific factual or legal basis for any such objection. If a notice of objection shall be duly delivered, Buyer and the Sellers shall negotiate in good faith and use their reasonable best efforts to resolve such items. If Buyer and the Sellers are unable to reach such agreement within ten (10) days after receipt by the Sellers of such notice, the disputed items shall be resolved by the Accountant and any determination by the Accountant shall be final. The Accountant shall resolve any disputed items within twenty (20) days of having the item referred to it pursuant to such procedures as it may require. If the Accountant is unable to resolve any disputed items before the due date for such Tax Return, Buyer shall file for an extension of the due date, and if the date of the extension expires, the Tax Return shall be filed as prepared by the Sellers and then amended to reflect the Accountant's resolution. The costs, fees and expenses of the Accountant shall be borne equally by Buyer and the Sellers. The preparation and filing of any Tax Return of any of the Companies that does not relate to a Pre-Closing Tax Period shall be exclusively within the Control of Buyer.

7.2 Tax Indemnification. The Sellers shall indemnify the Companies, Buyer, and each Buyer

Indemnitee (as defined below) and hold them harmless from and against (a) any Loss (as defined below) attributable to any breach of or inaccuracy in any representation or warranty made in Section 4.12; (b) any Loss attributable to the Sellers or any its Affiliates' breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation in this Article VII; (c) all Taxes of the Companies, or of the Sellers, or that relate to the Business, in each case with respect to all Pre-Closing Tax Periods; (d) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which any of the Companies (or any predecessor of any of the Companies) is or was a member on or prior to the Closing Date by reason of a liability under Treasury Regulation Section 1.1502-6 or any comparable provisions of foreign, state or local Law; and (e) any and all Taxes of any person imposed on any of the Companies or Buyer arising under the principles of transferee or successor liability or by contract, relating to an event or transaction occurring before the Closing Date. In each of the above cases, together with any other Losses incurred in connection therewith, the Sellers shall reimburse Buyer for any Taxes and other amounts that are the responsibility of the Sellers pursuant to this Section 7.2 within ten (10) Business Days after written notice from Buyer.

7.3 Straddle Period. In the case of Taxes that are payable with respect to a taxable period that begins before and ends after the Closing Date (each such period, a "Straddle Period"), the portion of any such Taxes that are treated as Pre-Closing Taxes for purposes of this Agreement shall be:

(a) in the case of Taxes (i) based upon, or related to, income, receipts, profits, wages, capital, or net worth, (ii) imposed in connection with the sale, transfer, or assignment of property, or (iii) required to be withheld, deemed to be equal to the amount which would be payable if the taxable year ended with the Closing Date; and

(b) in the case of other Taxes, deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

7.4 Contests. Buyer agrees to give written notice to the Sellers within thirty (30) days of the receipt of any written notice by any of the Companies or Buyer which involves the assertion of any claim, or the commencement of any Action, in respect of which an indemnity may be sought by Buyer pursuant to this Article VII (a "Tax Claim"); *provided*, *that* failure to comply with this provision shall not affect Buyer's right hereunder. Buyer shall control the defense, contest or resolution of any Tax Claim and any other claim that may be the subject of Section 7.2; *provided, however*, that Buyer shall obtain the prior written consent of the Sellers (which consent shall not be unreasonably withheld, conditioned or delayed) before entering into any settlement of a claim or ceasing to defend such claim; and, *provided further*, that the Sellers shall be entitled to participate in the defense of such claim and to employ counsel of their choice for such purpose, the fees and expenses of which separate counsel shall be borne solely by the Sellers. With respect to direct claims under Section 7.2, Buyer shall give notice thereof to the Sellers.

7.5 Purchase Price Allocation. The Purchase Price will be allocated for all federal and state tax purposes in accordance with Schedule 7.5 attached hereto.

7.6 Cooperation and Exchange of Information. The Sellers shall provide Buyer and the Companies with such cooperation and information as Buyer or the Companies may reasonably request in filing any Tax Return pursuant to this Article VII or in connection with any audit or other proceeding in respect of Taxes. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents. The Sellers and Buyer shall retain all Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the Companies for any taxable period beginning before the Closing Date until the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents

relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods. Prior to transferring, destroying, or discarding any Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the Companies for any taxable period beginning before the Closing Date, the Sellers on the one hand, or Buyer on the other hand, as the case may be, shall provide the other party with reasonable written notice and offer the other party the opportunity to take custody of such materials.

7.7 Tax Treatment of Indemnification Payments. Any indemnification payments pursuant to this Article VII or pursuant to Article VIII shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes, unless otherwise required by Law.

7.8 Survival. Notwithstanding anything in this Agreement to the contrary, the provisions of Section 4.12 and this Article VII shall survive for a period ending sixty (60) days after the applicable statute of limitations.

7.9 Overlap. To the extent that any obligation or responsibility pursuant to Article VIII may overlap with an obligation or responsibility pursuant to this Article VII, the provisions of this Article VII shall govern.

## ARTICLE VIII.
## INDEMNIFICATION

8.1 Survival. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein (other than any representations or warranties contained in Section 4.12 which are subject to Article VII) shall survive the Closing and shall remain in full force and effect until the date that is twenty-four (24) months from the Closing Date; *provided, that* the representations and warranties contained in Section 4.22 shall in each case survive the Closing for a period of sixty (60) days following the expiration of the applicable statute of limitations with respect to the matter that is the subject matter thereof; *provided further*, *that* the Sellers' Fundamental Representations (as defined below) shall survive the Closing indefinitely. All covenants and agreements of the parties contained herein (other than any covenants or agreements contained in Article VI which are subject to Article VI) shall survive the Closing for the period of sixty (60) days following the expiration of the applicable statute of limitations with respect to the matter that is the subject matter thereof. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved. As used herein, "Sellers' Fundamental Representations" means the representations and/or warranties contained in Section 4.1, Section 4.2, Section 4.3, Section 4.4, and Section 4.21.

8.2 Indemnification By the Companies and the Sellers. Subject to the other terms and conditions of this Article VIII, the Sellers and the Companies shall, jointly and severally, indemnify and defend Buyer and its Affiliates (which after Closing with respect to the Sellers' obligations hereunder, shall include the Companies) (collectively, the "Buyer Indemnitees") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "Losses") incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of any (a) fraud or willful misconduct in connection with this Agreement, including without limitation in connection with the representations, warranties and covenants contained herein or any certificate or instrument delivered by the Sellers or the Companies pursuant to this Agreement; or (b) inaccuracy in or breach of any of the

representations or warranties of the Companies of the Sellers contained in Section 4.11, Section 4.17 and Section 4.21.

8.3 Indemnification By Buyer. Subject to the other terms and conditions of this Article VIII, Buyer shall indemnify and defend the Sellers (collectively, the "Sellers Indemnitees") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Sellers Indemnitees based upon, arising out of, with respect to or by reason of any fraud or willful misconduct in connection with this Agreement, including without limitation in connection with the representations, warranties and covenants contained herein or any certificate or instrument delivered by Buyer pursuant to this Agreement.

8.4 Certain Limitations. The party making a claim under this Article VIII is referred to as the "Indemnified Party", and the party against whom such claims are asserted under this Article VIII is referred to as the "Indemnifying Party." The indemnification provided for in Sections 8.2 and 8.3 shall be subject to the following limitations:

(a) The aggregate amount of all Losses for which an Indemnifying Party shall be liable pursuant to Sections 8.2 or 8.3 as the case may be, shall not exceed the Purchase Price.

(b) Payments by an Indemnifying Party pursuant to Sections 8.2 or 8.3 in respect of any Loss shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnified Party (or the Companies) in respect of any such claim. The Indemnified Party shall use its commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for any Losses prior to seeking indemnification under this Agreement.

(c) Payments by an Indemnifying Party pursuant to Sections 8.2 or 8.3 in respect of any Loss shall be reduced by an amount equal to any Tax benefit realized or reasonably expected to be realized as a result of such Loss by the Indemnified Party.

(d) In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple.

(e) Each Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

8.5 Notice and Defense of Claim. Whenever any claim shall arise for indemnification hereunder, the Indemnified Party shall provide written notice to the Indemnifying Party within thirty (30) days of becoming aware of the right to indemnification and, as expeditiously as possible thereafter, the facts constituting the basis for such claim. In connection with any claim giving rise to indemnity hereunder, resulting from or arising out of any claim or legal proceeding by a person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such claim or legal proceeding with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such action, with its counsel and at its own expense. If the Indemnifying Party does not assume the defense of any such claim or litigation resulting therefrom, the Indemnified Party may, but shall not be obligated to,

defend against such claim or litigation in such manner as it may deem appropriate including, but not limited to, settling such claim or litigation, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any Losses resulting therefrom.

8.6 Tax Claims. Notwithstanding any other provision of this Agreement, the control of any claim, assertion, event or proceeding in respect of Taxes of any of the Companies (including, but not limited to, any such claim in respect of a breach of the representations and warranties in Section 4.12 hereof or any breach or violation of or failure to fully perform any covenant, agreement, undertaking or obligation in Article VII) (a "Tax Claim") shall be governed exclusively by Article VII hereof.

8.7 Certain Waivers. The Sellers waive any right the Sellers may have to indemnification or advancement of expenses pursuant to any Company's Governing Documents or any applicable Law of any state (including without limitation each Territory) in such person's capacity as a director, manager, member, officer, employee or agent of any of the Companies with respect to any matter, cause or thing for which the Sellers are obligated to indemnify any of the Companies or Buyer pursuant to Section 7.2 or Section 8.2 hereof.

8.8 Effect of Investigation. The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives).

8.9 Right of Setoff. Upon a Final Determination, Buyer or any of the Companies shall have the right, on its own behalf and on behalf of any other Buyer Indemnitee, to set off or to cause the Companies to set off against all of any portion of the Deferred Payment Amount and any other amounts owed or owing to Sellers pursuant to or in connection with this Agreement and the transactions contemplated thereby (including without limitation in respect of Seller's indemnity obligations pursuant to Section 7.2 an pursuant to this Article VIII). In addition, Buyer or any of the Companies may withhold from any payments otherwise due to the Sellers hereunder the aggregate amount of any such claim until a Final Determination has been made with respect to such claim.

8.10 Disregard of Qualifications. For the purposes of calculating the amount of any damages resulting from any claim hereunder and for the determination of the existence of any breach of any representation or warranty herein, any and all representations and warranties made by the Seller will be deemed to be made without qualification by the concepts of materiality, material adverse effect, or other similar concepts stated herein.

8.11 Exclusive Remedies. Except with respect to the obligations of the Sellers under Sections 6.2 and 7.2, or in the case of fraud, as between the parties hereto, the remedies provided in this Article VIII shall, from and after the Closing, be the sole and exclusive monetary remedies of the Buyer Indemnitees and the Seller Indemnitees with respect to a breach of any representation, warranty, covenant, agreement or obligation set forth in this Agreement.

## ARTICLE IX.
## TERMINATION

9.1 Termination. This Agreement may be terminated at any time prior to the Closing:

(a) by the mutual written consent of the Sellers and Buyer;

(b) by Buyer by written notice to the Sellers if:

(i) Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by the Sellers pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article III and such breach, inaccuracy or failure has not been cured by Seller within three (3) days of the Sellers' receipt of written notice of such breach from Buyer; or

(ii) any of the conditions set forth in Sections 3.2 or 3.4 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by September 15, 2026, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(c) by the Sellers by written notice to Buyer if:

(i) Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article III and such breach, inaccuracy or failure has not been cured by Buyer within three (3) days of Buyer's receipt of written notice of such breach from Seller; or

(ii) any of the conditions set forth in Sections 3.2 or 3.3 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by September 15, 2026, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing.

9.2 <u>Effect of Termination</u>. In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a) as set forth in this Article IX and Section 6.01 and Article X hereof; and

(b) that nothing herein shall relieve any party hereto from liability for any fraud or willful breach of any provision hereof.

## ARTICLE X.
## MISCELLANEOUS PROVISIONS

10.1 <u>Notices</u>. All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given and made (i) upon being hand delivered to the Party for whom it is intended, or (ii) one (1) business day after deposit with a nationally recognized overnight carrier providing proof of delivery, or (iii) upon receipt if sent by email, to the address shown in this Section 10.1 for, or such other address as may be designated in writing hereafter by, such Party, and further provided that any such notice intended for the Sellers shall be delivered to the Sellers in

the manner set forth in this Section 10.1 and such delivery shall be deemed to have been properly made to the Sellers:

If to the Companies (before Closing; after Closing send to Buyer):

c/o American Health Associates Parent, LLC
Attn: Christopher Martin
15712 SW 41 Street, Ste 11
Davie, FL 33331
Email: ctmartin@ahalabs.com

If to Buyer: All-Stat Portable LLC
Attn: Etai Sooliman, CEO
8235 Christiana Ave
Skokie, IL 60076-2910
Email 1: Etai@AllStatPortable.com
Email 2: Legal@AllStatPortable.com

With a copy to: Baker Donelson
100 Light Street, 19th Floor
Baltimore, MD 21202
Attn: Matthew G. Huddle, Esq.
Email: mhuddle@bakerdonelson.com

If to the Sellers:
c/o American Health Associates Parent, LLC
Attn: Christopher Martin
15712 SW 41 Street, Ste 11
Davie, FL 33331
Email: ctmartin@ahalabs.com

With a copy to, which shall not constitute notice:
Akerman LLP
201 E. Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL 33301
Attention: Martin Burkett; Hunter Carpenter
E-mail: martin.burkett@akerman.com; hunter.carpenter@akerman.com

10.2 Entire Agreement. This Agreement embodies the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings relative to such subject matter.

10.3 Assignment; Binding Agreement. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Parties and their respective successors, heirs, devisees, legatees, legal representatives and permitted assigns, as applicable. Neither this Agreement nor any of the rights, interests, or obligations hereunder shall be transferred, delegated, or assigned (by operation of law or otherwise) by any Party hereto without the prior written consent of all Parties hereto, which shall not be unreasonably withheld. Notwithstanding the foregoing, Buyer shall have the right to assign this Agreement to an Affiliate.

10.4 Counterparts. This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. A signed copy of this Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

10.5 Governing Law.

(a) This Agreement shall in all respects be construed in accordance with and governed by the substantive laws of the State of Delaware, without reference to its choice of law rules.

(b) TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY AND ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY IN NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

10.6 No Third-Party Beneficiaries or Other Rights. Except as provided in Section 7.2 and Article VIII, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

10.7 Gender. References herein to any gender shall include each other gender.

10.8 Amendment and Modification. This Agreement shall be amended, modified or supplemented only by a written agreement signed by all the Parties hereto.

10.9 Severability. If any provision of this Agreement shall be determined to be contrary to Law and unenforceable by any court of law, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby are not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible, and failing such agreement by the parties, shall be so modified by a court of competent jurisdiction.

10.10 Not-Binding Until Fully Executed. Submission of this Agreement by Buyer shall not constitute the making of an offer to purchase the Membership Interests, and submission of this Agreement by Sellers shall not constitute the making of an offer to sell the Membership Interests to Buyer. This Agreement shall not be binding against any party, nor shall any party have any liability or obligation hereunder, unless and until fully executed copies of this Agreement are delivered by all parties hereto.

*[Remainder of Page Intentionally Left Blank; Signatures to Follow]*

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed as of the date first above written.

**BUYER:**

ALL-STAT PORTABLE LLC, an Illinois limited liability company

Signed by:

By ______________________________

043E53DBE1D1419...

Name: Etai Soolliman
Its: CEO

**COMPANIES:**

MOBILE XRAY DIAGNOSTICS, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH IMAGING MW, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH IMAGING S, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH W, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed as of the date first above written.

**BUYER:**

ALL-STAT PORTABLE LLC, an Illinois limited liability company

By:______________________________
Name: Etai Sooliman
Its: CEO

**COMPANIES:**

MOBILE XRAY DIAGNOSTICS, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH IMAGING MW, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH IMAGING S, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH W, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

*[Signature Page to Membership Interest Purchase Agreement]*

**SELLERS:**

AMERICAN HEALTH HOLDINGS, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH HOLDINGS II, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH HOLDINGS III, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH HOLDINGS IV, LLC, a Delaware limited liability company

By:______________________________
Name: Christopher Martin
Its: President

## TABLE OF EXHIBITS AND SCHEDULES


1) EXHIBIT A SELLER'S BANK ROUTING AND ACCOUNT
2) EXHIBIT B ASSIGNMENT AND TRANSFER OF MEMBERSHIP INTERESTS
3) EXHIBIT C FORM OF RESIGNATION
4) EXHIBIT D FORM OF RELEASE AGREEMENT
5) EXHIBIT E FORM W-9
6) EXHIBIT F FORM OF OFFICER'S CERTIFICATE
7) EXHIBIT G BILLING SERVICES AGREEMENT
8) EXHIBIT H DRAFT ORDER
9) Schedule 1.1(e) Closing Adjustment
10) Schedule 4.5 Leases
11) Schedule 4.7 Financial Statements
12) Schedule 4.8 Accounts Receivable
13) Schedule 4.9 Accounts Payable
14) Schedule 4.10 Absence of Certain Changes
15) Schedule 4.11 Litigation; Legal Proceedings
16) Schedule 4.12(c) Tax Matters
17) Schedule 4.13 Contracts and Commitments
18) Schedule 4.14 Compliance with Laws
19) Schedule 4.15 Permits, Licenses and Authorizations
20) Schedule 4.16 FFE and Intellectual Property
21) Schedule 4.17 Employees and Independent Contractors
22) Schedule 4.21(c) Government Programs
23) Schedule 4.21(d) Health Care Professionals
24) Schedule 4.21(l) Coronavirus Aid, Relief and Economic Security Act
25) Schedule 6.5 Three (3) Year Tail Policy Endorsement and Proof Of Payment
26) Schedule 7.5 Purchase Price Allocation

**EXHIBIT A**

**SELLERS' BANK ROUTING AND ACCOUNT**

City National Bank of Florida
2701 S Le Jeune Rd, 8th Floor
Coral Gables, Fl 33134-5809
Contact: Minelly Rios
Email: Minelly.Rios@citynational.com
Tel: 305-898-9553
Bank Routing Number: 066004367
Type: Checking
Account Number: [redacted]

# EXHIBIT B

## ASSIGNMENT AND TRANSFER OF MEMBERSHIP INTERESTS

This ASSIGNMENT AND TRANSFER OF MEMBERSHIP INTERESTS (this "Assignment") is effective as of ______, 2026 by and between ALL-STAT PORTABLE LLC, an Illinois limited liability company ("Assignee"), and American Health Holdings, LLC, a Delaware limited liability company (the "AHI MW Seller"), American Health Holdings II, LLC, a Delaware limited liability company (the "AHI S Seller"), American Health Holdings III, LLC, a Delaware limited liability company (the "MXD Seller"), American Health Holdings IV, LLC, a Delaware limited liability company (the "AH W Seller" and together with each of the AHI MW Seller, the AHI S Seller and the MXD Seller, each an "Assignor" and collectively "Assignors").

WHEREAS, Assignee and Assignors and certain other parties are each a party to that certain Membership Interest Purchase Agreement, dated as of August 24, 2026 (the "Purchase Agreement");

WHEREAS, the AHI MW Seller owns one hundred percent (100%) of the membership interests (the "AHI MW Membership Interests") of AHI MW;

WHEREAS, the AHI S Seller owns one hundred percent (100%) of the membership interests (the "AHI S Membership Interests") of AHI S;

WHEREAS, the MXD Seller owns one hundred percent (100%) of the membership interests (the "MXD Membership Interests") of MXD;

WHEREAS, the AH W Seller owns one hundred percent (100%) of the membership interests (the "AH W Membership Interests" and together with the AHI MW Membership Interests, the AHI S Membership Interests and the MXD Membership Interests, collectively the "Membership Interests") of AH W; and

WHEREAS, the Assignors desire to transfer, assign, convey, sell and deliver to Assignee, and Assignee desires to purchase and accept from the Assignors, the Assignors' right, title and interest in the Membership Interests.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. The Assignors hereby transfer, assign, convey, sell and deliver to Assignee all right, title and interest to their respective Membership Interests, and Assignee hereby purchases and accepts the assignment from the Assignors such Assignor's right, title and interest to its respective Membership Interests.

2. In the event of a conflict between this Assignment and the Purchase Agreement, the Purchase Agreement shall control.

3. This Assignment may be executed in one or more counterparts, each of which together will constitute one and the same instrument. Any counterparts of this Assignment or any signatures thereon delivered by any electronic method (including by email in portable document format (.pdf)) will be deemed an original executed document for all purposes hereof.

4. This Assignment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

5. This Assignment will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any principles of conflicts of laws that would apply to any other law.

[*Signature page follows*]

**IN WITNESS WHEREOF**, the parties have caused this Assignment and Transfer of Membership Interests to be executed on its behalf as of the date first written above.

**ASSIGNORS**:

**AMERICAN HEALTH HOLDINGS, LLC**, a Delaware limited liability company

By:__________________________________
Name: Christopher Martin
Its: President

**AMERICAN HEALTH HOLDINGS II, LLC**, a Delaware limited liability company

By:__________________________________
Name: Christopher Martin
Its: President

**AMERICAN HEALTH HOLDINGS III, LLC**, a Delaware limited liability company

By:__________________________________
Name: Christopher Martin
Its: President

**AMERICAN HEALTH HOLDINGS IV, LLC**, a Delaware limited liability company

By:__________________________________
Name: Christopher Martin
Its: President

**ASSIGNEE**:

**ALL-STAT PORTABLE LLC**

By: ____________________________________
Name: Etai Sooliman
Title: CEO

# EXHIBIT C

## FORM OF RESIGNATION

_______________, 2026

To: Secretary of each of American Health Imaging MW, LLC, American Health Imaging S, LLC, Mobile Xray Diagnostics, LLC and American Health W, LLC

Ladies and Gentlemen:

Reference is made to that certain Membership Interest Purchase Agreement (the "Purchase Agreement"), dated as of August 24, 2026, by and among the Companies, the Sellers, and All-Stat Portable LLC, an Illinois limited liability company ("Buyer"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

Contingent upon the occurrence of, and effective as of, the Closing, each of the undersigned hereby resign from any and all positions the undersigned holds as a manager, director (including committees thereof) and/or officer, or any similar capacity, or employee, of each of the Companies, without the need for acceptance or further action by any Person or Persons in connection herewith.

Sincerely,

_________________________________
[•][1]

[1] Note to Draft: Each of the Companies is member-managed by its sole member. Chris Martin is the sole officer of S, MW and S; Chris, Joel and Mindy are officers of MXD.

# EXHIBIT D

## RELEASE AGREEMENT

This RELEASE AGREEMENT (this "Agreement") is entered into on [●], 2026, by and among ALL-STAT PORTABLE LLC, an Illinois limited liability company (the "Buyer"), and [●] ("Releasing Party"). Buyer and the Releasing Party are referred to from time to time herein individually as a "Party" and together as the "Parties."

## Recitals

A. Buyer, American Health Holdings III, LLC, a Delaware limited liability company (the "Seller"), and Mobile Xray Diagnostics, LLC, a Delaware limited liability company (the "Company") have entered into that certain Membership Interest Purchase Agreement (the "Purchase Agreement") of even date herewith. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Purchase Agreement.

B. The Parties are entering into this Agreement in connection with the Purchase Agreement, to ensure that the Buyer receives the full benefit of the transactions contemplated by the Purchase Agreement and the other agreements executed and delivered pursuant to the Purchase Agreement (collectively, the "Transaction Agreements").

C. The Releasing Party is entering into this Agreement in exchange for good and valuable consideration, including the consummation of the transactions contemplated by the Transaction Agreements and the benefits to be received by the Releasing Party in connection therewith, the receipt and sufficiency of which are hereby acknowledged.

NOW THEREFORE, in consideration of the mutual promises and covenants hereinafter set forth and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. Release of Claims by Releasing Party. Releasing Party does hereby for himself or herself and his or her heirs, personal representatives, executors, administrators, agents and assigns, fully and forever release and absolutely discharge the Buyer and the Companies and their Affiliates, and each of their officers, directors, employees, administrators, agents, subsidiaries, and assigns ("Released Parties"), from, and agree not to sue concerning, any claim, demand, duty, debt, liability, account, reckoning, obligation, cost, expense, lien, attorneys' fee, action or cause of action directly relating to any matters of any kind arising, occurring or accruing prior to and including the Closing Date in connection with or related to any of the Companies; *provided*, *however*, that the foregoing release shall not extend to (i) claims arising from fraud by Buyer or any of its Affiliates (other than the Companies), (ii) any rights to indemnification, contribution, or reimbursement to which Releasing Party is entitled under the governing documents of any of the Companies or any agreement between Releasing Party and any of the Companies or any insurance policy, or (iii) any claims arising under the Transaction Agreements. Releasing Party and the Buyer agree that the release set forth in this section shall be and remain in effect in all respects as a complete general release, subject to the foregoing exceptions. Notwithstanding anything to the contrary contained herein, this Agreement and any release contained herein does not extend to nor shall it have any effect on or release any Party from and shall not affect or impair any rights and/or obligations of the Parties under the Transaction Agreements and the transactions contemplated thereby.

2. Release of Unknown Claims. In connection with the release of claims pursuant to Section 1 and subject to the limitations and exceptions set forth in this Agreement, Releasing Party acknowledges that he or she is aware that he or she, or his or her attorneys, may later discover claims or facts in addition to or different from those which he or she now knows or believes to exist with respect to the subject matter of this

Agreement or any Released Party, but that it is his or her intention that such Releasing Party releases, pursuant to Section 1 and subject to the limitations and exceptions set forth in this Agreement, respectively, the claims, complaints, disputes and differences, known or unknown, suspected or unsuspected, which now exist or may exist, with the Released Parties; *provided*, *however*, that such release of unknown claims shall not extend to any claims arising from fraud by Buyer or any of its Affiliates (other than the Companies), which are expressly excluded from this release regardless of whether such claims are presently known or unknown. Releasing Party acknowledges that he or she has been advised by legal counsel and that he or she acknowledges and, pursuant to Section 1 and subject to the limitations and exceptions set forth in this Agreement, respectively, waives and relinquishes any right or benefit which he or she has or may have under any provision of the statutory, non-statutory law, or common law of any applicable jurisdiction to the full extent that it may lawfully waive all such rights and benefits pertaining to the subject matter of this Agreement.

3. No Future Claims. Releasing Party represents that, as of the date hereof, he or she has no lawsuits, claims, complaints or actions pending in his or her name, or on behalf of any other person or entity, against the Buyer or any other Released Party in any court, whether federal or in any state, or before any government agency or entity.

4. Mutual Release. In consideration of the release provided by Releasing Party under Section 1, the Buyer, on behalf of itself and its Affiliates, and the Companies, do hereby release and absolutely discharge the Releasing Party and his or her heirs, personal representatives, executors, administrators, agents and assigns, from any claim, demand, duty, debt, liability, account, reckoning, obligation, cost, expense, lien, attorneys' fee, action or cause of action directly relating to any matters of any kind arising, occurring or accruing prior to and including the Closing Date in connection with Releasing Party's service as an officer, director, manager, member, or employee of any of the Companies; *provided*, *however*, that the foregoing release shall not extend to any claims arising under the Transaction Agreements.

5. Confidentiality. This Agreement shall be kept confidential to the same extent and on the same terms as provided with respect to the Purchase Agreement pursuant to Section 6.1 of the Purchase Agreement.

6. No Admission of Liability. Releasing Party understands and acknowledges that no action taken by any Released Party, either previously or in connection with this Agreement, shall be deemed or construed to be (a) an admission of the truth or falsity of any potential claims; or (b) an acknowledgment or admission by any Released Party of any fault or liability whatsoever to any Releasing Party or to any third party.

7. Costs. The Parties shall each bear their own costs, expert fees, attorneys' fees and other fees incurred in connection with entering into and enforcing this Agreement.

8. Authority. Releasing Party represents and warrants that (a) Releasing Party has full power and authority to execute and deliver this Agreement and to perform his or her obligations hereunder, and (b) to Releasing Party's knowledge, there are no liens or claims of lien or assignments in law or equity or otherwise of or against any of the claims or causes of action released herein by the Releasing Party.

9. Additional Documents. Releasing Party hereby covenants and agrees to execute and deliver any additional documents necessary or desirable, in the reasonable opinion of the Buyer to carry out the intent of this Agreement.

10. No Representations. RELEASING PARTY REPRESENTS THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY AND HAS CAREFULLY READ AND UNDERSTANDS THE SCOPE AND EFFECT OF THE PROVISIONS OF THIS AGREEMENT. RELEASING PARTY HAS NOT RELIED UPON ANY REPRESENTATIONS OR STATEMENTS MADE BY THE BUYER WHICH ARE NOT SPECIFICALLY SET FORTH IN THIS AGREEMENT. BUYER REPRESENTS THAT IT HAS NOT MADE ANY REPRESENTATIONS OR STATEMENTS TO THE

RELEASING PARTY REGARDING THE CLAIMS BEING RELEASED OR ANY OTHER MATTER COVERED BY THIS AGREEMENT OTHER THAN THOSE SPECIFICALLY SET FORTH HEREIN.

11. Severability. If any provision of this Agreement or portion of this Agreement is found to be wholly or partially invalid, illegal or unenforceable in any judicial proceeding, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated in this Agreement as so modified or restricted, or as if such provision had not been originally incorporated in this Agreement, as the case may be.

12. Entire Agreement; Amendment. This Agreement, the Transaction Agreements and any exhibits and schedules hereto or thereto (i) constitute the entire agreement and understanding between the Parties with respect to the subject matter herein identified and supersede, merge and integrate any and all previous and contemporaneous agreements and understandings (in fact or law), both written and oral, between the Parties concerning such matters, and (ii) shall be applicable to and binding upon the Parties and their respective, heirs, personal representatives, successors and assigns. This Agreement may be amended by the Parties only by execution of an instrument in writing signed by each Party. The Company is an intended third party beneficiary of this Agreement.

13. Governing Law; Exclusive Jurisdiction. This Agreement and the respective rights and obligations of the Parties under this Agreement shall be governed by, and shall be determined under, the internal laws of the State of Delaware, without regard to conflict of law principles. Any action involving this Agreement shall be brought and maintained solely in the Federal or state courts located in the State of Delaware. Each of the Parties irrevocably consents to the exclusive jurisdiction and venue of such courts in connection with any matter based upon or arising out of this Agreement or the matters contemplated herein, agrees that process may be served upon them in any manner authorized by the laws of the State of Delaware for such persons and waives and covenants not to assert or plead any objection which they might otherwise have to such jurisdiction, venue and such process.

14. Waiver of Jury Trial. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AND ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY IN NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

15. Rules of Construction. The Parties agree that they have been represented by counsel during the negotiation, preparation and execution of this Agreement, or have voluntarily declined to seek such counsel, and; therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the Party drafting such agreement or document.

16. Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement. This Agreement shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that both Parties need not sign the same counterpart. This Agreement may be executed electronically.

17. Voluntary Execution of Agreement. This Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of the Parties, with the full intent of releasing all claims. The Parties acknowledge that:

(a) They have read this Agreement;

(b) They understand the terms and consequences of this Agreement and of the releases it contains; and

(c) They are fully aware of the legal and binding effect of this Agreement.

*[signature page follows]*

IN WITNESS WHEREOF, the Parties have executed this Agreement on the respective dates set forth below.

**BUYER:**

ALL-STAT PORTABLE LLC, an Illinois limited liability company

By:___________________________________
Name: Etai Sooliman
Its: CEO

**RELEASING PARTY:**

[●], a Delaware limited liability company

By:___________________________________
Name:
Its:

OR

___________________________________
[●]

# EXHIBIT E

## OMNIBUS OFFICER'S CERTIFICATE OF EACH OF AMERICAN HEALTH IMAGING MW, LLC AMERICAN HEALTH IMAGING S, LLC MOBILE XRAY DIAGNOSTICS, LLC AND AMERICAN HEALTH W, LLC

The undersigned, who is the President of each of American Health Imaging MW, LLC, a Delaware limited liability company ("AHI MW"), American Health Imaging S, LLC, a Delaware limited liability company ("AHI S"), Mobile Xray Diagnostics, LLC, a Delaware limited liability company ("MXD"), American Health W, LLC, a Delaware limited liability company ("AH W" and together with AHI MW, AHI S and MXD, each a "Company" and collectively the "Companies"), hereby certify on behalf of the Companies to All-Stat Portable LLC, an Illinois limited liability company ("Buyer") as follows:

(i) Attached hereto as Exhibit E-1 is a true, complete and correct copy of the Articles of Organization of AHI MW, and all amendments thereto. No action has been taken to amend, modify or repeal such Articles of Organization and the amendments thereto, the same being in full force and effect on the date hereof;

(ii) Attached hereto as Exhibit E-2 is a true, complete and correct copy of the Operating Agreement of AHI MW and any amendments thereto. Such Operating Agreement and any amendments thereto are in full force and effect on the date hereof and has not in any manner whatsoever been further amended or modified;

(iii) Attached hereto as Exhibit E-3 is a true, complete and correct copy of the Articles of Organization of AHI S, and all amendments thereto. No action has been taken to amend, modify or repeal such Articles of Organization and the amendments thereto, the same being in full force and effect on the date hereof;

(iv) Attached hereto as Exhibit E-4 is a true, complete and correct copy of the Operating Agreement of AHI S and any amendments thereto. Such Operating Agreement and any amendments thereto are in full force and effect on the date hereof and has not in any manner whatsoever been further amended or modified;

(v) Attached hereto as Exhibit E-5 is a true, complete and correct copy of the Articles of Organization of the MXD, and all amendments thereto. No action has been taken to amend, modify or repeal such Articles of Organization and the amendments thereto, the same being in full force and effect on the date hereof;

(vi) Attached hereto as Exhibit E-6 is a true, complete and correct copy of the Operating Agreement of the MXD and any amendments thereto. Such Operating Agreement and any amendments thereto are in full force and effect on the date hereof and has not in any manner whatsoever been further amended or modified;

(vii) Attached hereto as Exhibit E-7 is a true, complete and correct copy of the Articles of Organization of the AH W, and all amendments thereto. No action has been taken to amend, modify or repeal such Articles of Organization and the amendments thereto, the same being in full force and effect on the date hereof;

(viii) Attached hereto as Exhibit E-8 is a true, complete and correct copy of the Operating Agreement of the AH W and any amendments thereto. Such Operating Agreement and any amendments thereto are in full force and effect on the date hereof and has not in any manner whatsoever been further amended or modified;

(ix) Attached hereto as Exhibit E-9 are true, complete and correct copies of the omnibus written consent adopted by the sole member of each Company, authorizing the Purchase Agreement and the transactions contemplated by the Purchase Agreement, and such resolutions or written consent remains in full force and effect, and has not been amended, rescinded or modified;

(x) Set forth below is the name, title, and specimen signature of the person(s) duly authorized to execute and deliver on behalf of each Company the Purchase Agreement and the other documents, agreements and instruments to be executed and delivered by each Company pursuant to the Membership Interest Purchase Agreement:

| Name | Title | Signature |
|---|---|---|
| Christopher Martin | President | ________________ |

(xi) Attached hereto as Exhibit E-10 are true and correct copies of Certificates of Good Standing (or its equivalent) of AHI MW issued by the State of Delaware and each jurisdiction in which AHI MW is qualified as a foreign entity, in each case issued not more than five (5) days prior to the date hereof.

(xii) Attached hereto as Exhibit E-11 are true and correct copies of Certificates of Good Standing (or its equivalent) of AHI S issued by the State of Delaware and each jurisdiction in which AHI S is qualified as a foreign entity, in each case issued not more than five (5) days prior to the date hereof.

(xiii) Attached hereto as Exhibit E-12 are true and correct copies of Certificates of Good Standing (or its equivalent) of MXD issued by the State of Delaware and each jurisdiction in which MXD is qualified as a foreign entity, in each case issued not more than five (5) days prior to the date hereof.

(xiv) Attached hereto as Exhibit E-13 are true and correct copies of Certificates of Good Standing (or its equivalent) of AH W issued by the State of Delaware and each jurisdiction in which AH W is qualified as a foreign entity, in each case issued not more than five (5) days prior to the date hereof.

IN WITNESS WHEREOF, the undersigned has executed this Certificate in its capacity as Secretary of the Company as of this ___ day of ___________, 2026.

__________________________
Name: Christopher Martin
Title: President

**EXHIBIT F**

**W-9**

SEE ATTACHED

Form **W-9**
(Rev. March 2024)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Go to *www.irs.gov/FormW9* for instructions and the latest information.**

**Give form to the requester. Do not send to the IRS.**

**Before you begin.** For guidance related to the purpose of Form W-9, see *Purpose of Form*, below.

**Print or type.** See *Specific Instructions* on page 3.

1 Name of entity/individual. An entry is required. (For a sole proprietor or disregarded entity, enter the owner's name on line 1, and enter the business/disregarded entity's name on line 2.)

**Department of Health and Human Services**

2 Business name/disregarded entity name, if different from above.

**Centers for Medicare and Medicaid Services/CMS Laboratory Services/CLIA Laboratory Program**

3a Check the appropriate box for federal tax classification of the entity/individual whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor ☐ C corporation ☐ S corporation ☐ Partnership ☐ Trust/estate

☐ LLC. Enter the tax classification (C = C corporation, S = S corporation, P = Partnership) . . . . ________

**Note:** Check the "LLC" box above and, in the entry space, enter the appropriate code (C, S, or P) for the tax classification of the LLC, unless it is a disregarded entity. A disregarded entity should instead check the appropriate box for the tax classification of its owner.

☑ Other (see instructions) ________

3b If on line 3a you checked "Partnership" or "Trust/estate," or checked "LLC" and entered "P" as its tax classification, and you are providing this form to a partnership, trust, or estate in which you have an ownership interest, check this box if you have any foreign partners, owners, or beneficiaries. See instructions . . . . . . . . . . . ☐

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) ________

Exemption from Foreign Account Tax Compliance Act (FATCA) reporting code (if any) ________

*(Applies to accounts maintained outside the United States.)*

5 Address (number, street, and apt. or suite no.). See instructions.

**7500 Security Blvd**

6 City, state, and ZIP code

**Baltimore, MD 21244**

Requester's name and address (optional)

7 List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. See also *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

☐☐☐ – ☐☐ – ☐☐☐☐

**or**

**Employer identification number**

5 2 – 0 8 8 3 1 0 4

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and, generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here** **Signature of U.S. person** **Date**

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments**. For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## What's New

Line 3a has been modified to clarify how a disregarded entity completes this line. An LLC that is a disregarded entity should check the appropriate box for the tax classification of its owner. Otherwise, it should check the "LLC" box and enter its appropriate tax classification.

New line 3b has been added to this form. A flow-through entity is required to complete this line to indicate that it has direct or indirect foreign partners, owners, or beneficiaries when it provides the Form W-9 to another flow-through entity in which it has an ownership interest. This change is intended to provide a flow-through entity with information regarding the status of its indirect foreign partners, owners, or beneficiaries, so that it can satisfy any applicable reporting requirements. For example, a partnership that has any indirect foreign partners may be required to complete Schedules K-2 and K-3. See the Partnership Instructions for Schedules K-2 and K-3 (Form 1065).

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS is giving you this form because they

must obtain your correct taxpayer identification number (TIN), which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid).

• Form 1099-DIV (dividends, including those from stocks or mutual funds).

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds).

• Form 1099-NEC (nonemployee compensation).

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers).

• Form 1099-S (proceeds from real estate transactions).

• Form 1099-K (merchant card and third-party network transactions).

• Form 1098 (home mortgage interest), 1098-E (student loan interest), and 1098-T (tuition).

• Form 1099-C (canceled debt).

• Form 1099-A (acquisition or abandonment of secured property).

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

**Caution:** If you don't return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See *What is backup withholding*, later.

**By signing the filled-out form**, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued);

2. Certify that you are not subject to backup withholding; or

3. Claim exemption from backup withholding if you are a U.S. exempt payee; and

4. Certify to your non-foreign status for purposes of withholding under chapter 3 or 4 of the Code (if applicable); and

5. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting is correct. See *What Is FATCA Reporting*, later, for further information.

**Note:** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Establishing U.S. status for purposes of chapter 3 and chapter 4 withholding.** Payments made to foreign persons, including certain distributions, allocations of income, or transfers of sales proceeds, may be subject to withholding under chapter 3 or chapter 4 of the Code (sections 1441–1474). Under those rules, if a Form W-9 or other certification of non-foreign status has not been received, a withholding agent, transferee, or partnership (payor) generally applies presumption rules that may require the payor to withhold applicable tax from the recipient, owner, transferor, or partner (payee). See Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities.

The following persons must provide Form W-9 to the payor for purposes of establishing its non-foreign status.

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the disregarded entity.

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the grantor trust.

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust and not the beneficiaries of the trust.

See Pub. 515 for more information on providing a Form W-9 or a certification of non-foreign status to avoid withholding.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person (under Regulations section 1.1441-1(b)(2)(iv) or other applicable section for chapter 3 or 4 purposes), do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515). If you are a qualified foreign pension fund under Regulations section 1.897(l)-1(d), or a partnership that is wholly owned by qualified foreign pension funds, that is treated as a non-foreign person for purposes of section 1445 withholding, do not use Form W-9. Instead, use Form W-8EXP (or other certification of non-foreign status).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a saving clause. Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

***Example.*** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if their stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first Protocol) and is relying on this exception to claim an exemption from tax on their scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include, but are not limited to, interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third-party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester;

2. You do not certify your TIN when required (see the instructions for Part II for details);

3. The IRS tells the requester that you furnished an incorrect TIN;

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only); or

5. You do not certify to the requester that you are not subject to backup withholding, as described in item 4 under "*By signing the filled-out form*" above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code*, later, and the separate Instructions for the Requester of Form W-9 for more information.

See also *Establishing U.S. status for purposes of chapter 3 and chapter 4 withholding*, earlier.

## What Is FATCA Reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all U.S. account holders that are specified U.S. persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code*, later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you are no longer tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account, for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

# Specific Instructions

### Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

• **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note for ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040 you filed with your application.

• **Sole proprietor.** Enter your individual name as shown on your Form 1040 on line 1. Enter your business, trade, or "doing business as" (DBA) name on line 2.

• **Partnership, C corporation, S corporation, or LLC, other than a disregarded entity.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

• **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. Enter any business, trade, or DBA name on line 2.

• **Disregarded entity.** In general, a business entity that has a single owner, including an LLC, and is not a corporation, is disregarded as an entity separate from its owner (a disregarded entity). See Regulations section 301.7701-2(c)(2). A disregarded entity should check the appropriate box for the tax classification of its owner. Enter the owner's name on line 1. The name of the owner entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2. If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

### Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, enter it on line 2.

### Line 3a

Check the appropriate box on line 3a for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box on line 3a.

| IF the entity/individual on line 1 is a(n) . . . | THEN check the box for . . . |
|---|---|
| • Corporation | Corporation. |
| • Individual or<br>• Sole proprietorship | Individual/sole proprietor. |
| • LLC classified as a partnership for U.S. federal tax purposes or<br>• LLC that has filed Form 8832 or 2553 electing to be taxed as a corporation | Limited liability company and enter the appropriate tax classification:<br>P = Partnership,<br>C = C corporation, or<br>S = S corporation. |
| • Partnership | Partnership. |
| • Trust/estate | Trust/estate. |

### Line 3b

Check this box if you are a partnership (including an LLC classified as a partnership for U.S. federal tax purposes), trust, or estate that has any foreign partners, owners, or beneficiaries, and you are providing this form to a partnership, trust, or estate, in which you have an ownership interest. You must check the box on line 3b if you receive a Form W-8 (or documentary evidence) from any partner, owner, or beneficiary establishing foreign status or if you receive a Form W-9 from any partner, owner, or beneficiary that has checked the box on line 3b.

**Note:** A partnership that provides a Form W-9 and checks box 3b may be required to complete Schedules K-2 and K-3 (Form 1065). For more information, see the Partnership Instructions for Schedules K-2 and K-3 (Form 1065).

If you are required to complete line 3b but fail to do so, you may not receive the information necessary to file a correct information return with the IRS or furnish a correct payee statement to your partners or beneficiaries. See, for example, sections 6698, 6722, and 6724 for penalties that may apply.

### Line 4 Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third-party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space on line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2).

2—The United States or any of its agencies or instrumentalities.

3—A state, the District of Columbia, a U.S. commonwealth or territory, or any of their political subdivisions or instrumentalities.

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities.

5—A corporation.

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or territory.

7—A futures commission merchant registered with the Commodity Futures Trading Commission.

8—A real estate investment trust.

9—An entity registered at all times during the tax year under the Investment Company Act of 1940.

10—A common trust fund operated by a bank under section 584(a).

11—A financial institution as defined under section 581.

12—A middleman known in the investment community as a nominee or custodian.

13—A trust exempt from tax under section 664 or described in section 4947.

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| • Interest and dividend payments | All exempt payees except for 7. |
| • Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| • Barter exchange transactions and patronage dividends | Exempt payees 1 through 4. |
| • Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5.[2] |
| • Payments made in settlement of payment card or third-party network transactions | Exempt payees 1 through 4. |

[1] See Form 1099-MISC, Miscellaneous Information, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) entered on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37).

B—The United States or any of its agencies or instrumentalities.

C—A state, the District of Columbia, a U.S. commonwealth or territory, or any of their political subdivisions or instrumentalities.

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i).

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i).

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state.

G—A real estate investment trust.

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940.

I—A common trust fund as defined in section 584(a).

J—A bank as defined in section 581.

K—A broker.

L—A trust exempt from tax under section 664 or described in section 4947(a)(1).

M—A tax-exempt trust under a section 403(b) plan or section 457(g) plan.

**Note:** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

## Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, enter "NEW" at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

## Line 6

Enter your city, state, and ZIP code.

# Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have, and are not eligible to get, an SSN, your TIN is your IRS ITIN. Enter it in the entry space for the Social security number. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note:** See *What Name and Number To Give the Requester*, later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.SSA.gov*. You may also get this form by calling 800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/EIN*. Go to *www.irs.gov/Forms* to view, download, or print Form W-7 and/or Form SS-4. Or, you can go to *www.irs.gov/OrderForms* to place an order and have Form W-7 and/or Form SS-4 mailed to you within 15 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and enter "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, you will generally have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon. See also *Establishing U.S. status for purposes of chapter 3 and chapter 4 withholding*, earlier, for when you may instead be subject to withholding under chapter 3 or 4 of the Code.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, 4, or 5 below indicates otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code*, earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. “Other payments” include payments made in the course of the requester’s trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third-party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 7. Grantor trust filing under Optional Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A))** | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity[4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing Form 1041 or under the Optional Filing Method 2, requiring Form 1099 (see Regulations section 1.671-4(b)(2)(i)(B))** | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person’s number must be furnished.

[2] Circle the minor’s name and furnish the minor’s SSN.

[3] You must show your individual name on line 1, and enter your business or DBA name, if any, on line 2. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.)

* **Note:** The grantor must also provide a Form W-9 to the trustee of the trust.

** For more information on optional filing methods for grantor trusts, see the Instructions for Form 1041.

**Note:** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records From Identity Theft

Identity theft occurs when someone uses your personal information, such as your name, SSN, or other identifying information, without your permission to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

- Protect your SSN,
- Ensure your employer is protecting your SSN, and
- Be careful when choosing a tax return preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity, or a questionable credit report, contact the IRS Identity Theft Hotline at 800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 877-777-4778 or TTY/TDD 800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 800-366-4484. You can forward suspicious emails to the Federal Trade Commission at *spam@uce.gov* or report them at *www.ftc.gov/complaint*. You can contact the FTC at *www.ftc.gov/idtheft* or 877-IDTHEFT (877-438-4338). If you have been the victim of identity theft, see *www.IdentityTheft.gov* and Pub. 5027.

Go to *www.irs.gov/IdentityTheft* to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and territories for use in administering their laws. The information may also be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payors must generally withhold a percentage of taxable interest, dividends, and certain other payments to a payee who does not give a TIN to the payor. Certain penalties may also apply for providing false or fraudulent information.

# EXHIBIT G

## BILLING SERVICES AGREEMENT

This BILLING SERVICES AGREEMENT (this "Agreement") is made and entered into as of this ___ day of _________, 2026 (the "Effective Date"), by and among, American Health Imaging MW, LLC, a Delaware limited liability company ("AHI MW"), American Health Imaging S, LLC, a Delaware limited liability company ("AHI S"), Mobile Xray Diagnostics, LLC, a Delaware limited liability company ("MXD"), American Health W, LLC, a Delaware limited liability company ("AH W" and, together with AHI MW, AHI S and MXD, the "Companies" and each, a "Company"), and All-Stat Portable LLC ("Service Provider"). Each Company and Service Provider are each a "Party" and together are "Parties" to this Agreement.

RECITALS

WHEREAS, pursuant to that certain MEMBERSHIP INTEREST PURCHASE AGREEMENT of even date herewith (the "Purchase Agreement"), by and among the Sellers and Service Provider, Service Provider has agreed to collect certain Companies' Accounts Receivable (as defined in the Purchase Agreement) and remit them to Sellers;

WHEREAS, the Companies are engaged in, as of the date of this Agreement, providing diagnostic testing services to patients in skilled nursing facilities, assisted living centers, other healthcare settings;

WHEREAS, the Companies desires to engage Service Provider to provide the Companies with certain billing and collection services, and Service Provider desires to provide the Companies with such services on the terms and conditions set forth in this Agreement;

WHEREAS, the Parties are entering into this Agreement in connection with that certain Membership Interest Purchase Agreement of even date herewith (the "Purchase Agreement"), by and among the parties thereto, pursuant to which Service Provider has agreed to collect certain Companies' Accounts Receivable (as defined in the Purchase Agreement) and remit them to Sellers (as defined in the Purchase Agreement); and

WHEREAS, capitalized terms used herein but not defined shall have their respective meanings as set forth in the Purchase Agreement.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Duties and Responsibilities of Service Provider.

a. Billing and Collection Services. Service Provider agrees to provide billing and collection services (the "Services"), as set forth below:

i. Service Provider shall prepare and submit invoices to skilled nursing facilities, by the fifteenth (15th) business day of the month immediately following the month in which the service was performed, for diagnostic testing services which are covered as part of a Medicare Part A stay or for which the nursing facility receives a capitated rate and is responsible for the cost of the diagnostic test, in accordance with coding and billing information provided by each Company, which includes the established fees and in a format required under each Company's agreement with the nursing facility.

ii. Service Provider shall prepare and submit claims within a commercially reasonable timeframe consistent with industry standards for diagnostic testing services provided by each Company, other than services identified in 1.a.i. above, for which claims have not previously been submitted to the patient and/or applicable payer, in accordance with coding and billing information provided by each Company, which includes the most current charge master rate/s established by each Company. Notwithstanding reference to the submission of claims, both Parties understand and agree that these Services do not include the clearinghouse functions required for the claims to be transmitted electronically to the respective payers.

iii. Service Provider will be responsible for generating and mailing patient statements, limited to three patient statements per claim; and, for responding to patient calls related to the claims submitted by Service Provider for each Company.

iv. Service Provider will be responsible to post payments received from nursing facilities, payers and/or patients following the Effective Date irrespective of whether the payment relates to the Services provided under this Agreement, so long as each Company ensures that the financial institution provides depository information directly to Service Provider. Both Parties understand and agree that payments for services which had been provided by each Company will be deposited into each Company's bank account/s, account/s.

v. Service Provider intends to perform the Services in a timely and proficient manner and use its best efforts to pursue the payment of invoices and claims and collection of accounts receivable on each Company's behalf. Nothing contained herein shall be construed as a guaranty or warranty by Service Provider that any or all invoices submitted to nursing facilities or claims billed on each Company's behalf (including, without limitation, primary and secondary insurers, copayments, deductibles and coinsurance) shall be collected or collectible, in whole or in part. Further, both Parties understand and agree that the Services do not include the referral to or use of a third party to perform any collection activities for delinquent accounts.

vi. Service Provider shall provide each Company a monthly report, in accordance with a mutually agreed upon format, that will include information regarding invoices and claims submitted, payments received, adjustments, and ending accounts receivable.

vii. Service Provider shall comply with applicable federal, state and local laws and regulations and the coding, billing and claims submission policies and procedures of each payer, so long as those policies and procedures are made available to Service Provider in advance of the preparation and submission of claim under this Agreement.

b. Appeals Assistance. To the extent allowed by law, each Company may authorize the applicable payer to discuss the status of any denied, disallowed or recaptured claim; and, shall, if Service Provider consents in writing, appoint Service Provider to act as its agent for purposes of conducting any appeal of such claim. The Parties agree to cooperate in preparing such an appeal. Nothing in this Agreement shall preclude each Company from directly appealing any denied, disallowed, or recaptured claim. Any appeal's assistance is in addition to and not considered a part of the Services identified in 1.a. above.

2. Duties and Responsibilities of the Companies.

a. Policies and Procedures. Each Company shall provide or make available to Service Provider, in advance of the start of Services, copies of its policies and

procedures that are applicable to the delivery of Services, including its current nursing facility fee schedule/s and payer charge master rate/s and applicable payer coding, billing and claims submission policies and procedures.

b. Access to Patient Records. In accordance with applicable laws, each Company agrees to make available to Service Provider all medical records and other relevant patient information necessary for the performance of the Services. All such patient records are the sole property of the applicable Company.

c. Access to Depository Information. Each Company will ensure that as of the Effective Time and continuing throughout the Term of the Agreement, Service Provider will be given timely access to depository information from the financial institution/s in which invoice and claims payments are deposited. Both Parties understand and agree that claims payments will be deposited into each Company bank account/s, account/s.

d. Documentation and Coding Activities. Each Company will be responsible to perform any documentation in the patient records to support the invoiced amounts and claims for the diagnostic testing services it provided prior to the Effective Time for which Service Provider will be performing the Services under this Agreement. Further, as the provider of such diagnostic testing services, each Company will be responsible for supplying Service Provider with patient data, coding and billing data, skilled nursing facility and payer information in order for Service Provider to perform the identified billing and collection services.

e. Each Company shall timely review the reports identified in Section 1.a.vi. and notify Service Provider of any disputes regarding the invoices, claims, payments, adjustments, and/or accounts receivable information. Each Company acknowledges that the payments for claims and the amounts of collections are subject to numerous variables beyond Service Provider's control.

3. Payments for Services.

a. Compensation. For Services rendered under this Agreement, each Company will pay Service Provider the tiered percentage below, which includes payment for all tasks to complete the Services including expenses such as software licensing fees for maintenance of each Company's data and clearinghouse fees to transmit the claims. To the extent that any Company requests and Service Provider agrees to assist with appeals, the Parties will agree in writing to the additional amount to be paid for such services.

i. Six percent (6.0%) of the collections per calendar month for the first three (3) calendar months, plus the actual monthly software costs; and
ii. Ten percent (10.0%) of the collections per calendar month thereafter, plus the actual monthly software costs.

b. Invoice. Service Provider shall submit a complete and accurate invoice to each Company each month, within fifteen (15) business days following the end of the month, indicating the Services provided under this Agreement during the previous month for which each Company is responsible to pay. Within fifteen (15) business days after the receipt of such invoice, each Company agrees to pay to Service Provider the stated amount. Each Company shall notify Service Provider of any invoiced amounts in dispute no later than fifteen (15) business days of the receipt of the invoice or upon identification of any

amount in dispute, whichever is earlier. Each Company's payment of an invoice within the fifteen (15) business-day period shall not be deemed to waive its right to dispute any amount contained in such invoice. The Parties agree to work diligently and in good faith to promptly resolve any such disputed amounts, but the mere existence of a dispute shall not afford any Company any right of offset.

c. Late Payments. If any Company fails to make any payment when due, late payments shall bear interest from the date an invoice is due until paid at the rate of one and one-half percent (1½ %) per month, pro-rated for partial months. Payments with respect to which interest has accrued shall be applied to interest first. Inaction on the part of Service Provider to request or demand payment of any interest shall not constitute a waiver of its right to receive such interest. No such late payment penalty shall reduce the amounts to which Sellers are otherwise entitled pursuant to this Agreement and the Purchase Agreement.

4. Mutual Representations and Warranties. Each Party makes the following representations and warranties to the other Party, which are true and accurate upon execution of this Agreement, and shall remain true and correct throughout the term of this Agreement:

a. Organizational Representations. It is a legal entity duly formed, validly existing and in good standing under the laws of state where services are rendered and has all requisite legal power, licenses, certifications and permits to enter into this Agreement and to perform its obligations hereunder; and, is not presently under investigation for wrong-doing by any state or federal licensing agency.

b. Program Participation Representations. With respect to any federal health care program as defined in Section 1128B of the Social Security Act (42 U.S.C. § 1320a-7b(f)) or any state health care program as defined in Section 1128B of the Social Security Act (42 U.S.C. § 1320a-7b(h)) (collectively the "Programs"), neither Party, nor any individual with a direct or indirect ownership or controlling interest, nor any director, officer, agent, employee or independent contractor of such Party, is debarred, revoked, suspended or excluded from participation in such Programs, or presently under investigation for wrong-doing by any federal or state agency of such Program.

c. Notification. Each Party further agrees to provide to the other Party immediate, but not more than seventy-two (72) hours from when that Party knew of the change, written notice after it becomes aware that any of the foregoing representations and warranties may be inaccurate or may become incorrect; and, upon written notice that it is being investigated in connection with any Program participation or by any federal or state licensing agency.

5. Indemnification. Each Company, jointly and severally, agrees to indemnify and hold harmless Service Provider and its members, stockholders, directors, officers, employees, agents and affiliates (each, a "Service Provider Indemnified Party" and collectively, the "Service Provider Indemnified Parties") from and against (and will pay upon demand each Service Provider Indemnified Party the amount of) any and all losses, liabilities, claims, costs (including costs of investigation and defense), damages and expenses (including attorneys' fees) which any Service Provider Indemnified Party may sustain resulting from, arising out of, relating to or caused by (i) any breach of any representation or warranty made by any Company in this Agreement; (ii) any breach by any Company of any covenant or other agreement of such Company contained in this Agreement; and, (iii) any breach by any Company of any laws or regulations.

6. Term and Termination. This Agreement shall remain in full force and effect from the Effective Date of this Agreement until such time as each Company and Service Provider mutually agree in writing that further Services under the Agreement are no longer needed, which may be at a time when there is a diminished return as a result of the age or type of claim; provided however such termination shall not occur sooner than 180 days from the Effective Date.

a. Termination With or Without Cause. Either party may terminate this Agreement with or without cause by providing the other party thirty (30) days advance written notice.

b. Automatic Termination. This Agreement shall terminate automatically upon notice by either Party in the event of any of (i) either Party's revocation of billing privileges, exclusion or debarment from participation in any federally funded program such as Medicare or Medicaid, or (ii) upon the dissolution of either Party.

c. Effect of Termination. Any termination of this Agreement prior to 180 days from the Effective Date shall not alleviate the obligations of Service Provider under Section 6.6 of the Purchase Agreement.

7. Books and Records.

a. Records. Service Provider shall keep and maintain at all times complete and accurate up-to-date books and records adequate to reflect clearly and correctly the Services performed by Service Provider pursuant to this Agreement.

b. Social Security Act Requirements. In accordance with Medicare requirements under Section 952 of the Omnibus Reconciliation Act of 1980 (P.L. 96-499) and such final regulations relating thereto as promulgated by the Secretary of the U.S. Department of Health and Human Services (the "Secretary"), and to the extent that such requirements are applicable to this agreement Service Provider shall, while this Agreement is effective and until the expiration of four (4) years after furnishing of any Services hereunder, make available, upon written request to the Secretary, or the Comptroller General of the United States (the "Comptroller General"), or to any of their duly authorized representatives, a copy of this Agreement and such books, documents and records of Service Provider as are necessary to certify the nature and extent of the costs incurred by Company with respect to the Services furnished hereunder. If Service Provider carries out any of the duties hereunder through a subcontract, with a value or cost of $10,000 or more over a twelve (12) month period, such subcontract shall contain a clause identical to the foregoing concerning the maintenance of records and their availability to the Secretary or the Comptroller General.

8. Patient Information and Records.

a. Patient Records. Both Parties acknowledges that the patient records each Company maintains on each of its patients (which include medical records, billing records, correspondence, and other patient records related to the Services rendered) are the sole property of such Company. Service Provider shall prepare and maintain, or cause to be prepared and maintained, necessary patient records relating to the Services rendered pursuant to this Agreement, all of which shall belong to and be the sole property of such Company. Service Provider shall not disclose patient records other than as provided in Section 8.b, and shall promptly forward any patient record request or subpoena Service Provider receives that relates to a Company's patient records to such Company.

b. HIPAA Compliance. Each Company is a "covered entity" under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") 42 U.S.C. §§ 1320d to 1329d-8 and the regulations promulgated thereunder. Service Provider is being engaged as an independent contractor to provide associated payment and health care operations services, as those terms are defined for purposes of the HIPAA Rules. Both Parties acknowledge and agree that this Agreement shall be subject to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Privacy Rule implementing HIPAA, 45 CFR part 160 and part 164, the Security Standards implementing HIPAA, 45 CFR parts 160, 162 and 164, the amendments to HIPAA set forth in Division A, Title XIII of the American Recovery and Reinvestment Act of 2009, known as The Health Information Technology for Economic and Clinical Health Act or "HITECH Act," which are relevant to the Agreement and the applicable provisions of the regulations implementing certain provisions of the HITECH Act published as a Final Rule on Modifications to the Privacy, Security, Enforcement and Breach Notification Rules. Each Party shall take all further actions reasonably requested by the other Party as are necessary to comply with HIPAA and the HITECH Act. With respect to the performance of Services, Service Provider is a Business Associate and has entered in a Business Associate Agreement with each Company, enclosed as Exhibit A and incorporated by reference herein.

9. Independent Contractor. It is expressly understood and agreed that Service Provider and each Company are independent contractors, and not employees, agents, partners of, or joint ventures with the other. Service Provider is not the agent of any Company and is not authorized to make any representation, warranty, contract, or commitment on behalf of any Company. Neither Service Provider nor any employee, independent contractor, agent or sub-contractor of Service Provider shall have any claim under this Agreement or otherwise against any Company for vacation pay, sick leave, retirement benefits, social security, workers' compensation, disability or unemployment benefits, or employee benefits of any kind.

10. Miscellaneous

a. Amendments. This Agreement may be modified or amended only by a written instrument signed by both of the Parties.

b. Assignment. This Agreement may not be assigned by any Party without the prior written consent of the other Party.

c. Captions. The captions used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

d. Governing Law. This Agreement shall be governed by the laws of Illinois, without regard to conflicts of law principles.

e. Prior Agreements. This Agreement and its Exhibit A represents the entire understanding and agreement of the Parties as to the matters contained in it. No other oral or written understanding shall be of any force or effect with respect to the matters contained in this Agreement, unless attached to this Agreement as a subsequent amendment.

f. Severability. If any provision (or any part of any provision) contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, then such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Agreement, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had never been contained herein, but only to the extent such

provision (or part thereof) is invalid, illegal, or unenforceable.

g. Waiver. No waiver of any provision of this Agreement shall be effective against any Party unless it is in writing and signed by the Party granting the waiver. The failure to exercise any rights shall not operate as a waiver of such right.

h. Notices. All notices required or permitted hereunder shall be given in writing by personal delivery, by United States certified mail, return receipt requested, or by any nationally recognized overnight delivery service, addressed to the Party at the address set forth below or at such other places as the Party shall designate in writing:

If to Service Provider:

All-Stat Portable LLC
Attn: Etai Sooliman
8235 Christiana Ave.
Skokie, IL 60076
Legal@AllStatPortable.com

If to Companies:

c/o American Health Associates Parent, LLC
Attn: Christopher Martin
15712 SW 41 Street, Ste 11
Davie, FL 33331
Email: ctmartin@ahalabs.com

i. Compliance with Applicable Laws. Each Party hereto shall each comply in all material respects with all applicable federal, state and local laws, regulations and restrictions in the conduct of its obligations under this Agreement and shall carry out its duties under this Agreement exercising normal and customary business standards.

j. Additional Documents. Each of the Parties hereto agrees to execute any document or documents that may be reasonably requested from time to time by the other parties in order to implement or complete a Party's obligations pursuant to this Agreement.

k. Third Parties. Except for the Sellers, who shall be third party beneficiaries of this Agreement, none of the obligations of any Party hereunder shall run to, or be enforceable by, any person other than the other Party or Parties to this Agreement that are subject to such obligation.

l. Execution in Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall be deemed to be one and the same instrument, and may be delivered via facsimile or electronic transmission.

m. Recitals. The Recitals to this Agreement are incorporated herein as if fully set forth in the body of this Agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Parties have entered into this BILLING SERVICES AGREEMENT, as an instrument under seal, as of the day and year first written above.

ALL-STAT PORTABLE LLC, an Illinois limited liability company

By: ________________________________
Name: Etai Sooliman
Its: CEO

MOBILE XRAY DIAGNOSTICS, LLC, a Delaware limited liability company

By:________________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH IMAGING MW, LLC, a Delaware limited liability company

By:________________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH IMAGING S, LLC, a Delaware limited liability company

By:________________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH W, LLC, a Delaware limited liability company

By:________________________________
Name: Christopher Martin
Its: President

**EXHIBIT A**

**HIPAA BUSINESS ASSOCIATE AGREEMENT**

This Business Associate Agreement ("BAA") is entered into as of ___________, 2026, by and American Health Imaging MW, LLC, American Health Imaging S, LLC, Mobile Xray Diagnostics, LLC, American Health W, LLC (collectively, "Business Associate") and All-Stat Portable LLC ("Covered Entity") (collectively, the "Parties").

**RECITALS**

**WHEREAS**, The Parties have entered, and may in the future enter, into one or more arrangements or agreements (the "Agreement") which require the Business Associate to perform functions or activities on behalf of, or services for, Covered Entity or a Covered Entity Affiliate ("CE Affiliate") that involve the use or disclosure of Protected Health Information ("PHI") that is subject to the final federal Privacy, Security, Breach Notification and Enforcement Rules (collectively the "HIPAA Rules") issued pursuant to the Health Insurance Portability and Accountability Act of 1996 (the Act including the HIPAA rules shall be referred to as "HIPAA") and the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH"), as each is amended from time to time. The purpose of this BAA is to set forth the obligations of the Parties with respect to such PHI.

**WHEREAS**, Business Associate provides portable imaging services for Covered Entity pursuant to the effective date above and such other engagements as shall be entered into between the parties in the future in which Covered Entity discloses certain Protected Health Information ("PHI") to Business Associate (collectively, the "Master Agreement");

**WHEREAS**, Business Associate, during providing services to Covered Entity, may have access to PHI and may be deemed a business associate for certain purposes under HIPAA;

**WHEREAS**, the Parties contemplate that Business Associate may obtain PHI, with Covered Entity's knowledge and consent, from certain other business associates of Covered Entity that may possess such PHI; and

**WHEREAS**, Business Associate and Covered Entity are entering into this BAA to set forth Business Associate's obligations with respect to its handling of the PHI, whether such PHI was obtained from another business associate of Covered Entity or directly from Covered Entity;

**NOW, THEREFORE**, for mutual consideration, the sufficiency and delivery of which is acknowledged by the Parties, and upon the premises and covenants set forth herein, the Parties agree as follows:

1. **Definitions**. Unless otherwise defined herein, capitalized terms used in this BAA shall have the meanings ascribed to them in HIPAA or the Master Agreement between Covered Entity and Business Associate, as applicable.
2. **Obligations and Activities of Business Associate.** To the extent that Business Associate is provided with or creates any PHI on behalf of Covered Entity and is acting as a business associate of Covered Entity, Business Associate agrees to comply with the provisions of HIPAA applicable to business associates, and in doing so, represents and warrants as follows:
   a. Use or Disclosure. Business Associate agrees to not use or disclose PHI other than as set forth in this BAA, the Master Agreement, or as required by law.
   b. Specific Use of Disclosure. Except as otherwise limited by this BAA, Business Associate may:

i. use or disclose PHI to perform data aggregation and other services required under the Master Agreement to assist Covered Entity in its operations, as long as such use or disclosure would not violate HIPAA if done by Covered Entity, or HIPAA permits such use or disclosure by a business associate;
ii. use or disclose PHI for the proper management and administration of Business Associate or to carry out Business Associate's legal responsibilities, provided that with respect to disclosure of PHI, such disclosure is required by law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached; and
iii. de-identify PHI and maintain such de-identified PHI indefinitely, notwithstanding Section 4 of this Agreement, provided that all identifiers are destroyed or returned in accordance with the Privacy Rule.

c. **Minimum Necessary**. Business Associate agrees to take reasonable efforts to limit requests for, or uses and disclosures of, PHI to the extent practical, a limited data set, otherwise to the minimum necessary to accomplish the intended request, use, or disclosure.

d. **Safeguards**. Business Associate shall establish appropriate safeguards, consistent with HIPAA, that are reasonable and necessary to prevent any use or disclosure of PHI not expressly authorized by this BAA.
i. To the extent that Business Associate creates, receives, maintains, or transmits Electronic PHI, Business Associate agrees to establish administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic PHI that it creates, receives, maintains, or transmits on behalf of Covered Entity, as required by the Privacy Rule and Security Rule.
ii. The safeguards established by Business Associate shall include securing PHI that it creates, receives, maintains, or transmits on behalf of Covered Entity in accordance with the standards set forth in HITECH Act §13402(h) and any guidance issued thereunder.
iii. Business Associate agrees to provide Covered Entity with such written documentation concerning safeguards as Covered Entity may reasonably request from time to time.

e. **Agents and Subcontractors**. Business Associate agrees to obtain written assurances that any agents, including subcontractors, to whom it provides PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, agree to the same restrictions and conditions that apply to Business Associate with respect to such PHI, including the requirement that it agree to implement reasonable and appropriate safeguards to protect Electronic PHI that is disclosed to it by Business Associate. To the extent permitted by law, Business Associate shall be fully liable to Covered Entity for any and all acts, failures, or omissions of Business Associate's agents and subcontractors in any breach of their subcontracts or assurances to Business Associate as though they were Business Associate's own acts, failures, or omissions.

f. **Reporting.** Within five (5) business days of discovery by Business Associate, Business Associate agrees to notify Covered Entity in writing of any use or disclosure of, or Security Incident involving, PHI, including any Breach of Unsecured PHI, not provided for by this BAA or the Master Agreement, of which Business Associate may become aware.

i. In the notice provided to Covered Entity by Business Associate regarding unauthorized uses and/or disclosures of PHI, Business Associate shall describe the remedial or proposed mitigation efforts required under Section 2(g) of this BAA.

ii. Specifically, with respect to reporting a Breach of Unsecured PHI, Business Associate agrees to include the identity of the individual(s) whose Unsecured PHI was Breached in the written notice provided to Covered Entity, and any additional information required by HIPAA.

iii. Business Associate agrees to cooperate with Covered Entity upon report of any such Breach so that Covered Entity may provide the individual(s) affected by such Breach with proper notice as required by HIPAA.

g. **Mitigation**. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate resulting from a use or disclosure of PHI by Business Associate in violation of the requirements of this BAA or the Master Agreement.

h. **Audits and Inspections**. Business Associate agrees to make its internal practices, books, and records, including policies and procedures, relating to the use and disclosure of PHI available to the Secretary, in a time and manner mutually agreed to by the Parties or designated by the Secretary, for purposes of the Secretary determining the Covered Entity's compliance with HIPAA.

i. **Accounting**. Business Associate agrees to document and report to Covered Entity, within fourteen (14) days, Business Associate's disclosures of PHI so Covered Entity can comply with its accounting of disclosure obligations in accordance with 45 C.F.R. §164.528 and any subsequent regulations issued thereunder. Business Associate agrees to maintain electronic records of all such disclosures for a minimum of six (6) calendar years.

j. **Designated Record Set**. While the Parties do not intend for Business Associate to maintain any PHI in a designated record set, to the extent that Business Associate does maintain any PHI in a designated record set, Business Associate agrees to make available to Covered Entity PHI within fourteen (14) days:

i. for Covered Entity to comply with its access obligations in accordance with 45 C.F.R. §164.524 and any subsequent regulations issued thereunder; and

ii. for amendment upon Covered Entity's request and incorporate any amendments to PHI as may be required for Covered Entity to comply with its amendment obligations in accordance with 45 C.F.R. §164.526 and any subsequent guidance.

k. **HITECH Compliance Dates**. Business Associate agrees to comply with the HITECH Act provisions expressly addressed, or incorporated by reference, in this BAA as of the effective dates of applicability and enforcement established by the HITECH Act and any subsequent regulations issued thereunder.

**3. Obligations of Covered Entity.**

a. Covered Entity agrees to notify Business Associate of any limitation(s) in Covered Entity's notice of privacy practices in accordance with 45 C.F.R. §164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

b. Covered Entity agrees to notify Business Associate of any changes in, or revocation of, permission by Individual to use or disclose PHI, including disclosure of data to insurers and health plans when the patient pays for medical services in full and requests that such notification not be made, to the extent that such changes may affect Business Associate's use or disclosure of PHI.

c. Covered Entity agrees to notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 C.F.R. §164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

d. Covered Entity agrees to limit its use, disclosure, and requests of PHI under this BAA to a limited data set or, if needed by Covered Entity, to the minimum necessary PHI to accomplish the intended purpose of such use, disclosure, or request.

4. **Term and Termination**.

a. **Term**. This BAA shall become effective upon the Effective Date and, unless otherwise terminated as provided herein, shall have a term that shall run concurrently with that of the last expiration date or termination of the Master Agreement.

b. **Termination Upon Breach**

i. Without limiting the termination rights of the Parties pursuant to the Master Agreement, upon either Party's knowledge of a material breach by the other Party to this BAA, the breaching Party shall notify the non-breaching Party of such breach and the breaching party shall have fourteen (14) days from the date of notification to the non-breaching party to cure such breach. In the event that such breach is not cured, or cure is infeasible, the non-breaching party shall have the right to immediately terminate this BAA and those portions of the Master Agreement that involve the disclosure to Business Associate of PHI, or, if nonseverable, the Master Agreement.

c. **Termination by Either Party**. Either Party may terminate this BAA upon provision of thirty (30) days' prior written notice.

d. **Effect of Termination.**

i. To the extent feasible, upon termination of this BAA or the Master Agreement for any reason, Business Associate agrees, and shall cause any subcontractors or agents to return or destroy and retain no copies of all PHI received from or created or received by Business Associate on behalf of Covered Entity. Business Associate agrees to complete such return or destruction as promptly as possible and verify in writing within thirty (30) days of the termination of this BAA to Covered Entity that such return or destruction has been completed.

ii. If not feasible, Business Associate agrees to provide Covered Entity notification of the conditions that make return or destruction of PHI not feasible. Upon notice to Covered Entity that return or destruction of PHI is not feasible, Business Associate agrees to extend the protections of this BAA to such PHI for as long as Business Associate maintains such PHI.

iii. Without limiting the foregoing, Business Associate may retain copies of PHI in its workpapers related to the services provided in the Master Agreement to meet its professional obligations.

5. **Miscellaneous**:

a. **Regulatory References**: A reference in this BAA to a section in the Privacy Rule or Security Rule means the section as in effect or as amended.

b. **Amendment**: The Parties acknowledge that the provisions of this BAA are designed to comply with HIPAA and agree to take such action as is necessary to amend this BAA from time to time as is necessary for Covered Entity to comply with the requirements of HIPAA. Regardless of the execution of a formal amendment of this BAA, the BAA shall be deemed amended to permit the Covered Entity and Business Associate to comply with HIPAA.

c. **Method of Providing Notice**: Any notice required to be given pursuant to the terms and provisions of this BAA shall be in writing and may be either personally delivered or sent by registered or certified mail in the United States Postal Service, Return Receipt Requested, postage prepaid, addressed to each Party at the addresses listed in the Master Agreement currently in effect between Covered Entity and Business Associate. Any such notice shall be deemed to have been given if mailed as provided herein, as of the date mailed.

d. **Parties Bound**: This BAA shall inure to the benefit of and be binding upon the Parties hereto and their respective legal representatives, successors, and assigns. Business Associate may not assign or subcontract the rights or obligations under this BAA without the express written consent of Covered Entity. Covered Entity may assign its rights and obligations under this BAA to any successor or affiliated entity.

e. **No Waive**: No provision of this BAA or any breach thereof shall be deemed waived unless such waiver is in writing and signed by the Party claimed to have waived such provision or breach. No waiver of a breach shall constitute a waiver of or excuse any different or subsequent breach.

f. **Effect on Master Agreement**: This BAA together with the Master Agreement constitutes the complete agreement between the Parties and supersedes all prior representations or agreements, whether oral or written, with respect to such matters. In the event of any conflict between the terms of this BAA and the terms of the Master Agreement, the terms of this BAA shall control unless the terms of such Master Agreement are stricter, as determined by Covered Entity, with respect to PHI and comply with HIPAA, or the Parties specifically otherwise agree in writing. No oral modification or waiver of any of the provisions of this BAA shall be binding on either party. No obligation on either party to enter into any transaction is to be implied from the execution or delivery of this BAA.

g. **Interpretation**: Any ambiguity in this BAA shall be resolved to permit the Covered Entity to comply with HIPAA and any subsequent guidance.

h. **No Third-Party Rights**: Except as stated herein, the terms of this BAA are not intended nor, should they be construed to grant any rights, remedies, obligations, or liabilities whatsoever to parties other than Business Associate and Covered Entity and their respective successors or assigns.

i. **Applicable Law**: This BAA shall be governed under the laws of the State of Illinois, without regard to choose of law principles, and the Illinois courts shall have sole and exclusive jurisdiction over any dispute arising under this Agreement.

j. **Judicial and Administrative Proceedings**: In the event that Business Associate receives a subpoena, court or administrative order, or other discovery request or mandate for release of PHI, Business Associate agrees to collaborate with Covered Entity with respect to Business Associate's response to such request. Business Associate shall notify Covered Entity within seven (7) days of receipt of such request or mandate.

k. **Transmitting Electronic PHI**: Electronic PHI transmitted or otherwise transferred from between Covered Entity and Business Associate must be encrypted by a process that renders the Electronic PHI unusable, unreadable, or indecipherable to unauthorized individuals within the meaning of HITECH Act § 13402 and any implementing guidance including, but not limited to, 42 C.F.R. § 164.402.

*[Remainder of Page Intentionally Left Blank; Signatures to Follow]*

**IN WITNESS WHEREOF**, the Parties hereto have executed this BAA to be effective on the date set forth above.

**Covered Entity:**

ALL-STAT PORTABLE LLC, an Illinois limited liability company

By:________________________________
Name: Etai Sooliman
Its: CEO

**Business Associate:**

MOBILE XRAY DIAGNOSTICS, LLC, a Delaware limited liability company

By:________________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH IMAGING MW, LLC, a Delaware limited liability company

By:________________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH IMAGING S, LLC, a Delaware limited liability company

By:________________________________
Name: Christopher Martin
Its: President

AMERICAN HEALTH W, LLC, a Delaware limited liability company

By:________________________________

Name: Christopher Martin
Its: President

# EXHIBIT H

**DRAFT ORDER**

*[see attached]*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In re:

American Health Associates Holdings, Inc., *et al.*,[1] Case No. 26-14825-SMG

Debtors. Chapter 11

_______________________________________/

**PROPOSED ORDER APPROVING SALE OF DEBTORS' IMAGING BUSINESS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

**THIS MATTER** came before the Court for hearing on August __, 2026, upon the *Expedited Motion for Order Approving the Private Sale of the Debtors' Imaging Business Free and Clear of Liens, Claims, Encumbrances, and Interests* (the "Motion")[2] [ECF No. XX] filed by the Debtors.

[1] The Debtors in these jointly administered cases are: (1) American Health Associates Holdings, Inc.; (2) American Health Associates Parent, LLC; (3) American Health Holdings, LLC; (4) American Health Holdings II, LLC; (5) American Health Holdings III, LLC; (6) American Health Holdings IV, LLC; (7) American Health MW, LLC; (8) American Health Imaging MW, LLC; (9) American Health S, LLC; (10) American Health Imaging S, LLC; (11) American Health W, LLC; (12) American Health NE, LLC; and (13) Mobile Xray Diagnostic, LLC.
[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the PSA, as applicable.

For the reasons states on the record, and being otherwise fully advised in the premises, the it is FOUND AND DETERMINED:

A. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.[3]

B. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought in the Motion is 11 U.S.C. §§ 363.

C. Due and adequate notice of the Motion and of the relief requested therein has been given in accordance with the provisions of 11 U.S.C. §§ 102(1) and 363, and Bankruptcy Rules 2002 and 6004. No other or further notice of the Motion is or shall be required.

D. The Membership Interest Purchase Agreement (the "MIPA") between American Health Imaging MW, LLC, American Health Imaging S, LLC, Mobile Xray Diagnostics, LLC, American Health W, LLC, American Health Holdings, LLC, American Health Holdings II, LLC, American Health Holdings III, LLC, and American Health Holdings IV, LLC (the "Seller Debtors") and All-Stat Portable, LLC ( "Buyer"), a copy of which is attached to the Motion as Exhibit 1, is valid and enforceable and was the result of arm's-length, good faith negotiation between the Seller Debtors and Buyer. The MIPA and the documents contemplated thereby, the "Sale Documents."

E. The sale and transactions contemplated by the Sale Documents are undertaken by Buyer in good faith, as that term is used in 11 U.S.C. § 363(m), and accordingly, the reversal or

---

[3] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

modification on appeal of the authorization provided herein to consummate the sale and transactions shall not affect the validity of the sale of the Membership Interests to Buyer, unless such authorization is duly stayed pending such appeal. Buyer is a purchaser in good faith of the Membership Interests and is entitled to all of the protections afforded by 11 U.S.C. § 363(m).

F. Buyer entered into the proposed sale without collusion, in good faith, and from an arm's length bargaining position, and has not violated 11 U.S.C. § 363(n) by any action or inaction, and the MIPA does not violate the provisions of 11 U.S.C. § 363(n). The Seller Debtors and Buyer have not engaged in any conduct that would cause or permit the MIPA to be avoided under 11 U.S.C. § 363(n).

G. The Seller Debtors have, to the extent necessary or applicable, (a) the full corporate power and authority to execute and deliver the Sale Documents and all other documents contemplated thereby; (b) all corporate authority necessary to consummate the transaction contemplated by the Sale Documents; and (c) taken all corporate action necessary to authorize and approve the Sale Documents and the consummation of the transactions contemplated thereby. The sale has been duly and validly authorized by all necessary corporate action. No consents or approvals, other than those expressly provided for in the Sale Documents, are required for the Seller Debtors to consummate the sale, the Sale Documents, or the transactions contemplated thereby.

H. The Buyer is neither a successor nor a continuation of the Debtors.

I. The Buyer is unrelated to the Debtors, including the Debtors' past and present principals and owners.

J. There is a sound business justification for the sale and transactions described in the Sale Documents.

K. The disclosures made by the Debtors concerning the Motion, the Sale Documents, and the Sale were good, complete, and adequate.

L. The Purchase Price is fair and reasonable.

M. No holder of any liens, claims, interests, or encumbrances on the Membership Interests objected to the Motion, and therefore, all holders of liens, claims, interests, or encumbrances on the Membership Interests consented to the sale of the Membership Interests free and clear of all interests, liens, claims, and encumbrances under 11 U.S.C. § 363(f)(2).

N. The aggregate value of the Membership Interests is no greater than the Purchase Price, and therefore, pursuant to 11 U.S.C. § 506(a)(1), the aggregate value of all interests, liens, claims, and encumbrances on the Membership Interests is less than the Purchase Price.

Accordingly, for the foregoing reasons, and being otherwise fully advised in the premises, it is **ORDERED** and **ADJUDGED** that:

1. The Motion [ECF No. XXX] is **GRANTED**.

2. The Seller Debtors are authorized to enter into the MIPA.

3. The Sale Documents are valid and enforceable and are approved—together with the transactions contemplated therein—in their entirety, and the Seller Debtors and Buyer are authorized to close on the PSA and undertake all necessary actions and transactions to do so (the closing of the MIPA being the "Closing"). For the avoidance of doubt, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Seller Debtors to transfer the Membership Interests to the Buyer in accordance with the Sale Documents.

4. The Sale Documents and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court.

5. Except as set forth in the MIPA, the sale of the Membership Interests, as defined in the MIPA, is approved on an as-is where-is basis, free and clear of any and all interests, claims, liens, and encumbrances thereon pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(f), 365(b), and 365(f), including without limitation, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, and other liens (including mechanics', materialman's, and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise.

6. All claims, liens, interests, and encumbrances on the Membership Interests sold pursuant to the MIPA shall attach to the proceeds of the sale with the same priority, validity, and effect as they now have in and on such assets, subject to the rights, claims, defenses, and objections of the Debtors, their estates, and all interested parties.

7. The sale of the Membership Interests shall be free and clear of any claims of

derivative, vicarious, or successor liability of any kind, nature, or character whatsoever, by reason of any theory of law or equity. Buyer, as the result of any action taken in connection with the purchase of the Membership Interests, shall not be deemed to (a) be the successor of the Debtors; (b) have, *de facto* or otherwise, merged with or into the Debtosr; (c) be a mere continuation or a substantial continuation of the Debtors or for payment of any benefit(s) accruing to the Debtors; (d) be a successor in interest to the Debtors under any theory of successor liability for employee-related claims against the Debtors and/or its principals brought under the Fair Labor Standards Act; or (e) be a successor of or to the Debtors for any other type of claims, interests or causes of action against the Debtors or the Membership Interests of any kind whatsoever.

8. Buyer shall have no obligation to pay any liabilities or obligations of the Debtors of any kind except as expressly provided in the MIPA.

9. If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing interests in the Membership Interests shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all interests which the person or entity has with respect to the Membership Interests, then (a) the Debtors are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Membership Interests, and (b) Buyer is authorized to file, register, or otherwise record a certified copy of this Order which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all interests in the Membership Interests of any kind or nature whatsoever.

10. This Order shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of

deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of federal, state, county, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments that reflect that Buyer is the assignee and owner of the Membership Interests free and clear of all interests or claims, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers"). All Recording Officers are authorized and specifically directed to strike recorded encumbrances, claims, liens, and other interests against the Membership Interests recorded prior to the date of this Order. Further, all Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the MIPA and related agreements.

11. Subject to the Debtor's satisfaction of its obligations under this Order and solely to the extent set forth herein, any interest holders that did not object, or that withdrew their objections, to the Motion or the MIPA, are deemed to have consented to the sale of the Membership Interests free and clear of their respective interests on the Property pursuant to section 363(f)(2) of the Bankruptcy Code.

12. Prior to the Closing of the sale of the Membership Interests, each of the Debtors' creditors is authorized to execute such documents and take all other actions as may be necessary to release effective as of the Closing its interests in the Membership Interests, if any, as such interests may have been recorded or may otherwise exist.

13. The Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order, the MIPA, all amendments and modifications thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all

respects, including, but not limited to, retaining jurisdiction to: a) subject to the terms and conditions of the MIPA and this Order, compel delivery of the Membership Interests to Buyer; b) compel delivery of the Purchase Price by Buyer or performance of other obligations of Buyer contained in the MIPA; c) resolve any disputes arising under or related to the MIPA, except as otherwise provided therein; and d) interpret, implement, and enforce the provisions of this Order.

14. Within two business days of Closing, the Debtors shall file a notice of the occurrence of Closing.

15. Except as set forth in the MIPA, all persons and entities, including Debtors, employees, former employees, all debt holders, equity holders, administrative agencies, governmental units, tax and regulatory authorities, secretaries of state, federal, state, and local officials, lenders, contract parties, bidders, lessors, and other parties in possession of any of the Membership Interests at any time, trade creditors, and all other creditors holding or asserting liens, claims, or interests of any kind or nature whatsoever against or in the Membership Interests (whether known or unknown as of the Closing Date, now existing or hereafter arising, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, whether imposed by agreement, understanding, law, equity, or otherwise), shall be and hereby are forever barred, estopped, and permanently enjoined from asserting, prosecuting, commencing, continuing, or otherwise pursuing in any manner any action, claim, or other proceeding of any kind, directly or indirectly, against Buyer or any of its affiliates, predecessors, successors, or assigns or any of their respective current and former members, managers, officers, directors, managed funds, investment advisors, attorneys, employees, partners, principals, affiliates, shareholders (or equivalent), financial advisors, and representatives (each of the foregoing in its individual capacity), their property, or the Membership Interests in respect of liens, claims, or encumbrances

that arise under or out of, in connection with, or in any way relate to, the Membership Interests or the transfer of the Membership Interests to Buyer other than to enforce the terms of this Order.

16. Notwithstanding Bankruptcy Rule 6004, this Order shall be effective and enforceable immediately upon entry, and the 14-day stay provided for under the Bankruptcy Rules is waived.

###

Submitted by:

Bradley S. Shraiberg
Shraiberg Page P.A.
Attorneys for the Trustee
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
bss@slp.law

Bradley S. Shraiberg is directed to immediately serve a conformed copy of this Order and to file a Certificate of Service evidencing same.

# DISCLOSURE SCHEDULES
# TO
# MEMBERSHIP INTEREST PURCHASE AGREEMENT

The contents of these Disclosure Schedules (the "Disclosure Schedules") are exceptions to, or information otherwise required to be listed under, the representations and warranties of the Seller made pursuant to that certain Membership Interest Purchase Agreement (this "Agreement"), dated as of August 24, 2026 (the "Effective Date"), by and among American Health Imaging MW, LLC, a Delaware limited liability company ("AHI MW"), American Health Imaging S, LLC, a Delaware limited liability company ("AHI S"), Mobile Xray Diagnostics, LLC, a Delaware limited liability company ("MXD"), American Health W, LLC, a Delaware limited liability company ("AH W"), American Health Holdings, LLC, a Delaware limited liability company (the "AHI MW Seller"), American Health Holdings II, LLC, a Delaware limited liability company (the "AHI S Seller"), American Health Holdings III, LLC, a Delaware limited liability company (the "MXD Seller"), American Health Holdings IV, LLC, a Delaware limited liability company (the "AH W Seller" and together with each of the AHI MW Seller, the AHI S Seller and the MXD Seller, each a "Seller" and collectively the "Sellers"), and All-Stat Portable LLC, an Illinois limited liability company ("Buyer"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

The schedule numbers below correspond to the section numbers of the representations and warranties in the Agreement; provided, however, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement where such disclosure would be appropriate and such appropriateness is reasonably apparent from the face of such disclosure.

Any item of information, matter or document disclosed or referenced in, or attached to, these Disclosure Schedules shall not (i) be used as a basis for interpreting the terms "material", "material adverse effect" or other similar terms in the Agreement or to establish a standard of materiality, (ii) be deemed or interpreted to expand the scope of the parties' representations and warranties, obligations, covenants, conditions or agreements contained in the Agreement, or (iii) constitute, or be deemed to constitute, an admission of liability or obligation regarding such matter. No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

These Disclosure Schedules include brief descriptions or summaries of certain agreements and instruments. Such descriptions do not purport to be comprehensive and are qualified in their entirety by reference to the text of the documents described.

**Mobile Xray Diagnostics, LLC**
**American Health Imaging MW, LLC**
**American Health Imaging S, LLC**
**American Health W, LLC**

**Schedule 1.1(e) Estimated Closing Statement**

**Estimated Closing Statement effective as of August 1, 2026 at 12:01am**

| | | **Amount** | **Memo** | |
|---|---|---|---|---|
| Purchase Price | $ | 3,000,000.00 | | |
| Less: Deferred Payment Amount | | (1,000,000.00) | | |
| Less: Accounts Payable at 7/31/2026 | $ | (56,343.81) | | |
| Less: Payroll Liabilities at 7/31/2026 | $ | (58,627.73) | | |
| Less: Pre-Closing Taxes, as defined | $ | - | None per Seller | |
| Less: Company Transaction Expenses at 8/31/2026 | $ | - | None per Seller | |
| Less: 50% of Professional Liability 3-Year Tail Policy | $ | (20,000.00) | est. as of 8/24/2026 | |
| Memo: Residual Book Value of 15 Enterprise Fleet leased vehicles (not deducted) | $ | - | $ | 164,973.63 |
| Memo: Accrued PTO at 7/31/2026 (not deducted) | $ | - | $ | 41,801.46 |
| **Net Purchase Price payable at Closing** | **$** | **1,865,028.46** | | |

**<u>Schedule 4.5 Leases</u>**

1. Oral Lease Agreement by and between Mobile Xray Diagnostics, LLC and Kenyan Consumer Products for real property located at 141 Fairgrounds Road, West Kensington, RI 02892 dated as of January 1, 2022

## Schedule 4.7 Financial Statements

1. See attached Financial Statements.
2. See Schedule 4.10 (Absence of Certain Changes).
3. See Schedule 4.13 (Contracts and Commitments).
4. See Schedule 4.18 (Employee Matters).

**Mobile Xray Diagnostics, LLC**

**Income Statement — Cash Basis (prepared from bank records; payroll per Paylocity records)**

**January 2025 through July 2026**

| Financial Row | Jan 2025 | Feb 2025 | Mar 2025 | Apr 2025 | May 2025 | Jun 2025 | Jul 2025 | Aug 2025 | Sep 2025 | Oct 2025 | Nov 2025 | Dec 2025 | FY 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | |
| Imaging Revenue — Insurance collections | 184,674 | 232,021 | 184,079 | 178,458 | 244,908 | 202,492 | 173,311 | 176,209 | 150,709 | 141,252 | 147,596 | 157,956 | **2,173,664** |
| Imaging Revenue — Facility & patient collections | 131,978 | 81,587 | 153,477 | 108,621 | 151,469 | 148,329 | 117,456 | 88,463 | 113,451 | 46,349 | 65,624 | 68,674 | **1,275,478** |
| **Total Income** | **316,652** | **313,608** | **337,555** | **287,078** | **396,377** | **350,822** | **290,767** | **264,672** | **264,160** | **187,601** | **213,220** | **226,630** | **3,449,142** |
| Cost of Sales — Supplies | - | - | - | 6,007 | - | - | - | - | - | - | - | - | **6,007** |
| **Gross Profit** | **316,652** | **313,608** | **337,555** | **281,071** | **396,377** | **350,822** | **290,767** | **264,672** | **264,160** | **187,601** | **213,220** | **226,630** | **3,443,135** |
| **Expense** | | | | | | | | | | | | | |
| Salaries & Wages | 137,126 | 110,102 | 120,481 | 109,216 | 110,527 | 100,839 | 103,797 | 103,542 | 86,005 | 73,911 | 83,317 | 70,215 | **1,209,078** |
| Payroll Taxes | 4,579 | 2,141 | 1,523 | 1,522 | 1,463 | 1,209 | 1,151 | 1,152 | 1,072 | 1,129 | 1,119 | 1,779 | **19,839** |
| Employee Benefits (medical & life) | 21,588 | 20,705 | 22,226 | 22,228 | 6 | 33,157 | 21,396 | 22,309 | 78,677 | 19,812 | 20,572 | 21 | **282,695** |
| **Total Wages, Taxes & Benefits** | **163,292** | **132,947** | **144,229** | **132,966** | **111,996** | **135,205** | **126,343** | **127,004** | **165,754** | **94,852** | **105,008** | **72,016** | **1,511,612** |
| Outside Services (radiology reads & interpretation) | 24,425 | 25,675 | 24,975 | 32,350 | 16,175 | 20,600 | 37,150 | 31,375 | 8,700 | 43,105 | 15,650 | 22,150 | **302,330** |
| IT Services & PACS | 127 | - | - | - | 166 | - | - | - | 12,604 | 12,780 | - | 12,828 | **38,505** |
| Rent & Equipment Leases | - | - | - | - | - | - | - | - | - | - | 13,500 | 4,375 | **17,875** |
| Equipment Service Contracts | 1,883 | 1,883 | 1,883 | 1,883 | 1,883 | 1,883 | 1,883 | 1,883 | 1,883 | 1,883 | 1,883 | 1,883 | **22,594** |
| Vehicle, Fuel & Tolls | 660 | 210 | 939 | 720 | 720 | - | 720 | 820 | - | 720 | 720 | 764 | **6,994** |
| Insurance — Other | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| Professional Fees (legal & consulting) | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| Telephone & Communications | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| Office Supplies, Software & Postage | 21 | 21 | 21 | 21 | 21 | 127 | 21 | 21 | 21 | 21 | 21 | 21 | **361** |
| Licenses & Permits | - | - | - | - | - | - | - | - | - | - | - | 1,275 | **1,275** |
| Bank & Payroll Service Charges | 615 | 500 | 535 | 590 | 560 | 475 | 470 | 320 | 145 | 1,546 | 1,323 | 2,018 | **9,096** |
| **Total Operating Expenses** | **27,731** | **28,289** | **28,353** | **35,564** | **19,525** | **23,085** | **40,244** | **34,419** | **23,353** | **60,055** | **33,097** | **45,314** | **399,029** |
| **Total Expense** | **191,024** | **161,236** | **172,582** | **168,530** | **131,520** | **158,290** | **166,587** | **161,423** | **189,107** | **154,908** | **138,105** | **117,330** | **1,910,641** |
| **Net Income** | **125,628** | **152,372** | **164,973** | **112,541** | **264,857** | **192,531** | **124,179** | **103,250** | **75,053** | **32,693** | **75,115** | **109,301** | **1,532,493** |

**Mobile Xray Diagnostics, LLC**



**Income Statement — Cash Basis (prepared from bank records; payroll per Paylocity records)**

**January 2025 through July 2026**

| Financial Row | Jan 2026 | Feb 2026 | Mar 2026 | Apr 2026 | May 2026 | Jun 2026 | Jul 2026 | YTD 2026 |
|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | |
| Imaging Revenue — Insurance collections | 222,183 | 174,887 | 196,810 | 201,057 | 142,795 | 150,036 | 158,884 | **1,246,651** |
| Imaging Revenue — Facility & patient collections | 79,828 | 103,396 | 104,578 | 60,463 | 101,581 | 92,312 | 5,898 | **548,057** |
| **Total Income** | **302,011** | **278,283** | **301,388** | **261,520** | **244,376** | **242,348** | **164,781** | **1,794,707** |
| Cost of Sales — Supplies | - | - | - | - | - | - | - | **-** |
| **Gross Profit** | **302,011** | **278,283** | **301,388** | **261,520** | **244,376** | **242,348** | **164,781** | **1,794,707** |
| **Expense** | | | | | | | | |
| Salaries & Wages | 95,893 | 96,166 | 97,261 | 81,816 | 165,307 | 116,757 | 73,521 | **726,720** |
| Payroll Taxes | 7,075 | 7,075 | 7,137 | 6,095 | 12,113 | 8,998 | 5,753 | **54,247** |
| Employee Benefits (medical & life) | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | **112,000** |
| **Total Wages, Taxes & Benefits** | **118,968** | **119,242** | **120,398** | **103,911** | **193,420** | **141,755** | **95,274** | **892,967** |
| Outside Services (radiology reads & interpretation) | 69,598 | 68,006 | 58,622 | 33,778 | 19,550 | 32,018 | 1,950 | **283,522** |
| IT Services & PACS | 11,519 | 26,420 | 11,908 | 944 | 334 | 5,908 | 64 | **57,097** |
| Rent & Equipment Leases | 4,375 | 19,539 | 4,375 | 4,375 | - | - | - | **32,664** |
| Equipment Service Contracts | 1,883 | 1,883 | 1,883 | 2,855 | 2,855 | 2,855 | 2,855 | **17,068** |
| Vehicle, Fuel & Tolls | - | 720 | 720 | 720 | - | 720 | - | **2,880** |
| Insurance — Other | - | - | - | 25,077 | - | - | - | **25,077** |
| Professional Fees (legal & consulting) | - | 9,602 | - | - | - | - | - | **9,602** |
| Telephone & Communications | - | 94 | 847 | 112 | 124 | 1,121 | 94 | **2,392** |
| Office Supplies, Software & Postage | 21 | 506 | 1,788 | 166 | 367 | 770 | 280 | **3,899** |
| Licenses & Permits | - | 750 | 750 | - | - | 977 | - | **2,477** |
| Bank & Payroll Service Charges | 1,172 | 1,989 | 1,625 | 5,522 | 2,068 | 1,587 | 1,147 | **15,111** |
| **Total Operating Expenses** | **88,569** | **129,509** | **82,518** | **73,549** | **25,298** | **45,957** | **6,390** | **451,789** |
| **Total Expense** | **207,537** | **248,750** | **202,916** | **177,459** | **218,718** | **187,711** | **101,664** | **1,344,756** |
| **Net Income** | **94,474** | **29,533** | **98,472** | **84,061** | **25,658** | **54,637** | **63,117** | **449,951** |

# Schedule 4.8 Accounts Receivable

1. See attached.

**Schedule 4.8 Accounts Receivable**

# Mobile Xray Diagnostics, LLC
## A/R Aging Summary
## As of July 31, 2026

| | 0 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 - 180 | 181 - 210 | 211 - 240 | 241 - 270 | 271 - 300 | 301 - 330 | 331 - 360 | > 360 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Insurance & patient A/R (by payer) | $251,429.90 | $240,813.27 | $201,163.70 | $146,947.14 | $162,399.86 | $152,608.78 | $187,171.76 | $186,449.01 | $188,503.28 | $185,063.38 | $151,808.06 | $109,934.73 | $1,682,584.76 | $3,846,877.63 |
| Facility / client-billed A/R | $60,696.66 | $91,899.43 | $90,697.82 | $56,930.01 | $68,642.21 | $73,821.62 | $51,163.91 | $36,463.06 | $38,857.93 | $36,395.90 | $25,734.09 | $27,773.91 | $8,369.29 | $667,445.84 |
| **Total A/R** | **$312,126.56** | **$332,712.70** | **$291,861.52** | **$203,877.15** | **$231,042.07** | **$226,430.40** | **$238,335.67** | **$222,912.07** | **$227,361.21** | **$221,459.28** | **$177,542.15** | **$137,708.64** | **$1,690,954.05** | **$4,514,323.47** |

**Insurance & patient A/R by financial class**

| Financial Class | 0 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 - 180 | 181 - 210 | 211 - 240 | 241 - 270 | 271 - 300 | 301 - 330 | 331 - 360 | > 360 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other | $38,545.08 | $64,011.78 | $53,094.76 | $46,758.77 | $51,019.42 | $39,084.62 | $44,971.64 | $67,885.10 | $60,817.10 | $62,911.78 | $55,094.38 | $46,612.82 | $747,895.19 | $1,378,702.44 |
| Medicare | $174,243.45 | $101,298.28 | $79,291.32 | $32,936.37 | $41,024.94 | $28,320.25 | $33,520.86 | $33,406.39 | $35,041.51 | $42,399.42 | $28,881.19 | $14,512.06 | $102,435.40 | $747,311.44 |
| Patient / self-pay | $2,030.76 | $13,284.71 | $15,750.87 | $19,130.21 | $19,039.34 | $32,224.39 | $48,986.29 | $36,115.89 | $25,724.05 | $26,184.77 | $12,755.51 | $12,961.53 | $401,339.00 | $665,527.32 |
| Medicaid | $8,547.69 | $26,187.98 | $30,690.74 | $31,970.76 | $31,169.96 | $38,482.33 | $37,450.29 | $21,895.00 | $30,206.49 | $23,321.99 | $22,186.91 | $17,558.20 | $225,652.54 | $545,320.88 |
| United Healthcare | $16,235.64 | $19,873.49 | $9,872.53 | $6,130.84 | $7,226.60 | $7,838.35 | $13,219.52 | $19,135.95 | $19,627.78 | $22,357.39 | $26,201.16 | $13,928.51 | $121,425.92 | $303,073.68 |
| Blue Cross / Blue Shield | $7,286.10 | $8,700.15 | $10,161.69 | $5,344.85 | $9,632.45 | $4,400.15 | $3,465.60 | $4,187.17 | $15,152.17 | $5,695.93 | $6,384.88 | $3,077.04 | $56,800.20 | $140,288.38 |
| Aetna | $3,853.90 | $5,041.40 | $1,046.32 | $2,887.34 | $1,800.55 | $774.88 | $4,855.60 | $2,714.66 | $635.66 | $1,381.96 | $67.90 | $94.35 | $11,817.59 | $36,972.11 |
| Client | $0.00 | $307.84 | $456.39 | $666.28 | $65.48 | $1,325.44 | $35.24 | $825.85 | $1,298.52 | $794.58 | $236.13 | $807.40 | $13,744.00 | $20,563.15 |
| Humana | $687.28 | $2,107.64 | $799.08 | $1,121.72 | $1,421.12 | $158.37 | $666.72 | $283.00 | $0.00 | $15.56 | $0.00 | $382.82 | $1,474.92 | $9,118.23 |
| **Total** | **$251,429.90** | **$240,813.27** | **$201,163.70** | **$146,947.14** | **$162,399.86** | **$152,608.78** | **$187,171.76** | **$186,449.01** | **$188,503.28** | **$185,063.38** | **$151,808.06** | **$109,934.73** | **$1,682,584.76** | **$3,846,877.63** |

**Mobile Xray Diagnostics, LLC**

**A/R Aging by Payer**

**As of July 31, 2026**

**Schedule 4.8 Accounts Receivable**

| Financial Class | PAYER | 0 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 - 180 | 181 - 210 | 211 - 240 | 241 - 270 | 271 - 300 | 301 - 330 | 331 - 360 | > 360 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medicare | MEDICARE MASS | $174,243.45 | $101,298.28 | $79,002.80 | $32,868.47 | $40,286.80 | $28,320.25 | $31,881.39 | $26,828.87 | $31,751.76 | $39,217.76 | $26,519.45 | $14,469.32 | $95,816.93 | $722,505.53 |
| Patient / self-pay | _Patient Responsibility | $2,030.76 | $13,284.71 | $15,750.87 | $19,130.21 | $19,039.34 | $32,224.39 | $48,986.29 | $36,115.89 | $25,724.05 | $26,184.77 | $12,755.51 | $12,961.53 | $401,339.00 | $665,527.32 |
| Other | TUFTS HEALTH PLAN | $18,568.97 | $26,722.16 | $22,683.35 | $19,859.97 | $26,345.36 | $10,584.92 | $6,972.15 | $18,741.00 | $16,855.82 | $29,599.47 | $21,940.30 | $24,265.66 | $419,714.60 | $662,853.73 |
| Medicaid | MEDICAID MASS | $7,637.39 | $25,803.67 | $30,138.42 | $31,967.31 | $30,120.20 | $38,145.90 | $33,781.98 | $18,093.31 | $24,932.31 | $17,629.28 | $18,313.86 | $12,980.11 | $169,382.85 | $458,926.59 |
| United Healthcare | UNITED HEALTH CARE | $16,235.64 | $19,061.52 | $9,872.53 | $6,109.14 | $7,226.60 | $7,838.35 | $13,219.52 | $19,135.95 | $19,627.78 | $22,357.39 | $26,201.16 | $13,928.51 | $121,425.92 | $302,240.01 |
| Other | FALLON CARE | $10,341.22 | $6,940.97 | $3,124.48 | $2,755.39 | $3,527.72 | $4,320.75 | $1,572.11 | $11,719.39 | $12,839.60 | $8,551.26 | $7,940.22 | $4,814.76 | $60,314.88 | $138,762.75 |
| Blue Cross / Blue Shield | BLUE CROSS OF MASSACHUSETTS | $7,286.10 | $8,700.15 | $10,161.69 | $5,344.85 | $9,632.45 | $4,400.15 | $3,465.60 | $3,920.41 | $15,152.17 | $5,167.02 | $6,384.88 | $3,013.86 | $50,310.59 | $132,939.92 |
| Other | PEAK PACE SOLUTIONS | $964.11 | $1,624.68 | $6,807.96 | $4,849.02 | $3,098.18 | $7,856.25 | $6,802.81 | $7,000.86 | $4,245.78 | $4,161.40 | $4,636.42 | $4,517.89 | $53,034.82 | $109,600.18 |
| Other | COMMONWEALTH CARE ALLIANCE | $2,863.15 | $10,294.87 | $7,525.44 | $3,257.42 | $7,081.62 | $4,159.68 | $6,656.45 | $8,753.21 | $7,412.67 | $3,450.76 | $3,175.21 | $2,361.29 | $37,426.33 | $104,418.10 |
| Other | NEIGHBORHOOD HEALTH RI INTEGRITY PLAN | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $6,032.03 | $2,813.72 | $4,670.76 | $7,404.53 | $3,198.66 | $1,406.14 | $66,608.71 | $92,134.55 |
| Other | HARVARD PILGRIM HEALTH CARE | $732.60 | $2,433.55 | $3,202.87 | $3,485.39 | $2,087.16 | $3,937.91 | $3,480.19 | $4,507.76 | $4,152.80 | $1,703.93 | $4,530.26 | $2,387.98 | $38,452.80 | $75,095.20 |
| Medicaid | MEDICAID RHODE ISLAND | $0.00 | $0.00 | $0.00 | $0.00 | $77.26 | $0.00 | $1,802.98 | $3,007.74 | $4,580.12 | $4,529.96 | $3,427.77 | $2,457.57 | $46,915.99 | $66,799.39 |
| Other | BOSTON MEDICAL HEALTH PLAN | $429.72 | $1,676.40 | $1,485.44 | $1,416.74 | $1,376.81 | $3,465.38 | $2,943.24 | $3,078.33 | $3,487.67 | $2,670.61 | $1,976.60 | $1,201.58 | $15,462.10 | $40,670.62 |
| Other | _No Payer Assigned | $0.00 | $7,045.78 | $2,608.28 | $4,980.71 | $2,971.08 | $3,478.91 | $4,584.21 | $2,353.61 | $1,775.05 | $1,593.36 | $1,241.25 | $2,088.29 | $3,681.65 | $38,402.18 |
| Aetna | AETNA | $3,853.90 | $5,041.40 | $1,046.32 | $2,887.34 | $1,800.55 | $774.88 | $4,855.60 | $2,714.66 | $635.66 | $1,381.96 | $67.90 | $94.35 | $11,817.59 | $36,972.11 |
| Other | MASS GENERAL BRIGHAM HEALTH PLAN | $550.99 | $1,050.56 | $1,464.50 | $240.19 | $1,503.51 | $195.58 | $17.62 | $2,514.63 | $1,310.01 | $2,503.51 | $2,891.46 | $267.64 | $17,134.67 | $31,644.87 |
| Other | SENIOR WHOLE HEALTH MA | $0.00 | $1,022.92 | $1,101.52 | $382.82 | $49.90 | $650.46 | $4,725.29 | $1,944.66 | $3,137.71 | $650.46 | $1,542.07 | $650.46 | $10,074.74 | $25,933.01 |
| Medicare | MEDICARE RI | $0.00 | $0.00 | $0.00 | $29.28 | $0.00 | $0.00 | $1,639.47 | $6,304.87 | $3,289.75 | $3,181.66 | $2,361.74 | $25.12 | $5,995.67 | $22,827.56 |
| Client | HEALTH NEW ENGLAND | $0.00 | $307.84 | $456.39 | $666.28 | $65.48 | $1,325.44 | $35.24 | $825.85 | $1,298.52 | $794.58 | $0.00 | $807.40 | $13,744.00 | $20,327.02 |
| Medicaid | NEIGHBORHOOD HEALTH PLAN OF RI MEDICAID PLAN | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $29.28 | $614.66 | $0.00 | $329.40 | $2,120.52 | $8,414.61 | $11,508.47 |
| Other | ELEMENT CARE | $1,086.66 | $2,134.08 | $797.28 | $0.00 | $418.06 | $0.00 | $0.00 | $937.86 | $0.00 | $0.00 | $0.00 | $106.36 | $4,964.90 | $10,445.20 |
| Humana | HUMANA | $687.28 | $2,107.64 | $799.08 | $1,121.72 | $1,421.12 | $158.37 | $666.72 | $283.00 | $0.00 | $15.56 | $0.00 | $382.82 | $1,474.92 | $9,118.23 |
| Other | UNICARE | $933.76 | $578.74 | $777.43 | $1,584.73 | $765.56 | $57.19 | $56.02 | $1,008.95 | $0.00 | $87.01 | $1,189.26 | $38.62 | $1,161.30 | $8,238.57 |
| Other | TRICARE FOR LIFE | $0.00 | $218.94 | $733.71 | $1,445.81 | $1,047.96 | $79.78 | $37.26 | $1,376.39 | $0.00 | $261.74 | $350.62 | $137.58 | $1,831.76 | $7,521.55 |
| Other | HEALTH NEW ENGLAND, INC. | $702.98 | $1,547.49 | $52.18 | $71.80 | $50.28 | $0.00 | $16.26 | $89.85 | $337.05 | $127.34 | $56.94 | $1,083.42 | $3,272.76 | $7,408.35 |
| Blue Cross / Blue Shield | BLUE CROSS OF RHODE ISLAND | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $266.76 | $0.00 | $528.91 | $0.00 | $63.18 | $6,489.61 | $7,348.46 |
| Other | CIGNA | $0.00 | $0.00 | $23.31 | $403.82 | $335.02 | $73.71 | $0.00 | $30.66 | $0.00 | $0.00 | $0.00 | $664.30 | $4,849.86 | $6,380.68 |
| Other | ETERNAL HEALTH | $0.00 | $650.46 | $0.00 | $673.26 | $78.62 | $35.24 | $0.00 | $0.00 | $400.84 | $0.00 | $204.39 | $0.00 | $3,105.36 | $5,148.17 |
| Medicaid | MEDICAID NY | $910.30 | $163.55 | $124.29 | $0.00 | $972.50 | $137.81 | $443.39 | $0.00 | $15.56 | $764.11 | $115.88 | $0.00 | $939.09 | $4,586.48 |
| Other | MASS ADVANTAGE CARE | $0.00 | $0.00 | $0.00 | $21.00 | $204.39 | $0.00 | $56.94 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3,055.75 | $3,338.08 |
| Medicaid | MEDICAID | $0.00 | $181.68 | $0.00 | $0.00 | $0.00 | $181.68 | $1,421.94 | $249.02 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,034.32 |
| Other | BLUE BENEFIT ADMINISTRATORS OF MASSACHUSETTS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,818.84 | $1,818.84 |
| Other | WELLCARE HEALTH | $0.00 | $0.00 | $0.00 | $661.54 | $0.00 | $0.00 | $0.00 | $0.00 | $51.80 | $0.00 | $0.00 | $0.00 | $797.04 | $1,510.38 |
| Other | MUTUAL OF OMAHA | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $17.62 | $988.12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,005.74 |
| Other | CHAMP VA | $21.00 | $16.26 | $652.16 | $0.00 | $17.62 | $38.62 | $35.24 | $17.62 | $17.62 | $17.62 | $0.00 | $0.00 | $169.40 | $1,003.16 |
| United Healthcare | UNITED HEALTHCARE UT | $0.00 | $790.97 | $0.00 | $21.70 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $812.67 |
| Other | TUFTS HEALTH PLAN PUBLIC PLANS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $16.24 | $38.64 | $597.04 | $150.97 | $802.89 |
| Other | FALLON HEALTH SCO MN | $681.54 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $681.54 |
| Other | ELEMENT CARE, INC. | $668.38 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $668.38 |
| Other | HEALTH PLANS INC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $667.74 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $667.74 |
| Other | MEDICARE B | $0.00 | $0.00 | $0.00 | $666.28 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $666.28 |
| Medicare | MEDICARE IN | $0.00 | $0.00 | $0.00 | $0.00 | $663.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $663.60 |
| Medicare | PALMETTO GBA | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $17.62 | $622.80 | $640.42 |
| Other | GOVERNMENT EMPLOYEES HOSPITAL ASSOCIATION | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $580.40 | $580.40 |
| Medicaid | MEDICAID CO-INSURANCE MANAGED CARE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $515.65 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $515.65 |
| Other | MISC MEDICAID REPLACEMENT | $0.00 | $35.62 | $0.00 | $0.00 | $60.57 | $0.00 | $287.67 | $0.00 | $0.00 | $68.42 | $0.00 | $0.00 | $57.94 | $510.22 |
| Medicaid | MEDICAID ME | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $398.64 | $0.00 | $0.00 | $0.00 | $398.64 |
| Medicaid | MEDICAID PENDING - MA | $0.00 | $0.00 | $391.12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $391.12 |
| Other | UMR | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2.04 | $0.00 | $0.00 | $121.92 | $44.12 | $182.08 | $0.00 | $0.00 | $350.16 |
| Medicare | MEDICARE | $0.00 | $0.00 | $246.00 | $0.00 | $74.54 | $0.00 | $0.00 | $17.62 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $338.16 |
| Medicare | MEDICARE WPS NE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $255.03 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $255.03 |
| Client | MASCONOMET REHABILITATION AND HEALTHCARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $236.13 | $0.00 | $0.00 | $236.13 |

**Mobile Xray Diagnostics, LLC**

**A/R Aging by Payer**

**As of July 31, 2026**



| Financial Class | PAYER | 0 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 - 180 | 181 - 210 | 211 - 240 | 241 - 270 | 271 - 300 | 301 - 330 | 331 - 360 | > 360 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other | BANKERS LIFE AND CASUALTY | $0.00 | $0.00 | $37.23 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $23.81 | $173.61 | $234.65 |
| Medicaid | MEDICAID NH | $0.00 | $39.08 | $36.91 | $0.00 | $0.00 | $16.94 | $0.00 | $0.00 | $63.84 | $0.00 | $0.00 | $0.00 | $0.00 | $156.77 |
| Other | HEALTH NEW ENGLAND MA | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $75.09 | $8.48 | $8.48 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $92.05 |
| Medicare | MEDICARE A ACO-CM | $0.00 | $0.00 | $42.52 | $38.62 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $81.14 |
| Other | LONGWOOD HOSPICE MA | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $73.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $73.11 |
| United Healthcare | UNITEDHEALTHCARE OF NEW ENGLAND, INC. | $0.00 | $21.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $21.00 |
| Other | CENTRAL MASS HEALTH, LLC | $0.00 | $18.30 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $18.30 |
| Other | HARVARD PILGRIM HEALTHCAR MA | $0.00 | $0.00 | $17.62 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $17.62 |
| Medicaid | MEDICAID PENDING | $0.00 | $0.00 | $0.00 | $3.45 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3.45 |
| Other | ELEMENT CARE,INC. ESP NORTH SHORE MA | $0.00 | $0.00 | $0.00 | $2.88 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2.88 |
| Other | MEDICAID CO-INSURANCE B | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2.31 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2.31 |
| | **Total** | **$251,429.90** | **$240,813.27** | **$201,163.70** | **$146,947.14** | **$162,399.86** | **$152,608.78** | **$187,171.76** | **$186,449.01** | **$188,503.28** | **$185,063.38** | **$151,808.06** | **$109,934.73** | **$1,682,584.76** | **$3,846,877.63** |

**Mobile Xray Diagnostics, LLC**
**A/R Aging by Client / Facility**
**As of July 31, 2026**



| Financial Class | Client | 0 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 - 180 | 181 - 210 | 211 - 240 | 241 - 270 | 271 - 300 | 301 - 330 | 331 - 360 | > 360 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Client | VIBRA HOSPITAL OF SOUTHEASTERN MASSACHUSETTS | $6,129.96 | $6,993.32 | $7,197.25 | $5,795.27 | $6,750.00 | $3,728.32 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $237.38 | $36,831.50 |
| Client | LIFE CARE CENTER OF LEOMINSTER | $2,314.05 | $4,377.22 | $4,077.49 | $3,773.37 | $3,305.11 | $4,650.93 | $3,958.47 | $1,823.91 | $866.39 | $240.12 | $94.45 | $132.40 | ($1,337.59) | $28,276.32 |
| Client | CAREONE AT NEWTON | $3,203.96 | $1,995.00 | $3,180.28 | $2,142.35 | $2,460.00 | $2,879.40 | $2,549.52 | $2,421.89 | $1,889.14 | $2,411.64 | $780.00 | $0.00 | ($188.09) | $25,725.09 |
| Client | DYOUVILLE CENTER FOR ADVANCED THERAPY | $1,340.96 | $1,803.64 | $2,173.46 | $1,575.00 | $2,619.32 | $3,796.16 | $2,107.96 | $2,209.91 | $2,287.96 | $3,181.60 | $1,044.32 | $0.00 | $1,542.61 | $25,682.90 |
| Client | CAREONE AT MILLBURY | $2,370.59 | $2,792.96 | $6,556.08 | $4,896.43 | $4,419.82 | $1,270.00 | $1,800.54 | $1,044.32 | $174.12 | $71.51 | $0.00 | ($5.47) | ($629.56) | $24,761.34 |
| Client | BOSTON BRUINS | $0.00 | $0.00 | $0.00 | $25.00 | $650.00 | $1,950.00 | $3,275.00 | $5,275.00 | $2,675.00 | $4,775.00 | $3,950.00 | $0.00 | $2,125.00 | $24,700.00 |
| Client | CAREONE AT WEYMOUTH | $2,898.55 | $2,740.00 | $2,499.22 | $3,277.89 | $4,236.37 | $3,519.40 | $2,787.28 | $1,808.64 | $1,194.32 | $0.00 | $0.00 | $0.00 | ($2,129.01) | $22,832.66 |
| Client | CAREONE AT NEW BEDFORD | $4,484.54 | $6,132.60 | $5,442.78 | $3,436.92 | $3,296.68 | $684.32 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($1,303.05) | $22,174.79 |
| Client | LIFE CARE CENTER OF ACTON | $338.26 | $2,624.46 | $1,068.62 | $949.54 | $1,114.61 | $2,166.85 | $2,581.17 | $1,772.47 | $1,486.92 | $1,229.80 | $827.85 | $963.91 | $3,604.55 | $20,729.01 |
| Client | CAREONE AT REDSTONE | $1,750.00 | $1,950.00 | $2,491.94 | $3,220.00 | $2,440.00 | $2,850.00 | $2,650.00 | $490.00 | $372.47 | $70.00 | $0.00 | $0.00 | ($169.43) | $18,114.98 |
| Client | CAREONE AT BROOKLINE | $350.78 | $1,652.03 | $3,147.96 | $1,534.32 | $2,486.35 | $2,234.22 | $1,765.96 | $350.00 | $989.82 | $1,264.32 | $2,092.78 | $423.82 | ($260.58) | $18,031.78 |
| Client | BOSTON PUBLIC HEALTH COMMISSION | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,400.00 | $5,075.00 | $0.00 | $6,000.00 | $0.00 | $16,475.00 |
| Client | CLIFTON REHAB AND NURSING | $2,390.00 | $2,555.00 | $3,885.00 | $1,135.00 | $1,360.00 | $2,725.00 | $1,145.00 | $0.00 | ($5.47) | $0.00 | $0.00 | $0.00 | $266.44 | $15,455.97 |
| Client | WATERVIEW VILLA REHABILITATION AND HEALTH CARE CEN | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $120.00 | $655.00 | $700.00 | $1,315.00 | $1,200.00 | $2,759.88 | $3,883.53 | $2,867.80 | $13,501.21 |
| Client | FALL RIVER JEWISH | $0.00 | $1,045.00 | $1,575.00 | $1,035.00 | $610.00 | $1,515.00 | $1,659.20 | $185.00 | $600.00 | $335.00 | $1,370.00 | $645.00 | $1,537.06 | $12,111.26 |
| Client | LIFE CARE CENTER OF NASHOBA VALLEY | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $632.84 | $3,134.03 | $1,054.27 | $1,428.30 | $0.00 | $0.00 | $441.71 | $5,390.00 | $12,081.15 |
| Client | HARBOR HOUSE REHAB | $1,971.73 | $869.32 | $1,796.86 | $1,733.93 | $2,539.90 | $2,730.36 | $464.86 | $574.73 | ($70.00) | $0.00 | $0.00 | ($985.49) | ($705.47) | $10,920.73 |
| Client | LIFE CARE CENTER OF ATTLEBORO | $3,433.60 | $6,749.85 | $1,943.34 | $0.00 | $0.00 | ($58.87) | $0.00 | $0.00 | ($4.79) | $0.00 | $0.00 | $0.00 | ($1,392.36) | $10,670.77 |
| Client | LIFE CARE CENTER OF STONEHAM | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,105.95 | $2,145.52 | $2,462.97 | $1,874.00 | $0.00 | $0.00 | $1,051.08 | $929.41 | $10,568.93 |
| Client | JOHN SCOTT HOUSE | $525.00 | $1,603.74 | $1,869.32 | $1,340.13 | $1,479.91 | $2,049.46 | $550.22 | $665.00 | $455.00 | $0.00 | $0.00 | $0.00 | ($140.05) | $10,397.73 |
| Client | DYOUVILLE SENIOR CARE | $459.82 | $1,437.96 | $570.00 | $1,155.10 | $1,339.32 | $1,254.32 | $225.00 | $118.00 | $1,270.88 | $735.00 | $285.00 | $0.00 | $1,110.29 | $9,960.69 |
| Client | BROCKTON POST ACUTE CARE | $814.00 | $1,383.00 | $566.00 | $525.00 | $490.00 | $1,634.13 | ($47.74) | $824.96 | $480.00 | $490.00 | $135.00 | $15.27 | $1,751.92 | $9,061.54 |
| Client | SUMMIT COMMONS REHABILITATION AND HEALTH CARE CENT | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $747.47 | $550.00 | $1,796.86 | $2,154.16 | $1,635.00 | $1,181.92 | $870.89 | $8,936.30 |
| Client | LIFE CARE CENTER OF AUBURN | $2,488.29 | $5,547.47 | $1,260.39 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($393.68) | $8,902.47 |
| Client | SACHEM CENTER FOR HEALTH AND REHABILITATION | $0.00 | $0.00 | $0.00 | $0.00 | $230.00 | $1,825.00 | $1,285.00 | $955.00 | $690.00 | $1,349.53 | $380.00 | $1,262.06 | $690.00 | $8,666.59 |
| Client | BAKER KATZ SKILLED NURSING AND REHAB CENTER | $355.00 | $0.00 | $1,210.00 | $1,483.79 | $380.00 | $475.00 | $992.34 | $1,685.00 | $1,080.00 | $260.00 | $35.00 | $0.00 | $362.05 | $8,318.18 |
| Client | GARDNER REHABILITATION AND NURSING CENTER | $930.00 | $1,365.00 | $1,725.00 | $150.00 | $1,620.00 | $1,360.55 | $762.05 | $294.53 | $225.00 | $342.65 | $151.25 | ($3.55) | ($631.78) | $8,290.70 |
| Client | LEDGEWOOD REHABILITATION AND SKILLED CARE CENTER | $525.00 | $1,760.00 | $1,135.16 | $1,365.00 | $1,818.64 | $2,260.00 | $1,036.95 | $70.00 | $0.00 | $200.25 | $595.00 | $942.79 | ($3,464.99) | $8,243.80 |
| Client | SUNNY ACRES NURSING AND REHAB CENTER | $730.08 | $570.00 | $960.00 | $320.00 | $770.00 | $415.00 | $700.00 | $223.88 | $60.00 | $1,074.53 | $904.32 | $1,018.14 | $364.33 | $8,110.28 |
| Client | CAREONE AT RANDOLPH | $70.00 | $2,337.19 | $2,167.10 | $624.14 | $1,340.00 | $849.32 | $500.00 | $140.00 | $150.00 | $0.00 | $70.00 | $0.00 | ($183.77) | $8,063.98 |
| Client | LIFE CARE CENTER OF THE NORTH SHORE | $299.82 | $1,920.63 | $1,752.99 | $1,699.01 | $247.25 | $0.00 | $156.84 | $0.00 | $0.00 | $0.00 | $0.00 | $1,264.67 | $542.04 | $7,883.25 |
| Client | BAYPATH AT DUXBURY | $700.00 | $1,210.48 | $1,875.00 | $729.32 | $2,167.28 | $1,737.29 | $703.72 | $0.00 | ($59.73) | $0.00 | $0.00 | $350.00 | ($1,624.02) | $7,789.34 |
| Client | OAK KNOLL REHABILITATION AND HEALTHCARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $675.00 | $685.00 | $0.00 | $1,115.00 | $2,110.00 | $804.66 | $1,515.00 | $820.00 | ($82.91) | $7,641.75 |
| Client | JEFFREY AND SUSAN BRUDNICK CENTER FOR LIVING | $1,202.96 | $1,642.77 | $1,854.32 | $225.00 | $190.24 | $0.00 | $1,365.45 | $989.36 | $117.75 | ($26.09) | $0.00 | ($117.95) | $165.88 | $7,609.69 |
| Client | HANCOCK PARK REHAB AND NURSING CENTER | $525.00 | $1,238.64 | $995.00 | $805.00 | $1,365.15 | $1,834.32 | $210.00 | $665.00 | $388.82 | $34.36 | $0.00 | $0.00 | ($451.77) | $7,609.52 |
| Client | QUEEN ANNE NURSING HOME | $2,013.64 | $1,363.64 | $1,190.00 | $668.64 | $0.00 | $0.00 | ($35.00) | $0.00 | $0.00 | ($34.72) | $0.00 | $1,315.84 | $893.06 | $7,375.10 |
| Client | BEAUMONT AT WESTBOROUGH | $1,048.70 | $2,597.51 | $2,213.64 | $805.00 | $339.32 | $0.00 | $320.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($74.01) | $7,250.16 |
| Client | TEWKSBURY HOSPITAL | $2,100.00 | $600.00 | $0.00 | $0.00 | $2,000.00 | $1,100.00 | $1,350.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,150.00 |
| Client | ADVINIACARE OF COUNTRY CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3,191.52 | $855.00 | $35.00 | $0.00 | $1,235.82 | $1,414.46 | ($58.77) | $248.52 | $6,921.55 |
| Client | WILLOW BROOK REHABILITATION AND HEALTHCARE CENTER | $420.00 | $210.00 | $650.00 | $0.00 | $280.00 | $490.00 | $445.00 | $640.00 | $210.00 | $210.00 | $747.88 | $150.00 | $2,219.59 | $6,672.47 |
| Client | ALDEN COURT NURSING CARE AND REHABILITATION CENTER | $1,270.00 | $1,119.86 | $894.80 | $857.01 | $656.63 | $151.13 | $0.00 | $0.00 | ($123.68) | ($19.57) | ($115.88) | $1,063.20 | $874.62 | $6,628.12 |
| Client | NEVINS NURSING AND REHABILITATION CENTRE | $0.00 | $763.00 | $305.00 | $0.00 | $35.00 | $0.00 | $0.00 | ($20.04) | $0.00 | $0.00 | ($400.68) | $912.32 | $4,753.18 | $6,347.78 |
| Client | BRIGHTON HOUSE | $394.00 | $798.00 | $842.00 | $0.00 | ($60.07) | ($6.12) | $710.00 | $595.00 | $745.00 | $430.00 | $675.00 | $691.27 | $191.47 | $6,005.55 |
| Client | CAREONE AT NORTHAMPTON | $490.00 | $560.00 | $1,190.00 | $630.00 | $420.00 | $700.00 | $280.00 | $961.20 | $420.00 | $0.00 | $0.00 | $0.00 | ($205.57) | $5,445.63 |
| Client | OAKLAND GROVE HEALTH CARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $60.00 | $715.00 | $1,140.00 | $1,221.52 | $820.00 | $1,290.00 | $445.00 | ($524.46) | $5,167.06 |
| Client | PORT REHABILITATION AND HEALTHCARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $140.00 | $0.00 | $0.00 | $0.00 | $1,950.00 | $2,139.48 | $0.00 | ($58.77) | $804.84 | $4,975.55 |
| Client | ORCHARD VIEW MANOR | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $360.00 | $295.00 | $618.46 | $684.67 | $425.00 | $880.00 | $1,560.06 | $4,823.19 |

**Mobile Xray Diagnostics, LLC**
**A/R Aging by Client / Facility**
**As of July 31, 2026**

**Schedule 4.8 Accounts Receivable**

| Financial Class | Client | 0 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 - 180 | 181 - 210 | 211 - 240 | 241 - 270 | 271 - 300 | 301 - 330 | 331 - 360 | > 360 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Client | THE HIGHLANDS | $1,742.44 | $3,175.51 | $1,190.23 | $0.00 | $0.00 | ($20.65) | $0.00 | ($27.03) | $0.00 | $0.00 | $0.00 | ($34.72) | ($1,355.97) | $4,669.81 |
| Client | ELIOT CENTER FOR NURSING AND REHABILITAION | $345.00 | $555.00 | $415.00 | $1,080.00 | $1,405.00 | $498.88 | $402.76 | $0.00 | $0.00 | $0.00 | $0.00 | ($3.12) | ($238.08) | $4,460.44 |
| Client | LEONARD FLORENCE CENTER FOR LIVING | $75.00 | $285.00 | $1,245.00 | $600.00 | $585.00 | $870.00 | $75.00 | $0.00 | $0.00 | $0.00 | $225.00 | $135.00 | $319.15 | $4,414.15 |
| Client | CARVALHO GROVE HEALTH | $35.00 | $60.00 | $565.76 | $175.00 | $189.86 | $130.00 | $26.13 | $120.41 | $30.45 | $0.00 | $0.00 | $1,036.95 | $1,928.83 | $4,298.39 |
| Client | SOUTHWOOD AT NORWELL | $1,580.00 | $1,240.00 | $670.00 | $41.13 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $30.21 | $0.00 | $0.00 | $630.02 | $4,191.36 |
| Client | HEATHERWOOD REHABILITATION AND HEALTH CARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $295.00 | $625.00 | $670.00 | $805.00 | $662.85 | $440.00 | $415.31 | $3,913.16 |
| Client | DWYER HOME | $0.00 | $220.00 | $940.00 | $388.42 | $57.89 | ($61.50) | $980.00 | $318.88 | $285.00 | $635.00 | $0.00 | $0.00 | ($6.33) | $3,757.36 |
| Client | DEVEREUX SKILLED NURSING & REHABILITATION CENTER | $0.00 | $0.00 | $320.00 | $111.67 | $285.00 | $0.00 | $95.00 | $95.00 | $191.52 | $175.00 | $165.00 | $130.00 | $2,153.74 | $3,721.93 |
| Client | SEACOAST NURSING AND REHAB CENTER | $280.00 | $774.32 | $784.32 | $840.00 | $605.00 | $895.00 | $140.00 | $0.00 | $0.00 | $0.00 | $140.00 | $360.00 | ($1,296.28) | $3,522.36 |
| Client | BLACKSTONE VALLEY HEALTH AND REHAB | $1,277.96 | $1,003.70 | $1,631.09 | $205.00 | $70.00 | ($5.40) | $0.00 | $0.00 | $12.06 | $176.10 | $385.91 | $0.00 | ($1,362.45) | $3,393.97 |
| Client | COLONY CENTER FOR HEALTH AND REHABILITATION | $355.00 | $495.00 | $1,040.00 | $70.00 | $495.00 | $150.00 | ($26.06) | $0.00 | $0.00 | $0.00 | $0.00 | $80.00 | $551.46 | $3,210.40 |
| Client | SPRINGSIDE REHAB AND SKILLED CARE CENTER | $0.00 | $570.00 | $650.00 | $904.60 | $859.58 | $720.00 | $140.00 | $0.00 | $0.00 | ($5.47) | $0.00 | $210.00 | ($846.48) | $3,202.23 |
| Client | MILL BROOK REHABILITATION AND HEALTHCARE CENTER | $1,597.10 | $1,457.00 | $1,528.00 | $931.00 | $44.40 | $0.00 | $0.00 | ($10.95) | $0.00 | ($8.48) | $70.00 | ($21.25) | ($2,591.42) | $2,995.40 |
| Client | COUNTRY GARDENS HEALTH | $0.00 | $165.00 | $505.00 | $210.00 | $549.32 | $515.00 | $120.00 | $0.00 | $0.00 | $85.00 | $0.00 | $454.02 | $284.35 | $2,887.69 |
| Client | REHABILITATION HOSPITAL OF RHODE ISLAND | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $312.63 | $0.00 | $0.00 | $308.88 | $0.00 | $2,224.61 | $2,846.12 |
| Client | LIFE CARE CENTER OF MERRIMACK VALLEY | $483.35 | $635.56 | $277.14 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,435.51 | $2,831.56 |
| Client | CEDARWOOD GARDENS | $120.00 | $1,501.27 | $908.64 | $175.00 | $499.32 | $325.00 | $78.88 | $0.00 | $0.00 | $0.00 | $0.00 | $35.00 | ($819.18) | $2,823.93 |
| Client | THE BOSTONIAN | $280.00 | $430.00 | $510.00 | $898.64 | $543.88 | $370.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($276.00) | $2,756.52 |
| Client | CAREONE AT LOWELL | $0.00 | $360.00 | $440.00 | $0.00 | $150.00 | $440.00 | $360.00 | $70.00 | $200.00 | $569.82 | $150.00 | $0.00 | ($6.20) | $2,733.62 |
| Client | CRANEVILLE PLACE OF DALTON | $70.00 | $430.00 | $510.00 | $560.00 | $570.00 | $650.00 | $0.00 | $0.00 | ($59.73) | $0.00 | $0.00 | $0.00 | ($191.00) | $2,539.27 |
| Client | MEDWAY COUNTRY MANOR | $185.00 | $405.00 | $1,039.32 | $575.00 | $705.00 | $175.00 | $229.03 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($815.38) | $2,497.97 |
| Client | KATZMAN FAMILY CENTER FOR LIVING | $0.00 | $260.00 | $60.00 | $0.00 | $60.00 | $120.00 | $0.00 | $0.00 | $0.00 | $0.00 | $60.00 | $60.00 | $1,423.62 | $2,043.62 |
| Client | ARMENIAN NURSING AND REHABILITATION CENTER | $0.00 | $724.14 | $60.00 | $320.00 | $140.00 | $0.00 | $0.00 | $160.00 | $60.00 | $0.00 | $80.00 | $220.00 | $200.00 | $1,964.14 |
| Client | HAVERHILL REHABILITATION AND HEALTHCARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $950.00 | $1,155.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($12.13) | ($17.52) | ($145.17) | $1,930.18 |
| Client | BRIGHAM HEALTH AND REHAB CENTER | $0.00 | $255.00 | $150.00 | $79.60 | $0.00 | $320.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $120.00 | $781.04 | $1,705.64 |
| Client | BLUE HILLS HEALTH AND REHABILITATION CENTER | $155.00 | $385.00 | $225.00 | $140.00 | $60.00 | $155.00 | $35.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $548.91 | $1,703.91 |
| Client | NEMASKET REHABILITATION AND HEALTHCARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $830.00 | $1,109.60 | $67.21 | $0.00 | ($86.43) | $0.00 | ($27.05) | $0.00 | ($251.09) | $1,642.24 |
| Client | CAREONE AT HOLYOKE | $70.00 | $0.00 | $630.00 | $280.00 | $420.00 | $70.00 | $70.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,540.00 |
| Client | COUNTRYSIDE HEALTH CARE OF MILFORD | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,338.46 | $1,338.46 |
| Client | SOUTH COVE MANOR AT QUINCY POINT | $380.00 | $250.00 | $727.32 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($133.36) | $1,223.96 |
| Client | BRUSH HILL CARE CENTER | $0.00 | $105.00 | $35.00 | $0.00 | $0.00 | $115.00 | $0.00 | $35.00 | $134.96 | $160.00 | $0.00 | $20.89 | $542.21 | $1,148.06 |
| Client | SIPPICAN REHABILITATION AND HEALTHCARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $951.13 | $640.00 | $0.00 | ($61.99) | $0.00 | $0.00 | $0.00 | ($439.19) | $1,089.95 |
| Client | CAMPION HEALTH AND WELLNESS | $0.00 | $0.00 | $0.00 | $0.00 | $98.88 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $967.08 | $1,065.96 |
| Client | ADVINIACARE OF SALEM | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $150.00 | $0.00 | $0.00 | $0.00 | $110.00 | $255.00 | $0.00 | $528.97 | $1,043.97 |
| Client | SHREWSBURY REHAB AND NURSING | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $275.00 | $195.00 | $534.67 | $0.00 | $0.00 | $0.00 | $0.00 | $1,004.67 |
| Client | CAMBRIDGE REHAB AND NURSING | $0.00 | $60.00 | $130.00 | $70.00 | $208.50 | $340.00 | $0.00 | $70.00 | $200.00 | $270.00 | $270.00 | $0.00 | ($621.32) | $997.18 |
| Client | MASCONOMET REHABILITATION AND HEALTHCARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $1,065.00 | $594.40 | ($89.60) | ($45.32) | ($42.98) | $0.00 | $0.00 | ($69.09) | ($417.32) | $995.09 |
| Client | LAFAYETTE REHABILITATION AND SKILLED NURSING | $0.00 | $169.32 | $140.00 | $105.00 | $110.00 | $331.08 | $89.67 | $0.00 | $150.00 | $0.00 | $0.00 | $0.00 | ($100.48) | $994.59 |
| Client | HIGHLAND PARK REHABILITATION AND HEALTHCARE CENTER | $300.00 | $270.00 | $190.00 | $140.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $79.50 | $979.50 |
| Client | ABBOTT SKILLED NURSING & REHABILITATION CENTER | $0.00 | $0.00 | $0.00 | $105.00 | $71.13 | $0.00 | $355.00 | $0.00 | $0.00 | $380.00 | $0.00 | $0.00 | ($76.16) | $834.97 |
| Client | OAK KNOLL HEALTHCARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $758.63 | $758.63 |
| Client | BEAUMONT AT NORTHBOROUGH | $275.00 | $230.00 | $310.00 | $0.00 | ($33.92) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($28.06) | $753.02 |
| Client | BEAUMONT AT NATICK | $230.00 | $220.00 | $290.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($44.53) | $695.47 |
| Client | THE BOSTON HOME | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $543.98 | $543.98 |
| Client | JESMOND NURSING HOME | $0.00 | $35.00 | $130.00 | $0.00 | $373.80 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($115.08) | $423.72 |
| Client | EVERETT NURSING AND REHABILITATION CENTER | $0.00 | $130.00 | $130.00 | ($3.45) | $0.00 | $120.00 | $0.00 | $0.00 | ($70.00) | $140.00 | $130.00 | $0.00 | ($159.32) | $417.23 |
| Client | ADVINIACARE OF NEWTON WELLESLEY | $0.00 | $0.00 | $0.00 | $0.00 | $75.00 | $150.00 | $0.00 | $0.00 | $0.00 | $75.00 | $150.00 | $0.00 | ($60.00) | $390.00 |

**Mobile Xray Diagnostics, LLC**
**A/R Aging by Client / Facility**
**As of July 31, 2026**



| Financial Class | Client | 0 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 - 180 | 181 - 210 | 211 - 240 | 241 - 270 | 271 - 300 | 301 - 330 | 331 - 360 | > 360 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Client | DOCTORS ORDERS-MA | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $140.00 | $210.00 | $0.00 | $0.00 | $0.00 | $0.00 | $350.00 |
| Client | FAIRHAVEN HEALTHCARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $216.61 | $216.61 |
| Client | LEGACY LIFECARE VNA & HOSPICE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $159.54 | $159.54 |
| Client | COPLEY AT STOUGHTON | $490.00 | $474.32 | $0.00 | $0.00 | $323.86 | $466.92 | ($4.59) | ($6.55) | ($34.65) | $0.00 | $0.00 | ($6.18) | ($1,686.12) | $17.01 |
| Client | BETHANY HEALTH CARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($12.00) | ($12.00) |
| Client | ALLIANCE HEALTH AT MARIE ESTHER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($48.60) | ($48.60) |
| Client | MEDFORD REHAB AND NURSING | $0.00 | $60.00 | $60.00 | $0.00 | $63.88 | $0.00 | $3.81 | $135.99 | $55.99 | $60.00 | $60.00 | $0.00 | ($568.95) | ($69.28) |
| Client | ALLIANCE HEALTH AT BALDWINVILLE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($160.25) | ($160.25) |
| Client | ALLIANCE HEALTH AT WEST ACRES | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($180.14) | ($180.14) |
| Client | _No Payer Assigned | $32.52 | $0.00 | $0.00 | $16.24 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($236.41) | ($187.65) |
| Client | EVERGREEN HOUSE HEALTH CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($236.40) | ($236.40) |
| Client | ALLIANCE HEALTH AT ROSEWOOD | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($273.47) | ($273.47) |
| Client | PORT HEALTHCARE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $160.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($442.23) | ($282.23) |
| Client | SIPPICAN HEALTH CARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($284.69) | ($284.69) |
| Client | CHERRY HILL MANOR NURSING AND REHAB CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($311.00) | ($311.00) |
| Client | ALLIANCE HEALTH AT MAPLES | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($373.26) | ($373.26) |
| Client | ADVINIACARE OF NORTHBRIDGE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $225.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($628.84) | ($403.84) |
| Client | ALLIANCE HEALTH AT BRAINTREE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($651.19) | ($651.19) |
| Client | NEMASKET HEALTHCARE CENTER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($855.76) | ($855.76) |
| Client | MASCONOMET HEALTH CARE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($881.35) | ($881.35) |
| Client | ALLIANCE HEALTH AT MARINA BAY | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($903.40) | ($903.40) |
| Client | HANNAH DUSTON HEALTHCARE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($1,001.49) | ($1,001.49) |
| Client | THE OAKS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $231.36 | ($60.14) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($1,278.14) | ($1,106.92) |
| Client | NORTHEAST REHABILITATION SALEM | $0.00 | $200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $200.00 | $0.00 | $0.00 | $0.00 | ($2,150.00) | ($1,750.00) |
| Client | ALDEN COURT NURSING CARE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($4,113.54) | ($4,113.54) |
| | **Total** | **$60,696.66** | **$91,899.43** | **$90,697.82** | **$56,930.01** | **$68,642.21** | **$73,821.62** | **$51,163.91** | **$36,463.06** | **$38,857.93** | **$36,395.90** | **$25,734.09** | **$27,773.91** | **$8,369.29** | **$667,445.84** |

**Schedule 4.9 Accounts Payable**

1. See attached.

# Mobile Xray Diagnostics, LLC



# Post-Petition Accounts Payable
# As of July 31, 2026

| Vendor | Recorded in G/L | Accrued — invoice pending | Total |
|---|---|---|---|
| VE1044-C Associated X-Ray Imaging Corp. | $20,592.91 | $0.00 | $20,592.91 |
| VE1354 Rapid Radiology | $0.00 | $18,469.00 | $18,469.00 |
| VE1151 Emergent Connect | $0.00 | $11,055.80 | $11,055.80 |
| VE2202 Dosimetry Services - Mirion Tech | $0.00 | $2,550.00 | $2,550.00 |
| VE2208 Cambridge Cardiovascular Ultrasound Inc | $0.00 | $1,950.00 | $1,950.00 |
| Medical director fees | $0.00 | $750.00 | $750.00 |
| VE2148 Kenyon Consumer Products | $0.00 | $450.00 | $450.00 |
| VE1118 Cox Business | $279.10 | $0.00 | $279.10 |
| VE2351 Comcast 4300 (PO Box 37601) | $247.00 | $0.00 | $247.00 |
| **Total** | **$21,119.01** | **$35,224.80** | **$56,343.81** |

| | |
|---|---|
| Enterprise Fleet Management — vehicle leases | See lease schedule |

**Schedule 4.10 Absence of Certain Changes**

1. None.

**Schedule 4.11 Litigation; Legal Proceedings; Governmental Orders**

1. Voluntary Petition for Bankruptcy Protection filed April 17, 2026, in the U.S. Bankruptcy Court for the Southern District of Florida, by:
   a. Mobile Xray Diagnostics, LLC
   b. American Health W, LLC
   c. American Health Imaging MW, LLC
   d. American Health Imaging S, LLC
2. Order of the U.S. Bankruptcy Court for the Southern District of Florida in the matter of Voluntary Petition for Bankruptcy Protection filed April 17, 2026, approving the transactions contemplated by the Agreement in all respects.
3. Letter dated January 8, 2026, from The Commonwealth of Massachusetts Office of the Attorney General, Re Massachusetts Wage and hour Laws Advisory / Timely Payment of Wages and Paystubs.

**Schedule 4.12 (c) Disregard Entity Status**

1. Mobile Xray Diagnostics, LLC was a partnership prior to December 17, 2021.

**Schedule 4.13 Contracts and Commitments**

1. Client Teleradiology Services Agreement dated January 6, 2020, by and between Mobile Xray Diagnostics, LLC and Rapid Radiology, Inc.
2. Emergent Connect Software Licensing Agreement by and between Mobile Xray Diagnostics, LLC and Emergent Connect, LLC of uncertain date. Unable to locate copy of agreement.
3. Consensus Cloud Solutions Inc. (dba eFax). Service provided on a month to month basis. eFax has advised us in writing that there is "no formal contract in place" and Mobile Xray Diagnostics, LLC is "currently on a month-to-month plan." Pricing requires minimum of 5 DIDs (Direct Inward Dialing). Most recent invoiced amount was $89.95.
4. Oral agreement with Associated X-Ray Imaging Corp. Provides equipment maintenance services to Mobile Xray Diagnostics, LLC. Services provided on a Purchase Order by Purchase Order basis. Associated performs Preventative Maintenance, equipment repair and maintenance on an as needed basis. Payment terms are net 30 days.
5. Cambridge Cardiovascular Ultrasound Inc. Services for echocardiographer. Paid $315 per echocardiogram performed, on an as-needed/as-ordered basis, with payment terms net 5 days.
6. Mirion Technologies, Inc. Provides services to read radiation badges for Mobile Xray Diagnostics, LLC employees and contractors. Services provided on a Purchase Order by Purchase Order basis. $133.10 per unit price.
7. E-ZPass. Terms available at https://www.mass.gov/info-details/apply-for-e-zpass-ma.
8. Harvard Pilgrim Health Care: Employee Benefits Medical Insurance.
9. Medical Director Agreement by and between Mobile Xray Diagnostics, LLC and Thomas Atlas, M.D. dated February 3, 2021.
10. Medical Director Agreement by and between Mobile Xray Diagnostics, LLC and Robert Hannon, M.D. dated August 27, 2020.
11. Business Associate Agreement by and between Mobile Xray Diagnostics, LLC and Inview Diagnostic Imaging, Inc. dated April 15, 2024.
12. Business Associate Agreement by and between Mobile Xray Diagnostics, LLC and Cambridge Cardiovascular Ultrasound, Inc. dated April 15, 2024.
13. Verizon Wireless. Account Number 542336354-00001. Terms available at www.verizon.com. Utilized for MXD xray technologists and hotspots for transmission of images.
14. Enterprise Fleet Vehicle Lease Transfer Agreement, with list of fifteen (15) vehicles by VIN. See Schedule 4.5 Leases.
15. Customer Contracts
    1. Facility Contracts: Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Alliance Health at Abbott dated July 1, 2020.

2. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Alliance Health at Devereux dated July 1, 2020.
3. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Azure Healthcare Management dated November 4, 2024.
4. Boston Public Health Commission Standard Contract for the Provision of Goods or Services by and between American Health Associates and Boston Public Health Commission dated November 22, 2024.
5. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Baker-Katz Nursing Home dated January 2021.
6. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and BaneCare Management LLC (Craneville Place of Dalton, Springside Rehab & Skilled Care, and Sugar Hill Assisted Living) dated April 30, 2022.
7. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and BaneCare Management LLC (Bay Path at Duxbury, Brighton House, Hancock Park, Harbor House Rehab, John Scott House, and The Bostonian) dated April 30, 2022.
8. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Whitney Place at Natick, dba Beaumont at Natick dated January 1, 2024.
9. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Willows at Westborough, dba Beaumont at Westborough dated January 1, 2024.
10. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Willows at Northborough, dba Beaumont at Northborough dated January 1, 2024.
11. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Brush Hill Care Center dated June 13, 2023.
12. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Cambridge Rehabilitation and Nursing dated May 1, 2022.
13. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Campion Health and Wellness Inc. dated February 1, 2024.
14. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Carvalho Grove Health and Rehab dated October 1, 2023.
15. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and William B. Rice Eventide Home, dba Dwyer Home dated July 9, 2024.
16. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Everett Rehabilitation and Nursing dated May 1, 2022.
17. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and First Choice Community Medical Services dated September 16, 2020.
18. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and The Gardens at Cedarwood LLC dated September 1, 2025.

19. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Highland Park Operator LLC, dba Highland Park Rehabilitation and Healthcare Center dated October 1, 2025.
20. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Jesmond Nursing Home dated January 2021.
21. Agreement for Diagnostic Imaging Services by and between Mobile Xray Diagnostics, LLC and Life Care Center of Auburn dated August 26, 2022.
22. Agreement for Diagnostic Imaging Services by and between Mobile Xray Diagnostics, LLC and Life Care Center of Leominster dated August 23, 2022.
23. Agreement for Diagnostic Imaging Services by and between Mobile Xray Diagnostics, LLC and Life Care Center of Acton dated May 14, 2021.
24. Agreement for Diagnostic Imaging Services by and between Mobile Xray Diagnostics, LLC and Life Care Center of Attleboro dated October 1, 2020.
25. Agreement for Diagnostic Imaging Services by and between Mobile Xray Diagnostics, LLC and Life Care Center of the North Shore dated May 14, 2021.
26. See attached Agreement for Diagnostic Imaging Services by and between Mobile Xray Diagnostics, LLC and Life Care Center of Merrimack Valley dated August 1, 2022.
27. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Ledgewood Rehabilitation and Skilled Nursing Center dated October 1, 2021.
28. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Mill Brook Operator LLC, dba Mill Brook Rehabilitation and Healthcare Center dated October 1, 2025.
29. Memorandum of Understanding by and between Mobile Xray Diagnostics, LLC and Boston Public Health Commission dated September 28, 2025.
30. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Medford Rehabilitation and Nursing dated May 1, 2022.
31. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Medway Country Manor dated October 1, 2022.
32. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Nevins Nursing & Rehabilitation Centre dated August 29, 2022.
33. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Phillips Manor dated June 15, 2020.
34. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Pointe Group dated March 1, 2023.
35. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Seacoast Rehabilitation and Skilled Nursing Center dated October 1, 2021.

36. Agreement for Diagnostic Imaging Services by and between Mobile Xray Diagnostics, LLC and Life Care Center of Stoneham dated August 1, 2022.
37. Contract for Medical Services Provided by Organizations (Massachusetts DPH RFR No. 180327) by and between Mobile Xray Diagnostics, LLC and the Massachusetts Department of Public Health / Tewksbury Hospital dated December 16, 2021.
38. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and The Center at Blue Hills LLC dated September 1, 2025.
39. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and The Gardens at Country LLC dated September 1, 2025.
40. Agreement for Diagnostic Imaging Services by and between Mobile Xray Diagnostics, LLC and The Highlands dated August 25, 2022.
41. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and 4499 Acushnet Avenue Operating Company, LLC, d/b/a Vibra Hospital of Southeastern Massachusetts dated November 3, 2020.
42. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Willow Brook Operator LLC, dba Willow Brook Rehabilitation and Healthcare Center dated October 1, 2025.
43. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Armenian Nursing and Rehab Center dated November 1, 2022.
44. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Queen Anne Nursing Home dated June 1, 2022.
45. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and South Cove Manor at Quincy Point dated January 1, 2023.
46. Laboratory Services Agreement by and between American Health NE LLC dba American Health Associates and Brighton House Operator LLC dba Brighton House dated October 24, 2025.
47. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Brighton House Operator LLC dba Brighton House dated October 1, 2025.
48. Laboratory Services Agreement by and between American Health NE LLC dba American Health Associates and Brockton Operator LLC dba Brockton Post Acute Care dated October 24, 2025.
49. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Brockton Operator LLC dba Brockton Post Acute Care dated October 1, 2025.
50. Laboratory Services Agreement by and between American Health NE LLC dba American Health Associates and Highland Park Operator LLC dba Highland Park Rehabilitation and Healthcare Center dated October 24, 2025.

51. Laboratory Services Agreement by and between American Health NE LLC dba American Health Associates and Mill Brook Operator LLC dba Mill Brook Rehabilitation and Healthcare Center dated October 24, 2025.
52. Laboratory Services Agreement by and between American Health NE LLC dba American Health Associates and Willow Brook Operator LLC dba Willow Brook Rehabilitation and Healthcare Center dated October 24, 2025.
53. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Alden Court Nursing Care dated January 1, 2024.
54. Mobile Imaging Services Agreement by and between Mobile Xray Diagnostics, LLC and Southcoast Long Term Care Services Inc. (SLTCS) d/b/a Alden Court Nursing Care dated February 1, 2025.
55. Agreement for Diagnostic Imaging Services by and between Mobile Xray Diagnostics, LLC and Cherry Hill Manor Nursing and Rehabilitation Center dated November 18, 2020.
56. Agreement for Diagnostic Imaging Services by and between Mobile Xray Diagnostics, LLC and Evergreen House Health Center dated November 18, 2020.
57. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Oakland Grove Health Care Center dated June 15, 2020.
58. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Orchard View Manor dated June 15, 2020.
59. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Summit Commons Rehabilitation and Health Care Center dated June 15, 2020.
60. Mobile Diagnostics Services Agreement by and between Mobile Xray Diagnostics, LLC and Waterview Villa Rehabilitation and Health Care Center dated June 15, 2020.

Unable to locate copies of the Customer Contracts:

61. Mobile Diagnostics Services Agreement by and between Blackstone Valley Health and Rehab and Mobile Xray Diagnostics, LLC of uncertain date.
62. Mobile Diagnostics Services Agreement by and between Bringham Health and Rehab Center and Mobile Xray Diagnostics, LLC of uncertain date.
63. Mobile Diagnostics Services Agreement by and between CareOne at Lowell and Mobile Xray Diagnostics, LLC of uncertain date.
64. Mobile Diagnostics Services Agreement by and between CareOne at Millbury and Mobile Xray Diagnostics, LLC of uncertain date.
65. Mobile Diagnostics Services Agreement by and between CareOne at New Bedford and Mobile Xray Diagnostics, LLC of uncertain date.
66. Mobile Diagnostics Services Agreement by and between CareOne at Newton and Mobile Xray Diagnostics, LLC of uncertain date.

67. Mobile Diagnostics Services Agreement by and between CareOne at Randolph and Mobile Xray Diagnostics, LLC of uncertain date.
68. Mobile Diagnostics Services Agreement by and between CareOne at Weymouth and Mobile Xray Diagnostics, LLC of uncertain date.
69. Mobile Diagnostics Services Agreement by and between Clifton Rehab and Nursing and Mobile Xray Diagnostics, LLC of uncertain date.
70. Mobile Diagnostics Services Agreement by and between Copley at Stoughton and Mobile Xray Diagnostics, LLC of uncertain date.
71. Mobile Diagnostics Services Agreement by and between Dyouville Center for Advanced Therapy and Mobile Xray Diagnostics, LLC of uncertain date.
72. Mobile Diagnostics Services Agreement by and between Dyouville Senior Care and Mobile Xray Diagnostics, LLC of uncertain date.
73. Mobile Diagnostics Services Agreement by and between Edgar Benjamin Healthcare Center and Mobile Xray Diagnostics, LLC of uncertain date.
74. Mobile Diagnostics Services Agreement by and between Gardner Rehabilitation and Nursing Center and Mobile Xray Diagnostics, LLC of uncertain date.
75. Mobile Diagnostics Services Agreement by and between Jeffrey and Susan Brudnick Center for Living and Mobile Xray Diagnostics, LLC of uncertain date.
76. Mobile Diagnostics Services Agreement by and between Katzman Family Center for Living and Mobile Xray Diagnostics, LLC of uncertain date.
77. Mobile Diagnostics Services Agreement by and between Lafayette Rehabilitation and Skilled Nursing and Mobile Xray Diagnostics, LLC of uncertain date.
78. Mobile Diagnostics Services Agreement by and between Leonard Florence Center for Living and Mobile Xray Diagnostics, LLC of uncertain date.
79. Mobile Diagnostics Services Agreement by and between New England Community Medical Services and Mobile Xray Diagnostics, LLC of uncertain date.
80. Mobile Diagnostics Services Agreement by and between Shrewsbury Rehab and Nursing and Mobile Xray Diagnostics, LLC of uncertain date.
81. Mobile Diagnostics Services Agreement by and between Southwood at Norwell and Mobile Xray Diagnostics, LLC of uncertain date.
82. Mobile Diagnostics Services Agreement by and between Sunny Acres Nursing and Rehab Center and Mobile Xray Diagnostics, LLC of uncertain date.
83. Mobile Diagnostics Services Agreement by and between The Boston Home and Rehab Center and Mobile Xray Diagnostics, LLC of uncertain date.

**Schedule 4.14 Compliance with Laws**

1. Letter dated January 8, 2026, from The Commonwealth of Massachusetts Office of the Attorney General, Re Massachusetts Wage and hour Laws Advisory / Timely Payment of Wages and Paystubs. See Schedule 4.11 Litigation.

**Schedule 4.15 Permits, Licenses, Authorizations**

1. See Schedule 4.21(c).
2. Florida Department of Health Mobile Medical Facility Radiation Machine Registration. Registration No. JR 54295000. Expires October 28, 2026.
3. Colorado Registration No. 99687. Source Ray SR-130-G and Source Ray SXR-130-G. Expires April 30, 2027.
4. Radiology Registrations issued to Mobile Xray Diagnostics, LLC:
    a. Massachusetts Department of Public Health, Diagnostic Radiography Facility Registration. License Number 11948. Expires December 31, 2026.
    b. State of Rhode Island Department of Health, Certificate of Registration of Specific Radiology Facility (Single), License Number SRF0398. Expires August 31, 2026.
5. Washington State Department of Health (DOH) Certificate of Registration expires August 31, 2026.
6. Michigan Department of Licensing & Regulatory Affairs (LARA) Certificate of Registration 22-038854 expired on July 1, 2025.
7. Ohio Department of Health (ODH) Certificate of Registration 06-M-20965-001 expired on May 31, 2026.

| ENTITY (COMPANY) | State | Modaility | Physical Addresss | EIN (TIN) | NPI | Taxonomy | MAC | PTAN-MCR |
|---|---|---|---|---|---|---|---|---|
| **American Health Imaging MW, LLC** | Michigan | XRAY | 39205 Country Club Drive, Suite C-30, Farmington Hills, MI 48331-5700 | 88-2006889 | 1548907900 | 335V00000X | WPS | MI19552 |
| **American Health Imaging MW, LLC** | Ohio | XRAY | 665 Ohio Pike, Cincinnati OH 45245-2117 | 88-2006889 | 1184360141 | 335V00000X | CGS | H0010524 |
| **American Health Imaging S, LLC** | Florida | XRAY | 15712 SW 41st Ste 16 Davie, FL 33331-1538 | 88-2026995 | 1316685472 | 335V00000X | First Coast | S0110 |
| **American Health W LLC** | Colorado | IDTF | 7001 Tower Rd, Suite A2 Denver, CO 80249-7381 | 88-2728176 | 1386355162 | 293D00000X | Novitas | 6N1785 |
| **American Health W LLC** | Colorado | XRAY | 7001 Tower Rd, Suite A2 Denver, CO 80249-7381 | 88-2728176 | 1598491631 | 335V00000X | Novitas | 7C8430 |
| **American Health W LLC** | Washington | XRAY | 2200 Lind Ave SW Suite 909, Renton, WA 98057-3330 | 88-2728176 | 1740998301 | 335V00000X | Noridian | G9080190 |
| **American Health W LLC** | Washington | IDTF | 2200 Lind Ave SW Suite 909, Renton, WA 98057-3330 | 88-2728176 | 1477261030 | 293D00000X | Noridian | G9081673 |
| **Mobile X-Ray Diagnostic, LLC** | Massachusetts | IDTF | 171 Forbes Blvd Ste 2000 Mansfield, MA 02048 | 84-2331624 | 1245843556 | 293D00000X | NGS | S300732701 |
| **Mobile X-Ray Diagnostic, LLC** | Massachusetts | XRAY | 171 Forbes Blvd Ste 2000 Mansfield, MA 02048 | 84-2331624 | 1245843556 | 335V00000X | NGS | S300789298 |
| **Mobile X-Ray Diagnostic, LLC** | Rhode Island | XRAY | 141 Fairgrounds Road, West Kingston, RI 02892 | 84-2331624 | 1568016723 | 335V00000X | NGS | U300659768 |
| **Mobile X-Ray Diagnostic, LLC** | Rhode Island | IDTF | 141 Fairgrounds Road, West Kingston, RI 02892 | 84-2331624 | 1568016723 | 293D00000X | NGS | U300732146 |

**Schedule 4.16 Equipment and Inventory; Intellectual Property**

1. See Schedule 4.5.
2. See Schedule 7.5.
3. url: https://www.bluehost.com/my-account/login#/. The Bluehost URL is the web hosting account for the MXD website. The website serves as a client-facing site and includes links directing clients to the Rapid Radiology portal.
4. Domains with GoDaddy:
    a. Mxdxray.com
    b. Mobilexraydiagnostics.com

## Schedule 4.5 Asset Listing

| Asset Name | Description | Serial No. | Physical Location | Fair Market Value |
|---|---|---|---|---|
| DR Plate | First Source | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | First Source | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | First Source | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | First Source | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Plate | I-ray plate - MARS1417V-TSI | | | $15,000 |
| DR Stand/Tube | First Source -IQM FLEX MODEL M | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | First Source -IQM FLEX MODEL M | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | First Source -IQM FLEX MODEL M | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | First Source -IQM FLEX MODEL M | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| DR Stand/Tube | SR-130 | | | $25,000 |
| EKG machine | Schiller Tablet EKG - Cardiovit FT-1 | | | $1,800 |
| EKG machine | Schiller Tablet EKG - Cardiovit FT-1 | | | $1,800 |
| EKG machine | Schiller Tablet EKG - Cardiovit FT-1 | | | $1,800 |
| EKG machine | Schiller Tablet EKG - Cardiovit FT-1 | | | $1,800 |
| EKG machine | Schiller Tablet EKG - Cardiovit FT-1 | | | $1,800 |
| EKG machine | Schiller Tablet EKG - Cardiovit FT-1 | | | $1,800 |
| EKG machine | Schiller Tablet EKG - Cardiovit FT-1 | | | $1,800 |
| EKG machine | Schiller Tablet EKG - Cardiovit FT-1 | | | $1,800 |
| EKG machine | Schiller Tablet EKG - Cardiovit FT-1 | | | $1,800 |

| Asset Name | Description | Serial No. | Physical Location | Fair Market Value |
|---|---|---|---|---|
| EKG machine | Schiller Tablet EKG - Cardiovit FT-1 | | | $1,800 |
| Laptop | First Source | | | $2,000 |
| Laptop | Lenovo ThinkPad L14 Gen 4 | | | $2,000 |
| Laptop | Dell Latitude 5400 - DR Laptop | | | $2,000 |
| Laptop | Dell Latitude 5400 - DR Laptop | | | $2,000 |
| Laptop | Lenovo ThinkPad L14 Gen 4 | | | $2,000 |
| Laptop | Dell Latitude 5420 - DR Laptop | | | $2,000 |
| Laptop | Lenovo ThinkPad L14 Gen 4 | | | $2,000 |
| Laptop | Dell Latitude 5400 - DR Laptop | | | $2,000 |
| Laptop | First Source | | | $2,000 |
| Laptop | Dell Latitude 5490- DR Laptop | | | $2,000 |
| Laptop | Dell Latitude 5400 - DR Laptop | | | $2,000 |
| Laptop | Dell Latitude 5400 - DR Laptop | | | $2,000 |
| Laptop | Dell Latitude 5420 - DR Laptop | | | $2,000 |
| Laptop | Dell Latitude 5420 - DR Laptop | | | $2,000 |
| Laptop | Dell Latitude 5420 - DR Laptop | | | $2,000 |
| Laptop | Dell Latitude 5400 - DR Laptop | | | $2,000 |
| Tablet | Microsoft Surface GO | | | $2,000 |
| US Machine | Siemens Acuson P500 | (21) 470235 | Mansfield, MA | $40,000 |
| US Machine | Mindray M8 Elite | CB9-25000819 | Mansfield, MA | $40,000 |
| US Machine | Mindray M8 Elite | CB9-25000806 | Mansfield, MA | $40,000 |

## REPAIR

| | | | | |
|---|---|---|---|---|
| DR Stand/Tube | SR-130 | | | $25,000 |
| Laptop | Dell Latitude 5400 - DR Laptop | | | $2,000 |
| US Machine | Mindray M8 Elite | Not recorded | Mansfield, MA | $40,000 |

## LOCATED AT OTHER SITES - AUGUST 21, 2026 PHOTO INVENTORY

| | | | | |
|---|---|---|---|---|
| US Machine | Siemens Acuson P500 | (21) 470234 | Denver, CO | $40,000 |
| US Machine | Siemens Acuson P500 | (21) 470236 | Denver, CO | $40,000 |
| US Machine | Mindray M8 Elite | CB9-22000771 | Denver, CO | $40,000 |
| US Machine | Mindray M8 Elite | CB9-21000747 | Davie, FL | $40,000 |
| Accessories | Mindray accessories - 4 boxes | N/A | Davie, FL | $8,000 |
| | | | | **$1,137,000** |

**Schedule 4.5 Enterprise Fleet Leased Vehicles**

| No. | Enterprise Vehicle Number | Vehicle Plate Number | Vehicle State | VIN | YEAR | MAKE | MODEL | Fair Market Value at 7/31/2026 | Garaging City, State Zip |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 25S3MR | X11914 | MA | 1FMCU9G66MUA14477 | 2021 | FORD | ESCAPE | $ 12,000.00 | Lakeville, MA 02347 |
| 2 | 25F5TX | W81193 | MA | 1FMCU9G65MUB11234 | 2021 | FORD | ESCAPE | $ 5,000.00 | Lakeville, MA 02347 |
| 3 | 25F5XX | W81194 | MA | 1FMCU9G66MUB10707 | 2021 | FORD | ESCAPE | $ 5,000.00 | Lakeville, MA 02347 |
| 4 | 26GH65 | Y73819 | MA | 1FMCU9F61NUB51409 | 2022 | FORD | ESCAPE | $ 5,000.00 | Lakeville, MA 02347 |
| 5 | 25FB3D | W91338 | MA | 1FMCU9F60NUA84155 | 2022 | FORD | ESCAPE | $ 5,000.00 | Lakeville, MA 02347 |
| 6 | 274FXT | 5FBE22 | MA | 5NMS1DAJXPH574068 | 2023 | HYUNDAI | SANTA FE | $ 8,000.00 | Lakeville, MA 02347 |
| 7 | 28DZ83 | Y34230 | MA | 5N1BT3AB9RC752384 | 2024 | NISSAN | ROGUE | $ 20,000.00 | Lakeville, MA 02347 |
| 8 | 27ZW76 | Y17414 | MA | 5N1BT3AB5RC725389 | 2024 | NISSAN | ROGUE | $ 20,000.00 | Lakeville, MA 02347 |
| 9 | 27ZW84 | Y17415 | MA | 5N1BT3AB3RC721406 | 2024 | NISSAN | ROGUE | $ 20,000.00 | Lakeville, MA 02347 |
| 10 | 274G3J | 5HSM95 | MA | 5NMS1DAJ8PH574070 | 2024 | HYUNDAI | SANTA FE | $ 8,000.00 | Lakeville, MA 02347 |
| 11 | 29CWMN | 4PAD96 | MA | 5N1BT3AB8SC828487 | 2025 | NISSAN | ROGUE | $ 26,000.00 | Lakeville, MA 02347 |
| 12 | 29CWFQ | 4PAD86 | MA | 5N1BT3AB7SC791609 | 2025 | NISSAN | ROGUE | $ 26,000.00 | Lakeville, MA 02347 |
| 13 | 29FKTT | 6RCC83 | MA | JM3KFBAL8S0773269 | 2025 | MAZDA | CX-5 | $ 26,000.00 | Lakeville, MA 02347 |
| 14 | 29FL4R | 6NZN23 | MA | JM3KFBAL6S0773366 | 2025 | MAZDA | CX-5 | $ 26,000.00 | Lakeville, MA 02347 |
| 15 | 29FL4T | 6NZN13 | MA | JM3KFBAL9S0772843 | 2025 | MAZDA | CX-5 | $ 26,000.00 | Lakeville, MA 02347 |
| | | | | | | | **Total** | **$ 238,000.00** | |

**Schedule 4.17 Employees & Independent Contractors**

1. See attached list of Employees & Independent Contractors.

MXD
MOBILE XRAY DIAGNOSTICS
*Where image is everything*

**Schedule 4.17 Employees**

| Employee Name | Position | Status | DOH | Annual Base Salary | Bonus Eligible | Comments | Accrued Vacation 07/31/26 (Hours) | Accrued Vacation 07/31/26 (Dollars) |
|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | $ 54,600 | | First Shift | 36.69 | $ 963.11 |
| | | | | $ 99,840 | | | 0.00 | - |
| | | | | $ 95,680 | stay bonus | | 223.10 | 10,262.60 |
| | | | | $ 95,680 | stay bonus | | 0.00 | - |
| | | | | $ 95,680 | stay bonus | | 153.29 | 7,051.34 |
| | | | | $ 95,680 | stay bonus | | 14.48 | 666.08 |
| | | | | $ 75,000 | | Intermittent PFML 2 days a week | 79.46 | 2,865.14 |
| | | | | $ 99,840 | stay bonus | | 154.60 | 7,420.80 |
| | | | | $ 45,760 | | Second Shift/Remote | 25.56 | 562.32 |
| | | | | $ 95,680 | stay bonus | | 145.29 | 6,683.34 |
| | | | | $ 124,800 | stay bonus | AB, RVT, VT | 68.37 | 4,102.20 |
| | | | | $ 95,680 | stay bonus | | 10.62 | 488.52 |
| | | | | $ 95,680 | sign on bonus | Temp License | 16.00 | 736.00 |
| | | | | | | **Total hours** | **927.46** | **$ 41,801.46** |

**as 08/29/2026

Pertinent Points

[redacted]

Updated as of 8/24/2026

**Schedule 4.21(c) Government Programs**

1. Mobile XRay Diagnostics, LLC approved Independent Diagnostic Testing Facility enrollment in Massachusetts from NGS for NPI 1245843556 and PTAN: S300732701
2. Mobile XRay Diagnostics, LLC approved Portable Xray enrollment in Massachusetts from NGS for NPI 1245843556 and PTAN: S300789298
3. Mobile XRay Diagnostics, LLC approved Portable Xray enrollment in Rhode Island from NGS for NPI 1568016723 and PTAN: U300659768
4. Mobile XRay Diagnostics, LLC approved Independent Diagnostic Testing Facility enrollment in Rhode Island from NGS for NPI 1568016723 and PTAN: U300732146 – Not Active.
5. American Health Imaging MW, LLC approved Portable Xray enrollment in Michigan from WPS for NPI 1548907900 and PTAN: MI19552
6. American Health Imaging MW, LLC approved Independent Diagnostic Testing Facility enrollment in Ohio from CGS for NPI 1124757851 and PTAN: H999720 – Not Active.
7. American Health Imaging MW, LLC approved Portable Xray enrollment in Ohio from CGS for NPI 1184360141 and PTAN: H0010524
8. American Health Imaging S, LLC approved Portable Xray enrollment in Florida from First Coast for NPI 1477299402and PTAN: S0110
9. American Health W, LLC approved Independent Diagnostic Testing Facility enrollment in Colorado from Novitas for NPI 1386355162 and PTAN: 6N1785
10. American Health W, LLC approved Portable Xray enrollment in Colorado from Novitas for NPI 1598491631 and PTAN: 7C8430
11. American Health W, LLC approved Independent Diagnostic Testing Facility enrollment in Washington from Noridian for NPI 1477261030 and PTAN: G9081673
12. American Health W, LLC approved Portable Xray enrollment in Washington from Noridian for NPI 1740998301 and PTAN: G9080190

# Schedule 4.21(d) Healthcare Professionals

1. See Schedule 4.17.

**Schedule 4.21(l) Coronavirus Aid, Relief and Economic Security Act**

1. Mobile Xray Diagnostics, LLC received a Paycheck Protection Program loan disbursement in the principal amount of $89,460 pursuant to the CARES Act. The loan was forgiven in its entirety.
    - Borrower: Mobile Xray Diagnostics, LLC
    - Lender of Record: Eastern Bank
    - SBA Loan No.: 9069508509
    - Loan Approval Date: 03/12/2021
    - Loan Disbursement Amount: $ 89,460.00
    - Amount of Forgiveness Requested by Lender: $ 89,460.00
    - Forgiveness Amount Remitted: $ 89,460.00 in principal and $ 474.63 in interest
    - Forgiveness Payment Date: 09/23/2021

**Schedule 6.5 Three (3) Year Tail Policy Endorsement & Proof of Payment**

See attached.

## Schedule 7.5 Purchase Price Allocation

| | |
|---|---|
| Automobiles | $ 238,000 |
| Fixed Assets | $1,137,000 |
| License – FL | $ 200,000 |
| License – CO | $ 200,000 |
| License – WA | $ 200,000 |
| License – MI | $ 200,000 |
| License – OH | $ 200,000 |
| | **$2,375,000** |

# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In re:

American Health Associates Holdings, Inc., *et al.*,[1] Case No. 26-14825-SMG

Debtors. Chapter 11

______________________________________/

**PROPOSED ORDER APPROVING SALE OF DEBTORS' IMAGING BUSINESS**
**FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

**THIS MATTER** came before the Court for hearing on August __, 2026, upon the *Expedited Motion for Order Approving the Private Sale of the Debtors' Imaging Business Free and Clear of Liens, Claims, Encumbrances, and Interests* (the "Motion")[2] [ECF No. XX] filed by the Debtors.

[1] The Debtors in these jointly administered cases are: (1) American Health Associates Holdings, Inc.; (2) American Health Associates Parent, LLC; (3) American Health Holdings, LLC; (4) American Health Holdings II, LLC; (5) American Health Holdings III, LLC; (6) American Health Holdings IV, LLC; (7) American Health MW, LLC; (8) American Health Imaging MW, LLC; (9) American Health S, LLC; (10) American Health Imaging S, LLC; (11) American Health W, LLC; (12) American Health NE, LLC; and (13) Mobile Xray Diagnostic, LLC.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the PSA, as applicable.

For the reasons states on the record, and being otherwise fully advised in the premises, the it is FOUND AND DETERMINED:

A. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.[3]

B. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought in the Motion is 11 U.S.C. §§ 363.

C. Due and adequate notice of the Motion and of the relief requested therein has been given in accordance with the provisions of 11 U.S.C. §§ 102(1) and 363, and Bankruptcy Rules 2002 and 6004. No other or further notice of the Motion is or shall be required.

D. The Membership Interest Purchase Agreement (the "MIPA") between American Health Imaging MW, LLC, American Health Imaging S, LLC, Mobile Xray Diagnostics, LLC, American Health W, LLC, American Health Holdings, LLC, American Health Holdings II, LLC, American Health Holdings III, LLC, and American Health Holdings IV, LLC (the "Seller Debtors") and All-Stat Portable, LLC ( "Buyer"), a copy of which is attached to the Motion as Exhibit 1, is valid and enforceable and was the result of arm's-length, good faith negotiation between the Seller Debtors and Buyer. The MIPA and the documents contemplated thereby, the "Sale Documents."

E. The sale and transactions contemplated by the Sale Documents are undertaken by Buyer in good faith, as that term is used in 11 U.S.C. § 363(m), and accordingly, the reversal or

[3] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

modification on appeal of the authorization provided herein to consummate the sale and transactions shall not affect the validity of the sale of the Membership Interests to Buyer, unless such authorization is duly stayed pending such appeal. Buyer is a purchaser in good faith of the Membership Interests and is entitled to all of the protections afforded by 11 U.S.C. § 363(m).

F. Buyer entered into the proposed sale without collusion, in good faith, and from an arm's length bargaining position, and has not violated 11 U.S.C. § 363(n) by any action or inaction, and the MIPA does not violate the provisions of 11 U.S.C. § 363(n). The Seller Debtors and Buyer have not engaged in any conduct that would cause or permit the MIPA to be avoided under 11 U.S.C. § 363(n).

G. The Seller Debtors have, to the extent necessary or applicable, (a) the full corporate power and authority to execute and deliver the Sale Documents and all other documents contemplated thereby; (b) all corporate authority necessary to consummate the transaction contemplated by the Sale Documents; and (c) taken all corporate action necessary to authorize and approve the Sale Documents and the consummation of the transactions contemplated thereby. The sale has been duly and validly authorized by all necessary corporate action. No consents or approvals, other than those expressly provided for in the Sale Documents, are required for the Seller Debtors to consummate the sale, the Sale Documents, or the transactions contemplated thereby.

H. The Buyer is neither a successor nor a continuation of the Debtors.

I. The Buyer is unrelated to the Debtors, including the Debtors' past and present principals and owners.

J. There is a sound business justification for the sale and transactions described in the Sale Documents.

K. The disclosures made by the Debtors concerning the Motion, the Sale Documents, and the Sale were good, complete, and adequate.

L. The Purchase Price is fair and reasonable.

M. No holder of any liens, claims, interests, or encumbrances on the Membership Interests objected to the Motion, and therefore, all holders of liens, claims, interests, or encumbrances on the Membership Interests consented to the sale of the Membership Interests free and clear of all interests, liens, claims, and encumbrances under 11 U.S.C. § 363(f)(2).

N. The aggregate value of the Membership Interests is no greater than the Purchase Price, and therefore, pursuant to 11 U.S.C. § 506(a)(1), the aggregate value of all interests, liens, claims, and encumbrances on the Membership Interests is less than the Purchase Price.

Accordingly, for the foregoing reasons, and being otherwise fully advised in the premises, it is **ORDERED** and **ADJUDGED** that:

1. The Motion [ECF No. XXX] is **GRANTED**.

2. The Seller Debtors are authorized to enter into the MIPA.

3. The Sale Documents are valid and enforceable and are approved—together with the transactions contemplated therein—in their entirety, and the Seller Debtors and Buyer are authorized to close on the PSA and undertake all necessary actions and transactions to do so (the closing of the MIPA being the "Closing"). For the avoidance of doubt, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Seller Debtors to transfer the Membership Interests to the Buyer in accordance with the Sale Documents.

4. The Sale Documents and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court.

5. Except as set forth in the MIPA, the sale of the Membership Interests, as defined in the MIPA, is approved on an as-is where-is basis, free and clear of any and all interests, claims, liens, and encumbrances thereon pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(f), 365(b), and 365(f), including without limitation, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, and other liens (including mechanics', materialman's, and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise.

6. All claims, liens, interests, and encumbrances on the Membership Interests sold pursuant to the MIPA shall attach to the proceeds of the sale with the same priority, validity, and effect as they now have in and on such assets, subject to the rights, claims, defenses, and objections of the Debtors, their estates, and all interested parties.

7. The sale of the Membership Interests shall be free and clear of any claims of

derivative, vicarious, or successor liability of any kind, nature, or character whatsoever, by reason of any theory of law or equity. Buyer, as the result of any action taken in connection with the purchase of the Membership Interests, shall not be deemed to (a) be the successor of the Debtors; (b) have, *de facto* or otherwise, merged with or into the Debtosr; (c) be a mere continuation or a substantial continuation of the Debtors or for payment of any benefit(s) accruing to the Debtors; (d) be a successor in interest to the Debtors under any theory of successor liability for employee-related claims against the Debtors and/or its principals brought under the Fair Labor Standards Act; or (e) be a successor of or to the Debtors for any other type of claims, interests or causes of action against the Debtors or the Membership Interests of any kind whatsoever.

8. Buyer shall have no obligation to pay any liabilities or obligations of the Debtors of any kind except as expressly provided in the MIPA.

9. If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing interests in the Membership Interests shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all interests which the person or entity has with respect to the Membership Interests, then (a) the Debtors are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Membership Interests, and (b) Buyer is authorized to file, register, or otherwise record a certified copy of this Order which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all interests in the Membership Interests of any kind or nature whatsoever.

10. This Order shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of

deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of federal, state, county, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments that reflect that Buyer is the assignee and owner of the Membership Interests free and clear of all interests or claims, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers"). All Recording Officers are authorized and specifically directed to strike recorded encumbrances, claims, liens, and other interests against the Membership Interests recorded prior to the date of this Order. Further, all Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the MIPA and related agreements.

11. Subject to the Debtor's satisfaction of its obligations under this Order and solely to the extent set forth herein, any interest holders that did not object, or that withdrew their objections, to the Motion or the MIPA, are deemed to have consented to the sale of the Membership Interests free and clear of their respective interests on the Property pursuant to section 363(f)(2) of the Bankruptcy Code.

12. Prior to the Closing of the sale of the Membership Interests, each of the Debtors' creditors is authorized to execute such documents and take all other actions as may be necessary to release effective as of the Closing its interests in the Membership Interests, if any, as such interests may have been recorded or may otherwise exist.

13. The Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order, the MIPA, all amendments and modifications thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all

respects, including, but not limited to, retaining jurisdiction to: a) subject to the terms and conditions of the MIPA and this Order, compel delivery of the Membership Interests to Buyer; b) compel delivery of the Purchase Price by Buyer or performance of other obligations of Buyer contained in the MIPA; c) resolve any disputes arising under or related to the MIPA, except as otherwise provided therein; and d) interpret, implement, and enforce the provisions of this Order.

14. Within two business days of Closing, the Debtors shall file a notice of the occurrence of Closing.

15. Except as set forth in the MIPA, all persons and entities, including Debtors, employees, former employees, all debt holders, equity holders, administrative agencies, governmental units, tax and regulatory authorities, secretaries of state, federal, state, and local officials, lenders, contract parties, bidders, lessors, and other parties in possession of any of the Membership Interests at any time, trade creditors, and all other creditors holding or asserting liens, claims, or interests of any kind or nature whatsoever against or in the Membership Interests (whether known or unknown as of the Closing Date, now existing or hereafter arising, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, whether imposed by agreement, understanding, law, equity, or otherwise), shall be and hereby are forever barred, estopped, and permanently enjoined from asserting, prosecuting, commencing, continuing, or otherwise pursuing in any manner any action, claim, or other proceeding of any kind, directly or indirectly, against Buyer or any of its affiliates, predecessors, successors, or assigns or any of their respective current and former members, managers, officers, directors, managed funds, investment advisors, attorneys, employees, partners, principals, affiliates, shareholders (or equivalent), financial advisors, and representatives (each of the foregoing in its individual capacity), their property, or the Membership Interests in respect of liens, claims, or encumbrances

that arise under or out of, in connection with, or in any way relate to, the Membership Interests or the transfer of the Membership Interests to Buyer other than to enforce the terms of this Order.

16. Notwithstanding Bankruptcy Rule 6004, this Order shall be effective and enforceable immediately upon entry, and the 14-day stay provided for under the Bankruptcy Rules is waived.

###

Submitted by:

Bradley S. Shraiberg
Shraiberg Page P.A.
Attorneys for the Trustee
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
bss@slp.law

Bradley S. Shraiberg is directed to immediately serve a conformed copy of this Order and to file a Certificate of Service evidencing same.